UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

MAY 1 4 2026

BY ARTHUR JOHNSTON DEPUTY

------------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, in its capacity as conservator of
Jackson Area Federal Credit Union,

                Plaintiff,

                  v.

LEIGH BRIDGES and CHAD BRIDGES,

                Defendants.

Civil Action No.: 3:26-cv-343-DPJ-RPM

------------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AGAINST DEFENDANTS AND FOR PRELIMINARY ATTACHMENT OF DEFENDANTS' ACCOUNTS AND ASSETS

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of
JACKSON AREA FEDERAL CREDIT UNION

Plaintiff, the National Credit Union Administration Board ("NCUAB"), acting in its capacity as conservator of Jackson Area Federal Credit Union, submits the following memorandum of law in support of its motion for a temporary restraining order ("TRO") against Defendants Leigh Bridges and Chad Bridges (collectively "Defendants") and for the preliminary attachment of Defendants' accounts and assets.

## BACKGROUND

### A. The dire need for injunctive relief.

This emergency motion is necessitated by what appears to be at least a **$95 million dollar** deficit in the financials of Jackson Area Federal Credit Union ("JAFCU"). *See* Meyer decl. ¶ 8. On April 17, 2026, in a meeting which included two JAFCU board members and two National Credit Union Administration ("NCUA") examiners, Leigh Bridges admitted to misappropriating JAFCU funds for her own personal benefit and to using false entries on the financials of JAFCU to conceal such misappropriation. *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶¶ 7-10; Meyer decl. ¶ 7; O'Quinn decl. ¶¶ 8-10. Leigh Bridges was the president and CEO, and previously the CFO, of JAFCU, and was responsible for preparing and signing the financial statements that JAFCU submitted to the NCUA. *See* Hill decl. ¶ 5; Meyer decl. ¶ 5. Leigh Bridges concealed the fact that funds were missing from JAFCU by overstating on JAFCU's general ledger the amounts listed as on deposit with, or pending from, Corporate America Credit Union, a corporate credit union with which JAFCU conducted business. *See* Corp. decl. ¶ 4; Hill decl. ¶¶ 5-10; Meyr decl. ¶ 7; O'Quinn decl. ¶ 8.

The NCUAB's analysis of JAFCU records shows that false deposit entries were entered in the share accounts of Leigh and Chad Bridges. *See* Meyer decl. ¶¶ 10-11; *see also* O'Quinn decl. ¶ 8. Those false deposits were manually entered under the transaction code "SDIT," which

signifies a share deposit, and contains a description with the preface "EFT," which stands for electronic funds transfer. *See* Meyer decl. ¶ 11. Those entries were false in that no funds were being transferred from an external source, but rather the funds were being transferred from the general ledger of JAFCU to the share accounts of Leigh and Chad Bridges. *See id.* The false "EFT" transactions listed financial institutions such as Acorns Investing, JP Morgan Chase Bank, and Raymond James financial as their sources. *See* Stanislao decl. ¶ 13; *see also* O'Quinn decl. ¶ 10. Aggregating those transactions from the information for the share accounts of Leigh and Chad Bridges shows over **$51 million dollars in false entries** from the year 2015 until the present. *See id.*

Although Leigh Bridges did not know how much she had misappropriated from JAFCU, she did admit to using JAFCU funds to make extensive personal purchases.[1] *See* Baylor decl. ¶¶ 8-9; Meyer decl. ¶¶ 14-15; O'Quinn decl. ¶ 8. Records from a corporate credit union with which JAFCU does business show that she used over **$22 million to pay credit card bills and to make lavish purchases**, including improvements to real estate, multiple luxury vehicles, jewelry, and expensive handbags, among other expenditures. *See* Corp. decl. ¶ 10; O'Quinn decl. ¶ 8. JAFCU records show that many of these transactions were run through two JAFCU share accounts of her husband, Chad Bridges, and that over one million dollars is currently in his accounts. *See* Stanislao decl. ¶¶ 3, 10-11. JAFCU records show that payroll amounts deposited into Chad Bridges' JAFCU share accounts over the last seven years were only approximately $56,719.30 per year after payroll deductions for him and approximately $100,805.35 per year after payroll deductions for Leigh Bridges. *See* Stanislao decl. ¶ 14. Those amounts are

---

[1] The NCUAB has engaged a forensic auditor to investigate and determine the extent of JAFCU's losses as a result of Leigh Bridges' misappropriation. *See* Meyer decl. ¶ 13.

insufficient to fund the amounts presently in Chad Bridges' share accounts with JAFCU, let alone to provide the financial means to pay for the purchases identified above.

In light of vastly insufficient means to fund their extravagant lifestyle, Leigh Bridges' admission to misappropriating funds and concealing that fact, and the NCUAB's analysis showing at least $51 million in deposits to the Bridges' accounts from the JAFCU general ledger, a TRO and a preliminary attachment of all of the assets and accounts of both Defendants is necessary to avoid further losses to JAFCU and the National Credit Union Share Insurance Fund ("NCUSIF"), which protects member share accounts up to $250,000 and will bear the burden of any unmitigated losses to JAFCU.[2]

Leigh Bridges stated that **millions of dollars** of the misappropriated funds are in personal accounts outside of JAFCU. *See* O'Quinn decl. ¶¶ 8, 10. Leigh and Chad Briges possess multiple properties, including a beachfront condominium, as well as luxury vehicles, ornate furnishings, and copious amounts of high-end handbags and jewelry. *See id.* ¶ 8; Stanislao decl. ¶¶ 4-8. Shipments of luxury items addressed to Leigh Bridges have continued to arrive at JAFCU's main office since the NCUAB conserved the credit union. *See* Meyer decl. ¶¶ 14, 16. Because the millions of dollars in accounts and millions of dollars of property are held in a constructive trust for the benefit of JAFCU, but may be easily transferred or dissipated, the NCUAB is requesting a TRO enjoining Defendants from transferring property and a preliminary attachment of assets within the jurisdiction of this Court for the entire 14 days permitted by Fed. R. Civ. P. 65(b)(2). Consistent with Fed. R. Civ. P. 65(b)(1), the NCUAB asks that the order enter without immediate notice to the Defendants. The NCUAB will use the time to notify

---

[2] The NCUSIF has guaranteed a $110 million line of credit to JAFCU. *See* Meyer decl. ¶ 9. If JAFCU is unable to pay its liabilities, the NCUSIF will ultimately be responsible for the loss. *Id.*

the institutions where Defendants are believed to have funds that will be subject to the preliminary attachment and to obtain assurances that such funds will not be transferred. Without injunctive relief, the consequences to federally-insured credit unions nationwide, and JAFCU members and creditors residing in Mississippi, could be even more drastic than they are already.

### B. The National Credit Union Administration.

The NCUA is an independent federal agency which is managed by the NCUAB. 12 U.S.C. §1752a(a). The NCUA operates under the Federal Credit Union Act ("FCUA"), 12 U.S.C. 1751 *et seq.*, as amended through P.L. 116-260, enacted December 27, 2020. NCUA's responsibilities include "chartering and regulating federal credit unions, regulating federally insured state-chartered credit unions, and administering the Share Insurance Fund [NCUSIF]. . . ." *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, 833 F.3d 1125, 1128-29 (9th Cir. 2016) (citing 12 U.S.C. §§ 1754, 1781, 1783, 1784). The NCUSIF protects credit union members' share accounts up to $250,000 in the event of credit union insolvency. *See* 12 U.S.C. §§ 1787(d)(1), (k)(1)(A), (k)(3).

