UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION
-------------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, in its capacity as conservator of
Jackson Area Federal Credit Union,

                      Plaintiff,

                  v.

LEIGH BRIDGES, CHAD BRIDGES, and
TINA FUNEZ,

                      Defendants.

-------------------------------------------------------------------------X

Case No.: 3:26-cv-343-DPJ-RPM
Hon. Daniel P. Jordan
Hon. Robert P. Myers, Jr.

## DECLARATION OF BRUCE R. HEGYI

I, Bruce R. Hegyi, declare, pursuant to 28 U.S.C. § 1746, the following facts are true and correct:

1.     My name is Bruce R. Hegyi.  I am fully competent to make this Declaration. Unless otherwise indicated, the facts set forth herein are based on my personal knowledge and are true and correct to the best of my knowledge and belief.

2.     I am an attorney licensed to practice law in the District of Columbia.  In terms of my more recent employment history, from 2017 to 2022, I was a Senior Trial Attorney with the Office of General Counsel ("OGC") at the National Credit Union Administration ("NCUA"). From 2012 to 2017, I was a Senior Trial Attorney with the Capital Case Section ("CCS") at the United States Department of Justice ("DOJ").  From 1993 to 2012, I was an Assistant United States Attorney ("AUSA") with the United States Attorney's Office for the District of Columbia ("USAO-DC").  To date, I have tried approximately 100 cases to verdict; there are in excess of

60 published opinions in cases I handled; and, while in the federal service, I was the recipient of numerous honors and awards.

3.      I have extensive professional experience in both interviewing and examining witnesses.

4.      I am currently Of Counsel with Collins & Hunter; which is the law firm retained by the National Credit Union Administration Board ("NCUAB") acting in its capacity as Conservator of Jackson Area Federal Credit Union ("JAFCU") to investigate and, if warranted, pursue a fidelity bond claim on behalf of JAFCU.

5.      In that role, I have been engaged in investigating facts relevant to a potential fidelity bond claim to be made by JAFCU.  To date, my main focus has been, *inter alia*, interviewing various current and/or former JAFCU employees, officers, supervisory committee members, and board members.

6.      In the course of the investigation, Patrice Collins, the owner of Collins & Hunter ("Ms. Collins") and I had occasion to interview then-JAFCU branch manager Tina Funez ("Ms. Funez").  Ms. Funez's interview occurred on May 15, 2026, at the Main Office of JAFCU, and lasted approximately two hours.

7.      On May 15, 2026, Ms. Funez appeared voluntarily at approximately 10:32 am. Prior to asking Ms. Funez any questions, Ms. Collins and I explained to Ms. Funez that we were investigating a potential bond claim on behalf of JAFCU.  Ms. Funez said that she understood and that she was willing to be interviewed.  We thanked Ms. Funez for her willingness to participate.

8.      During the course of the interview, Ms. Funez was offered multiple breaks; one of which she declined and two of which she accepted.  In addition, during the course of the

interview, Ms. Funez was offered and accepted refreshments. At no time during the interview did Ms. Funez ask to suspend or terminate the interview.

9. The following paragraphs concern portions of what occurred in our interview of Ms. Funez.

10. Ms. Funez said that she first met Leigh Bridges ("Ms. Bridges") at a fan club event in Los Angeles in the early 2000s. Ms. Funez subsequently developed a friendship with Ms. Bridges, and said that she and Ms. Bridges are "best friends" and are "almost like sisters." Ms. Funez said that, in 2025, she was invited to visit Ms. Bridges and her husband, Chad Bridges, in Mississippi; and that Ms. Funez's initial visit led to Ms. Funez's permanent relocation to Mississippi.

11. Having initially resided in a "cottage" on the grounds of a prior residence of Leigh and Chad Bridges ("the Bridges"), beginning in 2019, Ms. Funez said she rented a townhouse owned by the Bridges, which is located at 257 Eastbrooke Street, Jackson, Mississippi, where she continues to live. Ms. Funez said she pays the Bridges $500 per month in rent for the Eastbrooke Street townhouse.

12. Tina Funez said she has taken multiple vacations and/or trips with Leigh Bridges; and that Ms. Bridges paid for all of the travel expenses for those vacations/trips, which included (among other things) paying for the chartering of private airplanes and/or jets on various occasions.