The NCUA is the regulator of JAFCU because JAFCU is a federally-charted credit union. Due to the instability caused by Leigh Bridges' misconduct, the NCUAB conserved JAFCU on May 6, 2026, and appointed itself as conservator. *See* Ex. A, 5/6/26 NCUAB Or.; *see also* Meyer decl. ¶ 6. As conservator, the NCUAB steps into the shoes of the credit union and succeeds to "all rights, titles, powers, and privileges of the credit union . . . ." 12 U.S.C. § 1787(b)(2)(A)(i). The conservatorship order thus places the NCUAB in charge of JAFCU.

The NCUAB has the responsibility to place a troubled credit union into conservatorship in order "to conserve the assets of any insured credit union or to protect the [NCUSIF.]" 12 U.S.C. § 1786(h)(1). If a federal agency such as NCUA "acts as a conservator, its mission is

rehabilitation[.]" *Collins v. Yellen*, 594 U.S. 220, 238 (2021). Accordingly, as conservator of JAFCU, the NCUAB will take actions "necessary to put the credit union in a sound and solvent condition; and appropriate to carry on the business of the credit union and preserve and conserve the assets and property of the credit union." 12 U.S.C. § 1787(b)(2)(D).

One action that NCUAB may take as conservator is filing lawsuits to recover credit union funds. "In both its capacity as conservator and as liquidation agent, the NCUA is empowered to bring suit on behalf of the credit union and use any money recovered through litigation to replenish the [NCUSIF]." *NCUAB. v. Barclays Cap. Inc.*, 785 F.3d 387, 389 (10th Cir. 2015). Consistent with that authority, and in the interest of preserving JAFCU and the NCUSIF, the NCUAB has brought a lawsuit against Defendants, *see* Compl., and the present motion for a TRO and preliminary attachment under the relevant provisions of the FCUA.

## APPLICABLE LEGAL STANDARDS

The FCUA permits the NCUAB, when acting as conservator or liquidating agent, to request "an order placing the assets of any person . . . under the control of the court and appointing a trustee to hold such assets." 12 U.S.C. § 1787(b)(2)(G); *see Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) ("[A]n asset freeze by preliminary injunction is an appropriate method to assure the meaningful, final equitable relief sought."). The relevant section, 12 U.S.C. § 1787(b)(2)(G), which is entitled "Attachment of assets and other injunctive relief," allows a court to enjoin persons from dissipating assets potentially connected to their wrongdoing against a credit union. *See FDIC. v. Faulkner*, 991 F.2d 262, 264 n.3 (5th Cir. 1993) (citing 12 U.S.C. § 1821(d)(18)) (FDIC as Receiver may seek an injunction "[t]o prevent the dissipation of assets fraudulently obtained from federally insured financial institutions[.]"); *NCUAB v. True Yang Vangh*, No. 15-SM-0082, 2015 WL 13767043, at *2 (D. Minn. Oct. 16,

2015) (entering TRO enjoining defendants from "dissipat[ing], remov[ing], or encumber[ing] assets that they stole from the credit union.").[3] This section also permits a court to attach assets in order to protect a potential judgment against the person committing the wrongdoing. *See Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1517 (D.C. Cir. 1993) ("Section 1821(d)(18) allows the RTC to attach the assets of any person."); *In re Colonial Realty Co.*, 980 F.2d 125, 128 n.2 (2d Cir. 1992) ("Section 1821(d)(18) empowers the FDIC-receiver to obtain attachment of assets and other injunctive relief pursuant to the relaxed standards set forth in § 1821(d)(19)."); *NCUAB v. Zovko*, No. 1:13 CV 1430, 2014 WL 12889793, at *5 (N.D. Ohio Mar. 31, 2014) (entering order under § 1787(b)(2)(G) attaching defendants' real property).

"TROs serve to maintain the status quo until the court can hold a hearing on a preliminary injunction." *Mississippi Ass'n of Educators v. Bd. of Trs. of State Institutions of Higher Learning*, No. 3:25-CV-00417-HTW-LGI, 2025 WL 2142676, at *1 (S.D. Miss. July 20, 2025) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974)). Relatedly, an attachment of assets is "intended to preserve . . . [the property] from waste or dilapidation, and to keep it within control of the court until the rights of the parties concerned can be adjudicated by a final decree" through the imposition of a lien on a defendant's property. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 250 (3d Cir. 2022) (quoting *Forgay v. Conrad*, 47 U.S. 201, 204-05 (1848)). The preservation of assets through these means is particularly important where the recoveries will serve the public interest, as they will here. *See FDIC. v. Cafritz*, 762 F. Supp. 1503, 1509 (D.D.C. 1991) ("[T]he

---

[3] The relevant sections of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1821(d)(18, (19), are materially the same as 12 U.S.C. §§ 1787(b)(2)(G), (H). *See FDIC v. RBS Sec. Inc.*, 798 F.3d 244, 250 n.8 (5th Cir. 2015) (relying on FCUA precedent in FDIC litigation because the extender statutes in both the FDIA and the FCUA were "for all intents and purposes identical").

statute[s] . . . giv[ing] regulators power 'to enjoin the dissipation of assets wrongfully obtained'

. . . evidences Congress' seriousness of purpose in protecting taxpayers' interests.").

In response to NCUAB's request for a TRO or an attachment, "a court . . . may . . . issue

an order in accordance with Rule 65 of the Federal Rules of Civil Procedure[.]" 12 U.S.C.

§ 1787(b)(2)(G). "Federal Rule of Civil Procedure 64, which is the standard avenue for parties

seeking attachment of property, does not apply when the NCUAB invokes its powers under

§ 1787(b)(2)(G)." *Zovko*, 2014 WL 12889793, at *2; *see Faulkner*, 991 F.2d at 265 ("[T]he

preliminary injunction provisions of [12 U.S.C. § 1821(d)(18)] . . . do[] not make a distinction

between [legal relief and equitable relief] for the purpose of issuing an asset freeze."); *see also*

*Dixon*, 835 F.2d at 560 ("[Even though] an injunction to secure future payment of possible

money damages would be in the nature of a 'prejudgment attachment" subject to Federal Rule of

Civil Procedure 64 . . . . case law does allow a district court to exercise its equitable powers in

ordering a preliminary injunction to secure an equitable remedy such as restitution."). Therefore,

Fed. R. Civ. P. 65 governs NCUAB's request for both a TRO and for a preliminary attachment.

To establish the basis for relief under Fed. R. Civ. P. 65, a movant must generally

"establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of

irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is

denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of

an injunction will not disserve the public interest." *Mississippi Ass'n of Educators*, 2025 WL

2142676, at *1 (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)). The Fifth Circuit

espouses a "sliding scale" approach such that a greater showing on a particular factor allows for

a lesser showing on the other three factors. *See TitleMax of Texas, Inc v. City of Dallas*,

142 F.4th 322, 328 (5th Cir. 2025). A TRO is different from other injunctive relief, however, in

that "the TRO requires only a showing of immediate need for temporary relief," a lesser showing than what is required following a hearing on a preliminary injunction. *Mississippi Ass'n of Educators*, 2025 WL 2142676, at *1.