13. Tina Funez said that approximately 10 years ago, Leigh Bridges provided Ms. Funez with an American Express card, that was linked to Ms. Bridges' American Express card. According to Ms. Funez, Ms. Bridges authorized Ms. Funez to use the American Express card to make purchases in and/or under Ms. Bridges' American Express account. Ms. Funez said that all

3

of the charges Ms. Funez made on the American Express card were paid off by Ms. Bridges, without any contribution by or from Ms. Funez.

14.    During the interview, Ms. Funez was shown American Express annual summary statements for the years 2022 through 2025.  Those statements evidenced that Ms. Funez's American Express card charged $137,925.80 in 2025, $146,758.44 in 2024, $86,518.79 in 2023, and $84,947.29 in 2022.  Ms. Funez did not dispute these annual amounts had been charged by Ms. Funez.  Ms. Funez reaffirmed that Ms. Funez's charges (as set forth in the 2022-2025 annual statements) were solely and fully paid by Ms. Bridges; and that Ms. Funez had not reimbursed Ms. Bridges for any of the charges.

15.    According to the American Express statements examined with Ms. Funez, in total, Ms. Funez charged $456,150.32 between 2022 and 2025.

16.    Tina Funez said that Ms. Bridges "assisted" Ms. Funez in purchasing a single-family dwelling located in Utila, Honduras (the "Utila Dwelling"), which (according to Ms. Funez) had previously been owned by Ms. Funez's grandmother.

17.    During the interview, Ms. Funez was shown various JAFCU wire transfer sheets for payments that appeared to be related to the Utila Dwelling.  Ms. Funez identified a $190,000 wire transfer and said it was for the purchase of the Utila Dwelling.  She also identified a series of approximately sixteen selected JAFCU wire transfers each in the amount of $9,500 to a Honduran contractor.  Ms. Funez said the $9,500 wire transfers constituted a portion of the funds expended for the renovation of the Utila Dwelling.

18.    Ms. Funez said that all of the funds for the purchase of the Utila Dwelling and its renovations were provided by Leigh Bridges.  Ms. Funez also said that Ms. Bridges transferred the funds from an account of Ms. Bridges' at JAFCU to Ms. Funez's account at JAFCU, and that

4

Ms. Funez thereafter completed and/or signed the JAFCU paperwork to initiate the wire transfers from her JAFCU account.

19.    Tina Funez said that Leigh Bridges gifted a 2023 Tesla Model Y to Ms. Funez, the title to which Ms. Funez said was ultimately placed in Ms. Funez's name in January or February of 2026.  Ms. Funez said she did not pay Ms. Bridges any money for the 2023 Telsa.

20.    According to Tina Funez, Leigh Bridges has given Ms. Funez somewhere between thirty and forty designer handbags, each worth around $2,000 or more.

21.    Tina Funez also informed Ms. Collins and me that Ms. Funez had (among other things) numerous pieces of designer jewelry at Ms. Funez's residence that, according to Ms. Funez, had been gifted to Ms. Funez by Ms. Bridges.  In addition to the designer items gifted to Ms. Funez by Ms. Bridges, Ms. Funez said she also had at her residence a Rolex watch that was gifted to her by Mr. Bridges.

22.    Tina Funez said she did not have personal knowledge of the ultimate source of the funds used by Leigh Bridges to purchase and/or transfer any of the items identified in this Declaration.  Ms. Funez said she never inquired of Ms. Bridges as to the source of the funds.

23.    As the interview with Ms. Funez was concluding, I asked Ms. Funez if she would be willing to (a) take photographs of the jewelry (and other items) that had been gifted to her by Ms. Bridges that were currently at Ms. Funez's residence; and (b) if Ms. Funez would be willing to text the undersigned copies of such photographs.  Ms. Funez said she was willing to do so.

24.    Ms. Funez's interview concluded at approximately 12:40 pm.  At the conclusion of the interview, Ms. Collins and I thanked Ms. Funez having participated in the interview.

25.    On May 15, 2026, at approximately 2:18 pm, I began receiving by text from cellphone number (601) 832-1938 a series of 13 photographs.  Ms. Funez previously identified

5

cellphone number (601) 832-1938 as being her (personal) cellphone number.  The photographs received depict numerous necklaces, earrings, pins, wrist watches, and handbags, as well as other items.

I DO HEREBY DECLARE subject to the penalties for perjury that the above and foregoing is true and correct to the best of my knowledge and belief.

EXECUTED this 12th day of June, 2026.


*Bruce R. Hegyi*
Bruce R. Hegyi