Moreover, the "FCUA loosens some of the requirements of Rule 65 where the NCUAB seeks to attach assets [or requests an injunction] under § 1787(b)(2)(G)." *Zovko*, 2014 WL 12889793, at *3. Specifically, Congress relieved the NCUAB of the need to show irreparable injury. *See* 12 U.S.C. § 1787(b)(2)(H)(i) ("Rule 65 of the Federal Rules of Civil Procedure shall apply . . . without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate."); *NCUAB v. Johnson*, 133 F.3d 1097, 1101 (8th Cir. 1998) ("Where the NCUAB moves for a preliminary injunction, Congress has expressly removed the requirement that the movant show that irreparable harm will result without the injunction."); *see Faulkner*, 991 F.2d at 264 n.3 ("To prevent the dissipation of assets fraudulently obtained from federally insured financial institutions, [12 U.S.C. § 1821(d)(19)] altered the showing the FDIC must make to obtain a preliminary injunction."). "Congress . . . grant[ed] . . . relief from the more rigorous requirements of Rule 65 because the [federal financial regulators] are [ultimately] in the position of protecting . . . the taxpayers' money." *Faulkner*, 991 F.2d at 265 (citing 136 Cong. Rec. E3686 (daily ed. Nov. 2, 1990)).

## LEGAL ISSUES PRESENTED

(1)     Whether a TRO enjoining Defendants from transferring or dissipating assets, and a preliminary attachment of Defendants' accounts and assets, is supported under the traditional four-fact test for injunctive relief, recognizing that the less-stringent standard for a TRO and that the NCUAB need not show irreparable harm, that without a temporary restraining order and preliminary attachment of assets, the NCUAB's ability to collect on a judgment in this lawsuit

and the likely constructive trust in favor of NCUAB will likely be compromised, and that an order is necessary to mitigate the realistic possibility of dissipation of accounts and assets;

(2)     Whether, as a United States agency, the NCUAB must post a bond in connection with the entry of any TRO; and

(3)     Whether the TRO and preliminary attachment may enter without immediate notice to Defendants, given that Leigh Bridges concealed the misappropriation of millions of dollars of JAFCU funds, and given that Defendants possess millions of dollars in funds in various accounts, have easily transferable, high-dollar items, such as jewelry and handbags, and that they have been involved in fraudulent transfers.

**ARGUMENT**

**I.     The NCUAB is Likely to Succeed on the Merits of Its Claims Against Defendants.**

Analysis of the likelihood of success on the merits is conducted by reference to the "standards provided by the substantive law" applicable to the causes of action identified in the complaint. *TitleMax*, 142 F.4th at 329. "To show a likelihood of success, plaintiffs must present a prima facie case[.]" *Id.* Even "some likelihood of success on the merits will justify temporary injunctive relief[]" if the movant has made a strong showing on the other factors. *Productos Carnic, S.A. v. Cent. Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

The NCUAB's complaint, filed contemporaneously with this motion, sets forth eight causes of action exclusive of its count for injunctive relief. *See* Compl. Importantly, the NCUAB is likely to establish liability on multiple causes of action, as Leigh Bridges has admitted to misappropriation and its concealment. *See True Yang Vangh*, 2015 WL 13767043, at *2 (finding likelihood of success on the merits was met for TRO request when NCUAB "submitted evidence that defendants fabricated $1.8 million in loans and converted the proceeds

to their own use"); *see also Harris v. Upwintrade.com*, No. 1:24-CV-00313, 2024 WL 4920599, at \*4 (E.D. Tex. Sept. 5, 2024) (finding TRO justified in light of the obvious fraud committed).

### A. *Leigh Bridges misappropriated significant funds from JAFCU and concealed that activity from JAFCU.*

Leigh Bridges became the president and CEO of JAFCU in 2021 after having served as JAFCU's CFO. *See* Meyer decl ¶ 5. In her position as president and CEO, she was responsible for preparing and signing JAFCU's financial statements. *See* Hill decl. ¶ 5. Leigh Bridges abused her position in that she improperly used JAFCU funds to make expenditures for the benefit of her and her husband. Specifically, on April 17, 2026, in a meeting with JAFCU board members and two NCUA examiners, Leigh Bridges admitted to misappropriating JAFCU funds for her own personal benefit. *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶ 10; O'Quinn ¶¶ 8-10. She also admitted to concealing the fact that funds were missing from JAFCU by overstating the amount on JAFCU's general ledger on deposit with a corporate credit union with which JAFCU does business and through altering ACH entries on JAFCU's ledger to conceal the true purpose of those entries. *See* Hill decl. ¶¶ 6-9; O'Quinn decl. ¶ 8. To further the concealment, Leigh Bridges told the JAFCU board that JAFCU was well capitalized and doing well. *See* Hill decl. ¶ 5. Leigh Bridges also admitted to using JAFCU funds to make extensive person purchases, including expensive jewelry and handbags, and to transferring JAFCU funds into personal accounts, including accounts with American Express, Acorns Investing, and JP Morgan Chase Bank. *See* Baylor decl. ¶ 8; O'Quinn decl. ¶¶ 8, 10.

One instance in which Leigh Bridges deliberately concealed the transfer of funds is through an April 29, 2024 wire transfer. Leigh Bridges caused a wire transfer in the amount of $378,780 to be initiated from JAFCU to Tiffany & Co in New York, New York. *See* Ex. B, Wire sheet; Corp. decl. ¶ 6. Rather than Tiffany & Co, the instructions on the wire transfer sheet

list the beneficiary as Raymond James with an address of 880 Carillon Parkway, St. Petersburg, Florida. *See* Ex. B, Wire sheet; Corp. decl. ¶ 6. That same wire transfer sheet lists "Bridges, Chad & Leigh" under the section "Other Information." *See* Ex. B, Wire sheet. The typing that is visible under the sections "Beneficiary Name," "Address," and "Other information" appears to have been typed over the original text written on the wire transfer sheet. *See id.* The obvious manipulation suggests that the sheet was altered to conceal the true beneficiary.

The NCUAB's analysis of JAFCU records shows additional concealment. False deposit entries were made in the share accounts of Leigh and Chad Bridges. *See* Meyer decl. ¶ 11. Those false deposits were manually entered under the transaction code "SDIT," which signifies a share deposit, and contained descriptions with the preface "EFT," which stands for electronic funds transfer. *See* Meyer decl. ¶ 11. Those entries were false in that no funds were being transferred from an external source, but rather the funds were being transferred from the general ledger of JAFCU to the share accounts of Leigh and Chad Bridges. *See id.* The false transactions listed financial institutions such as Acorns Investing, JP Morgan Chase Bank, and Raymond James financial as their sources. *See* Stanislao decl. ¶ 13; *see also* O'Quinn decl. ¶ 10. Aggregating those transactions from the information for the share accounts of Leigh and Chad Bridges shows over $51 million dollars in entries from the year 2015 until the present. *See id.* As of April 17, 2026, the total difference between the stated financials of JAFCU and the actual financials was a deficit of at least $95 million. *See* Meyer decl. ¶ 8.

Although NCUAB has not yet been able to account for the totality of the missing funds, or how such funds were utilized, Corporate America Credit Union, JAFCU's corporate credit union, brought to the NCUA's attention millions of dollars of transactions running through JAFCU for the benefit of the Defendants. A corporate credit union is a financial institution

servicing member credit unions as their financial institution, *i.e.*, "a credit union's credit union." *See* Corp. decl. ¶ 3. The services that corporate credit unions typically provide to member credit unions include taking deposits, processing ACH transactions, and processing domestic and international wire transactions, among other services. *See id.* Corporate America Credit Union had access to that information because it processed wire transfers and ACH transfers and provided other services for JAFCU. *See id.* ¶ 4.

According to the corporate credit union's records, ACH transactions from January 1, 2025 through March 31, 2026, wire transfers from January 2021 through March 31, 2026, and check transactions from March 2019 through March 31, 2026, all show outgoing transfers from JAFCU of at least $22,453,999.67 for the benefit of Defendants. *See* Corp. decl. ¶¶ 7-10. As set forth fully in the declaration of the corporate credit union doing business with JAFCU, Leigh Bridges made or caused to be made the transfer of $15,052,890.45 of JAFCU funds to pay her personal credit card bills with Apple Card, Chase Bank, and American Express. *See id.* ¶ 8. The transactions conducted through JAFCU include but are not limited to, $3,315,085.36 in purchases at Brooks Collection, a luxury jewelry and handbag store in Jackson, Mississippi, $378,780 to Tiffany & Co in New York, New York, $127,870.75 to purchase two vehicles from Mercedes-Benz Porsche of Jackson, Mississippi, $273,400 into her personal account with Coinbase Global, Inc., and $129,300 in order to purchase a Steinway piano.. *See id.* ¶¶ 7, 9.

Between May 1, 2019 and May 4, 2026, funds coming into Chad Bridges' share accounts at JAFCU from his salary after deductions totaled $397,035.13 (approximately $56,719.30 per year). *See* Stanislao decl. ¶ 14. During that same period, funds coming into Chad Bridge's share accounts at JAFCU from Leigh Bridges' salary after payroll deductions totaled $705,637.40

(approximately $100,805.35 per year). *See id.* The purchases described above were therefore grossly inconsistent with Defendants' financial means to afford such purchases.[4]

In light of Defendants' insufficient means to afford the extravagant expenditures identified above, Leigh Bridges' admission to misappropriating an indefinite amount of funds from JAFCU, the NCUAB's analysis showing at least $51 million in deposits to the Bridges' accounts from the JAFCU general ledger, and the intermingling of substantial amounts of misappropriated funds with a modest amount of potentially legitimate funds, the expenditures must be presumed to have been made using funds rightfully belonging to JAFCU. Consequently, the NCUAB will likely prevail on several causes of action against Leigh Bridges, including claims of conversion, breach of fiduciary duty, fraudulent misrepresentation, and the federal credit union director and officer liability statute.

**B. Leigh Bridges' misappropriation establishes that the NCUAB will likely prevail on its claims against her under federal law and under Mississippi tort law.**

The NCUAB will likely prevail on its claims under Mississippi tort law, including its conversion claim. To establish the intentional tort of conversion, a plaintiff must show "a wrongful possession with intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 426 (S.D. Miss. 2015), *aff'd*, 886 F.3d 507 (5th Cir. 2018) (quoting *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So.2d 767, 773-74 (Miss. 2004).

---

[4] Perhaps due to Leigh Bridges manipulation of credit union data, the exact amount of their salaries is not known. *Compare* Meyer decl. ¶ 5 *with* Stanislao ¶ 14 *and* Corp. decl. ¶ 10. What appears to be true is that Chad Bridges is a state employee, *see* Stanislao ¶ 3, and that Leigh Bridges pre-tax salary was at most $216,564.70 per year, *see* Meyer decl. ¶ 5. Defendants' employment thus could not have supported the vast majority of their expenditures.

Leigh Bridges admitted misappropriating JAFCU funds to fund her personal accounts and to make extensive personal purchases. *See* Baylor decl. ¶ 8; Hill decl. ¶¶ 9-10; O'Quinn decl. ¶ 10. The use of such funds was made clear at the April 17, 2026 meeting and was not for any known legitimate purpose. Although the amount of conversion is not yet known, NCUAB's analysis shows at least $51 million in deposits to the Bridges' accounts from the JAFCU general ledger. *See* Stanislao decl. ¶ 13. In addition, Corporate America Credit Union found millions of dollars flowing through the accounts of her and her husband to fund what appear to be personal expenses. *See* Corp. decl. ¶¶ 7-10; *see also* Stanislao decl. ¶ 11. Their combined payroll deposits for the past seven years do not even equal the amount currently available in Chad Bridges' share accounts with JAFCU and are insufficient to support such extravagant purchases.

For similar reasons, the NCUAB will also be able to prevail on its claim for breach of fiduciary duty. In Mississippi, "[t]he elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship, and (2) its breach." *Cascade Cap. Grp., LLC v. Livingston Holdings, LLC*, No. 3:17CV952-LG-MTP, 2019 WL 438488, at *12 (S.D. Miss. Feb. 4, 2019). Like an officer of a bank, as an officer of a credit union, the CEO has a fiduciary duty to the credit union. *See Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 84 (Miss. 1992) (holding that bank branch manager had fiduciary duties). Leigh Bridges was the CEO and previously the CFO of JAFCU, *see* Meyer decl. ¶ 5, a credit union with three branches.

Fiduciaries owe their principal "a duty of loyalty and fair dealing." *Omnibank of Mantee*, 607 So. 2d at 84. "A part of an officer's duty of loyalty requires that he protect the corporation's property. That he may not appropriate corporate assets to his own use seems apparent." *Omnibank of Mantee*, 607 So. 2d at 91. Of course, if a bank or credit union officer "steal[s] and embezzle[s] [or] defraud[s] the corporations they serve," they are in breach of the duty of

14

loyalty. *Id.* at 90. In misappropriating millions of dollars of funds for her personal use, Leigh Bridges is clearly in breach of her fiduciary duty to JAFCU.

She is also in breach of her duty to disclose the true financial position of JAFCU to the board of directors. Fiduciaries are obligated "to make 'a full disclosure of any and all material facts within his knowledge, and of which he knows or should know that the other person is ignorant.'" *Strong v. First Fam. Fin. Servs., Inc.*, 202 F. Supp. 2d 536, 541 (S.D. Miss. 2002) (quoting *American Nat. Ins. Co. of Galveston, Tex. v. Murray*, 383 F.2d 81, 86 (5th Cir. 1967). If one is a fiduciary, "his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act[.]" *Id.* at 540-41 (quoting *Van Zandt v. Van Zandt*, 86 So.2d 466, 470 (Miss. 1956)).

Leigh Bridges admitted to concealing the fact that funds were missing from JAFCU by overstating the amount on JAFCU's general ledger on deposit with or pending from Corporate America Credit Union and through altering ACH entries on JAFCU's ledger to conceal the true purpose of those entries. *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶¶ 7-10; Meyer ¶ 8; O'Quinn decl. ¶¶ 8-10. Leigh Bridges also told the JAFCU board that JAFCU was well capitalized and doing well. *See* Hill decl. ¶ 5. Such concealment is undoubtedly a breach of fiduciary duties.

The concealment also constitutes the tort of fraudulent misrepresentation under Mississippi law. "The elements of fraud . . . include: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Levens v. Campbell*, 733 So. 2d 753, 761-62 (Miss. 1999).

15

The false statements concerning the amount held at Corporate America are material in both the amount of loss she concealed, estimated to be at least $95 million, *see* Meyer decl. ¶ 8, and that doing so was clearly to perpetuate her scheme to misappropriate funds from JAFCU. The board of directors had a right to rely on such statements, as Leigh Bridges was a fiduciary of JAFCU, as explained above. By that time, Leigh Bridges concealment of her misappropriation had caused significant financial harm to JAFCU. For these reasons the NCUAB has a likelihood of success as to fraudulent misrepresentation.

The NCUAB also has a likelihood of success of establishing fraudulent misrepresentation based on Leigh Bridges' false statements made with respect to wire transfer forms and ACH transactions. Leigh Bridges admitted to altering ACH entries on JAFCU's ledger to conceal the true purpose of those entries. One such instance is the wire transfer sheet to Tiffany & Co., described in Part A, above, in which she altered the wire transfer sheet to instead identify Raymond James as the beneficiary. *See* Ex. B, Wire sheet; Corp. decl. ¶ 6. The board of directors had a right to rely on such statements, as Leigh Bridges was a fiduciary of JAFCU, as explained above. By the time of the April 17, 2026 meeting, Leigh Bridges concealment of her misappropriation had caused significant financial harm to JAFCU.

In establishing a likelihood of success on those torts under Mississippi law, the NCUAB also establishes a likelihood of success on its claim under federal law. "A director or officer of an insured credit union may be held personally liable for monetary damages in any civil action by, on behalf of . . . of the [NCUA] Board . . . acting as conservator or liquidating agent of such insured credit union . . . for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct." 12 U.S.C. §§ 1787(h)(1), (3). In committing the intentional torts of

conversion and fraudulent misrepresentation, and in willfully breaching her fiduciary duty to JAFCU, Leigh Bridges is liable to the NCUAB consistent with 12 U.S.C. § 1787(h).

    ***C. Because the misappropriated funds were used to acquire assets and fund accounts for the benefit of Defendants, the NCUAB will likely prevail on its claims of constructive trust and fraudulent transfer as to both Defendants.***

The NCUAB may "avoid a transfer of any interest of an institution-affiliated party . . . in property . . . that was made within 5 years of the date on which the Board becomes conservator . . . if such party or person voluntarily or involuntarily made such transfer . . . with the intent to hinder, delay, or defraud the insured credit union . . . ." 12 U.S.C. § 1787(b)(16)(A); *accord* Miss. Code § 15-3-107(1) ("A transfer . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor or debtor."). As CEO and president of JAFCU since the year 2021, Meyer decl. ¶ 5, Leigh Bridges was an institution-affiliated party because she was an "officer, or employee of, or agent for, an insured credit union[.]" 12 U.S.C. § 1786(r)(1).

In proving the intent to hinder, delay, or defraud JAFCU, "fraudulent transfer can be proven in two ways: directly or circumstantially." *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 385 (5th Cir. 2017). "When direct evidence of fraudulent intent exists, as when a debtor admits the fraud, then intent can be decided as a matter of law." *Id.* (cleaned up). Leigh Bridges admitted to misappropriating funds from the credit union. *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶ 10; O'Quinn decl. ¶¶ 8-10. She is a debtor of the NCUAB to the extent that she is liable to the NCUAB for the misappropriation of JAFCU's funds. Those funds were used to fund personal accounts and to make millions of dollars of purchases. *See* Baylor decl. ¶ 8; O'Quinn decl. ¶¶ 8, 10. This evidence is sufficient to show a likelihood that the NCUAB will prevail in proving that fraudulent transfers were made by Leigh Bridges.

The NCUAB will also likely prevail on its fraudulent-transfer claim against Chad Bridges, as the transferee of fraudulently transferred funds. The NCUAB is permitted to recover fraudulently-transferred property from the "initial transferee of such transfer." 12 U.S.C. § 1787(b)(16)(B)(i). Chad Bridges has two share accounts with JAFCU. *See* Stanislao decl. ¶ 9. In 2024, NCUA examiners spoke with Leigh Bridges concerning the high volume of funds going through her JAFCU share accounts. *See* Meyer decl. ¶ 12. After the conversation with NCUA examiners, Leigh Bridges closed her share account with JAFCU. *See id.*; Stanislao decl. ¶¶ 9-10. After closing her share accounts with JAFCU, Leigh Bridges began to run millions of dollars of funds through Chad Bridges' share accounts instead. *See* Stanislao decl. ¶ 11.

JAFCU analysis shows false entries of approximately $13.8 million of funds transferred into Chad Bridges' accounts, listing financial institutions such as Acorns Investing, American Express, and JP Morgan Chase Bank. *See* Stanislao decl. ¶ 13. Those funds came from the general ledger of JAFCU. *See* Meyer decl. ¶ 11. Payments to Craig-Wilkinson Inc., Courtney Peters Interior Design, Coinbase Global, Inc., Tiffany & Co, and Premier Prive, transactions identified in the corporate credit union declaration, *see* Corp. decl. ¶¶ 7, 9, were all made through Chad Bridges' JAFCU share accounts. *See* Stanislao decl. ¶ 11. None of those transactions have any apparent connection to the legitimate business of JAFCU. In addition, transfers of almost $200,000 of funds were made from Chad Bridges' share accounts with JAFCU to family members of Leigh Bridges. *See* Stanislao decl. ¶ 12.

As of May 4, 2026, Chad Bridge's two share accounts at JAFCU totaled $1,381,245.77. *See* Stanislao decl. ¶ 10. That amount is of course far less than the $13.8 million in misappropriated funds, *see* Stanislao decl. ¶ 13; *see also* Meyer decl. ¶¶ 10-11, the difference apparently due to the extravagant personal expenditures. Between May 1, 2019 and May 4,

2026, funds coming into Chad Bridges' share accounts at JAFCU from payroll for him and his wife were roughly $1.1 million after deductions. *See* Stanislao decl. ¶ 14. Those amounts are insufficient to fund the amounts presently in Chad Bridges' share accounts with JAFCU, let alone to provide the financial means to pay for the purchases identified in this motion.

Although Leigh Bridges did not specifically admit to transferring funds belonging to JAFCU to her husband's accounts, there are significant indicia of fraud. Indicia of fraudulent transfer includes transfers to family members, a lack of consideration, insolvency of the debtor, and attempts at concealing the transactions. *See FDIC v. Elio*, 39 F.3d 1239, 1246 (1st Cir. 1994); *accord* Miss. Code § 15-3-107(2) (listing badges of fraud). Leigh Bridges' transfers of funds to her husband's account were without consideration in that he could not provide consideration for the transfers because the $13.8 million from 2019 was misappropriated from JAFCU. *See* Stanislao decl. ¶ 13; *see also* Meyer decl. ¶¶ 10-11. In addition, Leigh Bridges had closed her account at JAFCU and thus was running external transfers through her husband's accounts, *See* Meyer decl. ¶ 12; Stanislao ¶ 11, apparently to conceal her activity. Based on this and the actual fraud (*i.e.*, misappropriation) that Leigh Bridges admitted to and her insolvency based on her debt to the NCUAB for her misappropriation, the NCUAB will likely prevail that the funds in Chad Bridges' share accounts with JAFCU are the result of fraudulent transfers.

The NCUAB may not collect fraudulently-transferred property from a "transferee that takes for value," 12 U.S.C. § 1787(b)(16)(C)(i), but the evidence strongly indicates that Chad Bridges did not provide value for the transfers. In fact, he could not provide consideration for the transfers because the $13.8 million from 2019 was misappropriated from JAFCU. *See* Stanislao decl. ¶ 13; *see also* Meyer decl. ¶¶ 10-11. He therefore could not take legitimate title to the funds. Given that Leigh Bridges admitted to misappropriation, and considering the

transfers from the accounts to her relatives and high-end jewelers, the available evidence suggests that she exercised control over the JAFCU accounts for the benefit of Defendants, and that Chad Bridges was a nominal title holder to the accounts. The NCUAB therefore has a likelihood on prevailing on its claim for fraudulent transfer against Chad Bridges.

Based on the fraudulent transfers, and the state-law torts that Leigh Bridges likely committed, the NCUAB will also likely prevail against both Defendants under a claim for constructive trust. "A constructive trust 'is a means . . . whereunder one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.'" *Barriffe v. Est. of Nelson*, 153 So. 3d 613, 618 (Miss. 2014). There are "several examples of wrongful conduct that may justify imposition of a constructive trust" which include, among other wrongs, "fraud, actual or constructive" and "abuse of confidence." *Joel v. Joel*, 43 So. 3d 424, 431 (Miss. 2010). "An abuse of confidence within the rule may be an abuse of . . . a technical fiduciary relationship . . . ." *Allred v. Fairchild*, 785 So. 2d 1064, 1068 (Miss. 2001).

As explained in Part B, above, Leigh Bridges likely breached her fiduciary duties, made fraudulent representations, and engaged in conversion, all instances indicating a constructive trust. The basis for imposition of a constructive trust is particularly imperative here as the funds were misappropriated, and thus the funds and any assets purchased therewith are still JAFCU property. *See Eisenberg v. Grand Bank for Sav., FSB*, 207 F. Supp. 2d 553, 560 (S.D. Miss. 2002), *aff'd*, 70 F. App'x 765 (5th Cir. 2003) (quoting *Newman v. Stuart*, 597 So.2d 609, 613, 614 (Miss. 1992)) ("In this state, as in most states, the law is that neither the thief of stolen property nor his transferees can convey any title or property right to such property."). Because the assets acquired with JAFCU funds and the accounts with JAFCU funds are held in

constructive trust, an equitable lien is imposed on such assets. *See Lindsey v. Lindsey*, 612 So. 2d 376, 379 (Miss. 1992); *Neyland v. Neyland*, 482 So. 2d 228, 230 (Miss. 1986).

Leigh and Chad Bridges own real property and vehicles jointly, and their residence is ornately furnished. *See* Stanislao decl. ¶¶ 4-8. Most, if not all, of that property is likely subject to a constructive trust given that their salaries alone could not support the vast majority of their expenditures. Although the entirety of property subject to the equitable lien will not be known until the NCUAB can fully trace the misappropriated funds with the benefit of discovery, the likelihood of a constructive trust has clearly been established, and a failure to freeze assets potentially subject to the constructive trust will likely cause the NCUAB significant harm.

**II.    The NCUAB Can Show Significant Harm if not Granted a TRO and Preliminary Attachment, Even Though a Showing of Harm is Not Required.**

In interpreting the language of 12 U.S.C. § 1787(b)(2)(H)(i), which relieves the NCUAB of proving irreparable harm when seeking injunctive relief, "[s]ome courts have interpreted this [statutory language] strictly as essentially negating the showing of harm required by Rule 65." *Zovko*, 2014 WL 12889793, at *4 (citing *Johnson*, 133 F.3d at 1101); *see True Yang Vangh*, 2015 WL 13767043, at *2; *Cafritz*, 762 F. Supp. at 1506; *see also Faulkner*, 991 F.2d at 267, n.6 (referring to "clear language" of analogous FDIC statutes). At most, the NCUAB must establish "'some potential injury' prior to obtaining an asset freeze . . . ." *Faulkner*, 991 F.2d at 267, n.6 (in dictum). Because the NCUAB can readily establish a likelihood of harm, although the NCUAB need not show any harm, the Court does not need to decide that issue here.

*A.    The NCUAB will be harmed without the TRO and attachment in that its ability to satisfy a potential judgment will be impaired.*

Even though a private party seeking an injunction is often limited to "the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds[,]" *Alguire*, 647 F.3d at

21

600, because federal financial regulators acting as conservator or receiver are permitted to seek attachments of property under a lessened standard of harm, the insufficiency of assets to satisfy a potential judgment establishes harm for purposes of relief under § 1787(b)(2)(G) and analogous statutes. *See. Elio*, 39 F.3d at 1247 ("The record supports . . . that the F.D.I.C. would be harmed . . . specifically, that the F.D.I.C.'s ability to fulfill its statutory objective of collecting on the assets of the failed banks would be impaired."); *RTC v. Cruce*, 972 F.2d 1195, 1200 (10th Cir. 1992) ("[T]he record . . . suggests that [defendant] does not possess assets of sufficient value— even taking into account the assets he allegedly fraudulently conveyed . . . to extinguish this liability. These facts alone support a showing of injury."); *see also Dixon*, 835 F.2d at 563 ("[I]ts general equitable powers give the district court the authority to freeze assets when necessary, as here, to preserve meaningful equitable remedies."). For this reason, the Fifth Circuit found "no error in the district court's application of the preliminary injunction provisions of [12 U.S.C. § 1821(d)(19)] for the purpose of securing a potential damage award" for the FDIC as receiver of a failed bank. *Faulkner*, 991 F.2d at 265.

JAFCU is in a deficit of at least $95 million. *See* Meyer decl. ¶ 8. Leigh Bridges made at least $22 million in expenditures with JAFCU funds and misappropriated $51 million from the JAFCU general ledger to the Bridges' share accounts at JAFCU. *See* Corp. decl. ¶¶ 7-10; Meyer decl. ¶ 11; Stanislao decl. ¶ 13. Although Leigh Bridges stated that she had sufficient assets to pay back the misappropriated funds, Baylor decl. ¶ 9; O'Quinn ¶ 10, that is far from clear at this time. The NCUAB has not had the opportunity to formally value the assets of which it has knowledge but estimates show that the values of the real estate and vehicles do not equal close to the $22 million. *See* Stanislao decl. ¶¶ 5, 8. Because the sale of those assets will be insufficient to satisfy a judgment of even $22 million, and because the amount of the judgment against Leigh

Bridges will almost certainly be much more, attachment of all Defendants' assets is justified at this stage of the litigation.

The same reasoning justifies a TRO restraining Defendants from transferring or dissipating any accounts or assets subject to the attachment. "District courts have an inherent authority to enforce their injunctions . . . and to preserve their ability to render judgment[.]" *Parker v. Ryan*, 960 F.2d 543, 546 (5th Cir. 1992) (citations omitted); *see United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained[.]"). An attachment of assets would be of little utility if Defendants were not also prohibited from transferring such assets. Both Defendants reside within this District, *see* Stanislao decl. ¶ 3, and thus this Court has personal jurisdiction over them. *See Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 374 (5th Cir. 2003) ("The residency of a defendant in the forum state routinely creates [general jurisdiction]."). Accordingly, this Court has the authority to restrain Defendants from transferring or dissipating property, even though certain property, such as real property that Defendants own in Alabama, may be outside the jurisdiction of this Court. *See Sec. & Exch. Comm'n v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 294 (5th Cir. 2024) (holding that court can enjoin persons over whom there is personal jurisdiction).

**B.** **The NCUAB will be harmed without the TRO and attachment because the Defendants will be able to transfer or dissipate property that is likely subject to a constructive trust.**

Even if the inadequacy of assets sufficient to satisfy a potential judgment were insufficient to establish harm, the NCUAB can establish harm because many of the assets seized, and proceeds therefrom, are likely held in a constructive trust, as explained in Section I.C, above.

"[The Fifth Circuit] and others have upheld broad preliminary injunctions based upon a party's request for entry of a constructive trust." *Tisino v. R & R Consulting & Coordinating Grp., L.L.C.*, 478 F. App'x 183, 185 (5th Cir. 2012) (citing *Dixon*, 835 F.2d at 561); *see Zovko*, 2014 WL 12889793, at *5 (finding NCUAB established harm by "stat[ing] that the property sought to be attached was purchased with funds received from [the liquidated credit union]."). The harm is particularly salient here as the funds were misappropriated, and thus still JAFCU property. *See Eisenberg*, 207 F. Supp. 2d at 560; *see also Harris*, 2024 WL 4920599, at *4 ("The asset freeze the [plaintiffs] seek . . . is permissible in light of their request for a constructive trust over specific, traceable stolen assets[.]").

The NCUAB cannot trace all the purchases to specific items without the benefit of discovery, but that does not matter for purposes of this motion and at this early stage of the litigation. *See Janvey v. Proskauer Rose LLP*, No. 3:13-CV-477-N-BG, 2017 WL 11499756, at *5 (N.D. Tex. June 19, 2017) (requiring a plaintiff to identify all property potentially subject to a constructive trust in its complaint "is illogical and would require a creditor to do the impossible—identify (or more accurately guess) in its complaint, prior to discovery, where a party may have transferred proceeds or assets in an attempt to defraud creditors."). Indeed, "the burden is upon the party opposing an injunction to prove that certain assets are unrelated to the underlying litigation and should therefore be excluded from a constructive trust." *Tisino*, 478 F. App'x at 186 (referring to Texas's law of constructive trusts); *see Sec. & Exch. Comm'n v. Barton*, 135 F.4th 206, 227 (5th Cir. 2025) ("[F]reezing the assets . . . is appropriate to prevent . . . irreparable harm, given that [defendant's] commingling of funds . . . hindered tracing efforts."). The amount of assets potentially subject to a constructive trust establishes more than adequate harm for purposes of a preliminary attachment of assets and a TRO.

At the very least, this Court is undoubtedly permitted to enter an "asset freeze . . . to determine which assets are the subject matter of the litigation." *Barton*, 135 F.4th at 227; *see Faulkner*, 991 F.2d at 268 ("[T]he district court did not err in freezing all of the [defendant's] assets, pending a determination through limited discovery of which assets are traceable to [defendant's] alleged fraudulent activities."); *Dixon*, 835 F.2d at 566 ("[S]ince a vital public interest was at stake, the district court was correct to assume that all the defendants' assets were subject to restitution."). As explained in Section I.C, above, the assets purchased with monies improperly obtained from the credit union are subject to a constructive trust and funds in Defendants' accounts that were transferred from JAFCU are property of the credit union. Consequently, to protect the property rights of JAFCU, this Court should at the very least enjoin Defendants from transferring funds and property until there is a determination of which items are subject to the constructive trust.

### C. *The NCUAB will be harmed without the TRO and preliminary attachment in that Leigh Bridges' conduct suggests the likelihood of dissipation.*

Even if the NCUAB were required to show the potential dissipation of assets, the Fifth Circuit has recognized a presumption of dissipation of assets where defendants have received or acquired assets through the concealed misappropriation of funds. *See Alguire*, 647 F.3d at 601 ("Receiver provided evidence of a massive Ponzi scheme and proof that each individual received proceeds from the fraudulent scheme. This is sufficient to prove the likelihood of each individual removing or dissipating the frozen assets but for the preliminary injunction."); *Dixon*, 835 F.2d at 562 ("[T]he courts' ability to fashion preliminary relief . . . is especially true where the evidence strongly indicates that the assets were ill-gotten gains at the expense of an interest of the public protected by law."). As explained in Section I.A, above, there is substantial evidence

that Leigh Bridges misappropriated funds from JAFCU and that the monies were utilized to acquire property for her and her husband. The presumption of dissipation thus applies here.

Even without the presumption of dissipation, there is specific evidence of the possibility of dissipation. In examining the possibility of dissipation, courts look at how easily assets or funds can be transferred outside of the Court's jurisdiction. *See Alguire*, 647 F.3d at 600 ("If the defendants were to dissipate or transfer these assets out of the jurisdiction, the district court would not be able to grant the effective remedy, either in equity or in law, that the Receiver seeks."); *Harris*, 2024 WL 4920599, at *4 ("[T]he assets allegedly stolen from the [plaintiffs] could be further transferred to unretrievable locations at any time, with the click of a button . . . . Several federal courts have found that this exigency justified issuance of freezing orders.") (citing cases). Leigh Bridges has admitted to holding millions of dollars in funds in her financial accounts, including American Express, Chase Bank, and Acorns Financial. *See* O'Quinn decl. ¶ 10. Those funds can of course be easily transferred with the click of a button. Leigh Bridges initiated at least one wire transfer to Chung P. Luk, *see* Corp. decl. ¶ 7, funds that were transmitted to Hong Kong, China. Consequently, Leigh Bridges is knowledgeable of how to transfer assets outside of this Court's jurisdiction.

The possibility of fraudulent transfers also supports a likelihood of dissipation. *See Faulkner*, 991 F.2d at 267, n.6 (finding harm where "[defendant] transferred assets and income to his wife and children with the intention of placing them beyond the reach of potential creditors."); *see also DGG Grp., LLC v. Lockhart Fine Foods, LLC*, No. 1:20-CV-330-RP, 2020 WL 1879226, at *3 (W.D. Tex. Apr. 15, 2020) ("[A]n exception is made to the general rule that the availability of monetary damages negates irreparable harm, notably in cases where a fraudulent transfer is afoot."). Leigh Bridges has fraudulently transferred $13.8 million in

misappropriated funds to Chad Bridges' accounts at JAFCU since 2019. *See* Stanislao decl. ¶ 13; *see also* Meyer decl. ¶¶ 10-11. An amount approaching two hundred thousand dollars has been transferred from Chad Bridges' accounts to family members of Leigh Bridges. *See* Stanislao decl. ¶ 12. Even assuming the NCUAB had to show a threat of dissipation, these indicia establish such a threat here, establishing adequate harm for the purposes of that factor of the injunction standard.

### III. The Remaining Injunction Factors Favor the Entry of a TRO and a Preliminary Attachment of Assets.

#### A. *The balance of hardships favors the NCUAB.*

If the NCUAB establishes harm, then "equity favors granting the TRO because, while the order will likely inconvenience defendants, this inconvenience is outweighed by the potential harm that plaintiff would suffer if defendants dissipated, removed, or encumbered assets that they stole from the credit union." *True Yang Vangh*, 2015 WL 13767043, at *2; *see also Barton*, 135 F.4th at 227 ("[T]he concern for dissipation of assets and the defrauded investors' irreparable harm outweighs any harm to Barton if he is enjoined from transferring assets."). The NCUAB's interest in attachment of assets and a TRO is greater than an ordinary litigant because it seeks the order to further a public rather than a private interest. *See Zovko*, 2014 WL 12889793, at *5 ("A temporary attachment of [defendants'] property, while small in the context of the fraud, is a proper use of the attachment process because it secures assets which could help . . . recover some of the losses from the fraud, which affects the public interest in having a secure banking system."); *cf. Dixon*, 835 F.2d at 562 ("The general flexibility of equitable powers is enhanced where . . . the public interest is at stake."). Given the size of JAFCU's loss, at least $94 million, and Leigh Bridges' admission to misappropriating JAFCU funds, there can be no doubt that the balance of harms favors the NCUAB as the conservator of JAFCU.

Even when Defendants are permitted to submit evidence showing potential harm, Defendants will be unable to establish any meaningful harm. To the extent Defendants claim an interest in ill-gotten funds received from the credit union, Defendants have no legal interest in those funds. *See Eisenberg*, 207 F. Supp. 2d at 560; *see also Faulkner*, 991 F.2d at 268, n.9 ("Because the [defendant's family members] have not demonstrated which assets are traceable to [defendant's] alleged fraud, they cannot prove an independent interest in their assets."). To the extent Defendants possess assets acquired without the assistance of misappropriated funds, they "will suffer at worst a temporary inability to move assets if the injunction is later dissolved." *Harris*, 2024 WL 4920599, at \*5. Courts are especially reluctant to view a defendants' lack of access to assets as a hardship if they have been living a luxurious lifestyle. *See Jostens, Inc. v. Hammons*, No. 4:20-CV-00225, 2022 WL 2392311, at \*3 (E.D. Tex. July 1, 2022) ("Evidence at trial showed that [defendants] bought with the proceeds of the stolen rings multiple vehicles, a house with land, exotic pets like llamas and peacocks, international travel, etc. The Court will not shield [defendants] from the consequences of these choices at the expense of [the plaintiff.]"). Accordingly, the balance of the harm undoubtedly favors the NCUAB.

### B. The public interest favors entry of a TRO and preliminary attachment.

In assessing whether injunctive relief could disserve the public interest, courts have found that in seeking to freeze assets of those believed to be responsible for the financial institution's failure, federal financial liquidators serve important public interests. "Granting [an injunctive] order serves the public interest by allowing plaintiff to protect the . . . members of the credit union." *True Yang Vangh*, 2015 WL 13767043, at \*2. More generally, "even th[e] sparse legislative history" concerning the enactment of the asset-freeze statutes "evidences Congress' seriousness of purpose in protecting taxpayers' interests[,] which is undoubtedly consistent with

the public interest. *Cafritz*, 762 F. Supp. at 1509; *see Cruce*, 972 F.2d at 1201 ("[T]he RTC protects the depository insurance fund, which in a very real sense translates to the interest of all taxpayers."). Like other regulators, the NCUA's insurance of member's accounts "is fundamental to the financial stability of the entire [financial institution] industry[.]" *Dixon*, 835 F.2d at 563; *see Cruce*, 972 F.2d at 1201 ("Because the RTC's goal in seeking a preliminary injunction is to preserve assets that potentially may provide restitution to the depository insurance fund for monies fraudulently taken by defendants . . . , we cannot conclude that issuance of the injunction is adverse to the public interest."). In guaranteeing a $110 million line of credit to JAFCU, the NCUSIF is ultimately responsible for any unmitigated losses of JAFCU. *See* Meyer decl. ¶ 9.

Even looking at the public interest more generally, the relief requested is still fully consistent with the interest of the public. Public policy favors the entry of injunctive relief in order to ameliorate the harm caused by insider fraud. *See Barton*, 135 F.4th at 227 ("[S]eeking to protect the interests of defrauded investors . . . is in the public interest."); *Hammons*, 2022 WL 2392311, at *3 ("[T]he requested injunction furthers the public's interest in protecting against civil theft, conversion, and breach of fiduciary duty[.]"). For this reason and to protect JAFCU, the NCUSIF, and the taxpayers more generally, entry of a TRO and preliminary attachment is fully consistent with the interest of the public.

## IV. The NCUAB is Not Required to Post a Bond.

Fed. R. Civ. P. 65(c) exempts the "United States, its officers, and its agencies" from the requirement to post a bond. The NCUA is a federal agency. 12 U.S.C. §1752a(a). Accordingly, the NCUAB, when acting as conservator or "liquidating agent is not required to post a bond, as ordinarily required by Rule 65." *Zovko*, 2014 WL 12889793, at *3; *see True Yang Vangh*, 2015

WL 13767043, at *2 ("As a United States agency, [NCUAB] falls within [the Rule 65(c)] exception, so it need not provide security."). Therefore, no bond is required here.

**V.    The TRO Must Issue Without Notice to Defendants.**

A TRO may be issued with or without notice to the adverse party. Fed. R. Civ. P. 65(b)(1). A TRO may issue without notice to an adverse party if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Id.* If a party satisfies the Rule 65(b)(1) standard, the motion for TRO is appropriately filed under seal. *See Perez v. Bruister*, No. 3:13-CV-1001-DPJ-FKB, 2015 WL 237126, at *2 (S.D. Miss. Jan. 16, 2015). Moreover, if the government as a party meets the requirements of Rule 65(b)(1) and the four-factor injunction standard, there is no due process concern with the issuance of a TRO without immediate notice. *See United States v. Jenkins*, 974 F.2d 32, 35 (5th Cir. 1992).

As explained in Section II.C, above, there is a realistic likelihood of the dissipation of assets. Leigh Bridges admitted to having financial accounts with millions of dollars. *See* Mills cert.; *see also* O'Quinn decl. ¶ 10. Such funds can of course be easily transferred. *See* Mills cert. Issuing the TRO and preliminary attachment order without immediate notice will permit the NCUAB to serve a copy of the order on the financial institutions where Defendants have or may have financial accounts. *See* Mills cert. The issuance without immediate notice will also permit the NCUAB to prepare for filing *lis pendens* concerning the real property owned by Defendants. *See* Mills cert. These reasons are set forth in the certification of Alysson Mills, counsel of record for the NCUAB in this lawsuit. *See* Mills cert. Accordingly, the NCUAB

requests for filing under seal and that the TRO and preliminary attachment issue for the full

fourteen days so that NCUAB will have adequate time to serve the order upon financial

institutions where the accounts are located.

## CONCLUSION

For the reasons explained above, the Court should enter a TRO against Defendants and a

preliminary attachment of Defendants' accounts and assets.


Respectfully submitted,

May 14, 2026


Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of
JACKSON AREA FEDERAL CREDIT UNION