UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

-------------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION
BOARD, in its capacity as conservator of
Jackson Area Federal Credit Union,

Plaintiff,

v.

LEIGH BRIDGES, CHAD BRIDGES, and
TINA FUNEZ,

Defendants.

Case No.: 3:26-cv-343-DPJ-RPM
Hon. Daniel P. Jordan
Hon. Robert P. Myers, Jr.

-------------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
PRELIMINARY INJUNCTION AGAINST DEFENDANT TINA FUNEZ,
PREJUDGMENT ATTACHMENT OF HER ACCOUNTS AND ASSETS, AND
IMPOSITION OF A TRUSTEESHIP ON CERTAIN PROPERTY OF DEFENDANT**

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of
JACKSON AREA FEDERAL CREDIT UNION

Plaintiff, the National Credit Union Administration Board ("NCUAB"), acting in its capacity as conservator of Jackson Area Federal Credit Union ("JAFCU"), submits the following memorandum of law in support of its motion for a preliminary injunction against Defendant Tina Funez, a prejudgment attachment of Defendant's accounts and assets, and imposition of a trusteeship on certain property of Defendant.

## BACKGROUND

### I.      Procedural History.

On May 14, 2026, the NCUAB moved to file under seal both a new complaint and a motion for a temporary restraining order ("TRO") and the preliminary attachment of accounts and assets of Leigh and Chad Bridges.  *See* ECF No. 1.  Those motions were granted and the TRO was entered the same day without notice to those Defendants.  *See* ECF No. 7.  Before that order expired, this Court granted the NCUAB's motion to extend the TRO until such time as the Court has decided a motion for preliminary injunction against those Defendants.  *See* ECF No. 9.

A process server personally served a copy of the TRO, and all other docket entries in this case to date, upon Leigh Bridges on May 29, 2026.  *See* ECF No. 11.  On that same date, the process server delivered those same papers to an administrative assistant who works at the office where Chad Bridges is employed.  *See id.*  The documents served on the Bridges included a request to waive service of the summons for each of them.  *See* ECF No. 10.  Leigh and Chad Bridges have both executed waivers of service of the summons in this lawsuit but have not yet answered the complaint.  A motion to convert the TRO against those Defendants to a preliminary injunction was filed on June 4, 2026.  *See* ECF No. 12.  That motion is currently before this Court, and, among other relief, seeks to restrain the Bridges from transferring or dissipating

1

assets and accounts because the money used to purchase those assets and fund those accounts was very likely misappropriated from JAFCU.

Not all of the money misappropriated from JAFCU remains with Leigh Bridges, however.  She gave expensive gifts and provided extensive monetary benefits to others, including her friend, and former JAFCU branch manager, Tina Funez.  *See* Hegyi dec. ¶¶ 6, 10, 12-21; Stanislao decl. ¶ 8.  **The known benefits provided to Funez total over one million dollars**.  *See id.*  Recognizing that Tina Funez has assets that could easily be dissipated, and needing to preserve the status quo and prevent the further dissipation of property tied to JAFCU funds while this lawsuit is pending, the NCUAB files a motion seeking a preliminary injunction, a prejudgment attachment, and to place certain property under the control of this Court with the NCUAB serving as trustee.  Granting this motion after notice to Tina Funez and any hearing set by this Court will continue to preserve the status quo, safeguarding the monies and property subject to this Court's order pending the outcome of this lawsuit.

## II.     The importance of the relief requested.

The relief requested in this motion arises from a need to mitigate the harm stemming from what appears to be at least a **$95 million dollar** deficit in the financials of JAFCU.  *See* Meyer decl. ¶ 8.  On April 17, 2026, in a meeting which included two JAFCU board members and two National Credit Union Administration ("NCUA") examiners, Leigh Bridges admitted to misappropriating JAFCU funds for her own personal benefit and to using false entries on the financials of JAFCU to conceal such misappropriation.  *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶¶ 7-10; Meyer decl. ¶ 7; O'Quinn decl. ¶¶ 8-10.  Leigh Bridges was the president and CEO of JAFCU, and previously its CFO, and was responsible for preparing and signing the financial statements that JAFCU submitted to the NCUA.  *See* Hill decl. ¶ 5; Meyer decl. ¶ 5.  Leigh

Bridges concealed the fact that funds were missing from JAFCU by overstating the amounts listed as on deposit with, or pending from, Corporate America Credit Union ("Corporate America"), a corporate credit union with which JAFCU does business, on JAFCU's general ledger.  *See* Corp. decl. ¶ 4; Hill decl. ¶¶ 5-10; Meyer decl. ¶ 7; O'Quinn decl. ¶ 8.

The NCUAB's analysis of JAFCU records shows that false deposit entries were entered in the share accounts of Leigh and Chad Bridges in order to disguise transfers of funds to those accounts from JAFCU's general ledger.  *See* Meyer decl. ¶¶ 10-11; *see also* O'Quinn decl. ¶ 8. Those false deposits were manually entered under the transaction code "SDIT," which signifies a share deposit, and contains a description with the preface "EFT," which stands for electronic funds transfer.  *See* Meyer decl. ¶ 11.  The false "EFT" transactions listed financial institutions such as Acorns Investing, JP Morgan Chase Bank, American Express, and Raymond James financial as their sources.  *See* Stanislao decl. ¶ 6; *see also* O'Quinn decl. ¶ 10.  The deposits were false in that no funds were being transferred from an external source, but rather the funds were being transferred from the general ledger of JAFCU to the share accounts of Leigh and Chad Bridges.  *See* Meyer decl. ¶ 11.  Aggregating those transactions for the share accounts of Leigh and Chad Bridges shows over **$51 million dollars in false entries** from the year 2015 until the present.  *See* Stanislao decl. ¶ 6.

Significant amounts of money were transferred from Leigh Bridges to her friend Tina Funez through deposits into Funez's share account, full payment of Funez's American Express charges, and expensive gifts.  Leigh Bridges transferred at least $487,666.00 from JAFCU share accounts to Tina Funez.  *See* Stanislao decl. ¶ 8.  Many of transaction descriptions for those transfers refer to Utila, an island that is part of the country of Honduras.  *See id.*  Tina Funez admitted that Leigh Bridges provided all of the funds to purchase and renovate a dwelling on the

3

island that was previously owned by a relative of Funez.  *See* Hegyi dec. ¶¶ 16-18.  Funez also admitted to accepting gifts from Leigh Bridges such as handbags, jewelry, and a 2023 Tesla Model Y.  *See id.* ¶¶ 19-21.  Funez also made charges as an authorized user on an American Express credit card account of Leigh Bridges.  *See id.* ¶¶ 13-15.  Funez has had use of that card for the last ten years, with purchases between 2022 and 2025 alone totaling $456,150.32.  *See id.* ¶ 15.  That American Express bill was paid from the share accounts of Leigh and Chad Bridges containing the funds misappropriated from JAFCU's general ledger.  *See* Corp. decl. ¶ 8; Meyer decl. ¶ 11; Stanislao decl. ¶ 9.  The Bridges' salaries were grossly insufficient to fund the Bridges' lavish lifestyle or the extravagant gifts and benefits provided to Funez.  *See* Stanislao decl. ¶ 7.  Accordingly, the benefits that Funez received were almost certainly derived from JAFCU funds.

Because the property and funds that Funez acquired from Leigh Bridges are likely subject to a constructive trust for the benefit of JAFCU, but may be easily transferred or dissipated, the NCUAB is requesting a preliminary injunction, prejudgment attachment of all of the assets and accounts of Funez, and the trusteeship of certain property.  The injunctive relief requested herein will help to ameliorate the effects that the significant losses of JAFCU will have on federally-insured credit unions nationwide, and JAFCU members and other stakeholders residing in Mississippi.

## III.   The National Credit Union Administration.

The NCUA is an independent federal agency which is managed by the NCUAB. 12 U.S.C. § 1752a(a).  The NCUA operates under the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1751 *et seq.*, as amended through P.L. 116-260, enacted December 27, 2020. NCUA's responsibilities include "chartering and regulating federal credit unions, regulating

federally insured state-chartered credit unions, and administering the Share Insurance Fund

[NCUSIF]. . . ."  *NCUAB v. RBS Sec., Inc.*, 833 F.3d 1125, 1128-29 (9th Cir. 2016) (citing

12 U.S.C. §§ 1754, 1781, 1783, 1784).  The NCUSIF protects credit union members' share

accounts up to $250,000 in the event of credit union insolvency.  *See* 12 U.S.C. §§ 1787(d)(1),

(k)(1)(A), (k)(3).

The NCUA is the regulator of JAFCU because JAFCU is a federally-charted credit union.

Due to the financial instability caused by Leigh Bridges' misconduct, the NCUAB conserved

JAFCU on May 6, 2026, and appointed itself as conservator.  *See* Ex. A, 5/6/26 NCUAB Or.; *see*

*also* Meyer decl. ¶ 6.  As conservator, the NCUAB steps into the shoes of the credit union and

succeeds to "all rights, titles, powers, and privileges of the credit union . . . ."  12 U.S.C.

§ 1787(b)(2)(A)(i).  The conservatorship order thus places the NCUAB in charge of JAFCU.

The NCUAB has the responsibility to place a troubled credit union into conservatorship

in order "to conserve the assets of any insured credit union or to protect the [NCUSIF.]"

12 U.S.C. § 1786(h)(1).  If a federal agency such as NCUA "acts as a conservator, its mission is

rehabilitation[.]"  *Collins v. Yellen*, 594 U.S. 220, 238 (2021).  Accordingly, as conservator of

JAFCU, the NCUAB will take actions "necessary to put the credit union in a sound and solvent

condition; and appropriate to carry on the business of the credit union and preserve and conserve

the assets and property of the credit union."  12 U.S.C. § 1787(b)(2)(D).

One action that NCUAB may take as conservator is filing lawsuits to recover credit union

funds.  "In both its capacity as conservator and as liquidation agent, the NCUA is empowered to

bring suit on behalf of the credit union and use any money recovered through litigation to

replenish the [NCUSIF]."  *NCUAB v. Barclays Cap. Inc.*, 785 F.3d 387, 389 (10th Cir. 2015).

Consistent with that authority, and in the interest of preserving JAFCU and protecting the

5

NCUSIF, the NCUAB has brought a lawsuit against all Defendants, *see* ECF No. 17, Am. Compl., and the present motion for a preliminary injunction, prejudgment attachment, and a trusteeship under the FCUA.

**APPLICABLE LEGAL STANDARDS**

The FCUA permits the NCUAB, when acting as conservator or liquidating agent, to request "an order placing the assets of any person . . . under the control of the court and appointing a trustee to hold such assets." 12 U.S.C. § 1787(b)(2)(G); *see FSLIC v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) ("[A]n asset freeze by preliminary injunction is an appropriate method to assure the meaningful, final equitable relief sought."). The relevant section, 12 U.S.C. § 1787(b)(2)(G), which is entitled "Attachment of assets and other injunctive relief," allows a court to enjoin persons from dissipating assets potentially connected to their wrongdoing against a credit union. *See FDIC. v. Faulkner*, 991 F.2d 262, 264 n.3 (5th Cir. 1993) (citing 12 U.S.C. § 1821(d)(18)) (The FDIC as Receiver may seek an injunction "[t]o prevent the dissipation of assets fraudulently obtained from federally insured financial institutions[.]"); *NCUAB v. True Yang Vangh*, No. 15-SM-0082, 2015 WL 13767043, at *2 (D. Minn. Oct. 16, 2015) (entering TRO enjoining defendants from "dissipat[ing], remov[ing], or encumber[ing] assets that they stole from the credit union.").[1]

This section also permits a court to attach assets to ensure the agency's ability to collect a potential judgment against the person connected to the wrongdoing. *See Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1517 (D.C. Cir. 1993) ("Section

---

[1] The relevant sections of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1821(d)(18, (19), are materially the same as 12 U.S.C. §§ 1787(b)(2)(G), (H). *See FDIC v. RBS Sec. Inc.*, 798 F.3d 244, 250 n.8 (5th Cir. 2015) (relying on FCUA precedent in FDIC litigation because the extender statutes in both the FDIA and the FCUA were "for all intents and purposes identical").

6

1821(d)(18) allows the RTC to attach the assets of any person."); *In re Colonial Realty Co.*, 980 F.2d 125, 128 n.2 (2d Cir. 1992) ("Section 1821(d)(18) empowers the FDIC-receiver to obtain attachment of assets and other injunctive relief pursuant to the relaxed standards set forth in § 1821(d)(19)."); *NCUAB v. Zovko*, No. 1:13 CV 1430, 2014 WL 12889793, at *5 (N.D. Ohio Mar. 31, 2014) (entering order under 12 U.S.C. § 1787(b)(2)(G) attaching defendants' real property). It further permits a court to appoint a trustee, which "is analogous to a receiver[,]" to manage assets subject to the attachment. *FDIC v. Elio*, 39 F.3d 1239, 1244 (1st Cir. 1994).

A preliminary injunction is "designed to prevent irreparable harm during the pendency of litigation." *Mississippi Ass'n of Educators v. Bd. of Trs. of State Institutions of Higher Learning*, No. 3:25-CV-00417-HTW-LGI, 2025 WL 2142676, at *1 (S.D. Miss. July 20, 2025) (citing *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Relatedly, a prejudgment attachment of assets is "intended to preserve . . . [property] from waste or dilapidation, and to keep it within control of the court until the rights of the parties concerned can be adjudicated by a final decree" through the imposition of a lien on a defendant's property. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 250 (3d Cir. 2022) (quoting *Forgay v. Conrad*, 47 U.S. 201, 204-05 (1848)). A receivership or trusteeship is yet another mechanism to protect a party's interest in property pending the outcome of litigation. *See SEC v. Barton*, 135 F.4th 206, 217-18 (5th Cir. 2025). The preservation of assets through these means is particularly important where the recoveries will serve the public interest, as they will here. *See FDIC. v. Cafritz*, 762 F. Supp. 1503, 1509 (D.D.C. 1991) ("[T]he statute[s] . . . giv[ing] regulators power 'to enjoin the dissipation of assets wrongfully obtained' . . . evidences Congress' seriousness of purpose in protecting taxpayers' interests.").

In response to NCUAB's request for a preliminary injunction, prejudgment attachment, and trusteeship, "a court . . . may . . . issue an order in accordance with Rule 65 of the Federal Rules of Civil Procedure[.]" 12 U.S.C. § 1787(b)(2)(G).  "Federal Rule of Civil Procedure 64, which is the standard avenue for parties seeking attachment of property, does not apply when the NCUAB invokes its powers under § 1787(b)(2)(G)." *Zovko,* 2014 WL 12889793, at *2; *see Faulkner*, 991 F.2d at 265 ("[T]he preliminary injunction provisions of [12 U.S.C. § 1821(d)(18)] . . . do[] not make a distinction between [legal relief and equitable relief] for the purpose of issuing an asset freeze."); *see also Dixon*, 835 F.2d at 560 ("[Even though] an injunction to secure future payment of possible money damages would be in the nature of a 'prejudgment attachment" subject to Federal Rule of Civil Procedure 64 . . . . case law does allow a district court to exercise its equitable powers in ordering a preliminary injunction to secure an equitable remedy such as restitution.").  In addition, "the appointment of a trustee under 12 U.S.C. § 1821(d)(18) is governed by the standards and precedents applicable to the issuance of injunctive relief under Rule 65" rather than under Rule 66. *Elio*, 39 F.3d at 1245.  Therefore, Fed. R. Civ. P. 65 governs all of the NCUAB's requests for relief in this motion.

To establish the basis for relief under Fed. R. Civ. P. 65, a movant must generally "establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Mississippi Ass'n of Educators*, 2025 WL 2142676, at *1 (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)).  The Fifth Circuit espouses a "sliding scale" approach such that a greater showing on a particular factor allows for a lesser showing on the other three factors. *See TitleMax of Texas, Inc v. City of Dallas*,

8

142 F.4th 322, 328 (5th Cir. 2025).  Importantly, the "FCUA loosens some of the requirements of Rule 65 where the NCUAB seeks to attach assets [or requests other relief permitted] under § 1787(b)(2)(G)."  *Zovko*, 2014 WL 12889793, at *3.

Specifically, Congress relieved the NCUAB of the need to show irreparable injury.  *See* 12 U.S.C. § 1787(b)(2)(H)(i) ("Rule 65 of the Federal Rules of Civil Procedure shall apply . . . without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate."); *NCUAB v. Johnson*, 133 F.3d 1097, 1101 (8th Cir. 1998) ("Where the NCUAB moves for a preliminary injunction, Congress has expressly removed the requirement that the movant show that irreparable harm will result without the injunction."); *see also Faulkner*, 991 F.2d at 264 n.3 ("To prevent the dissipation of assets fraudulently obtained from federally insured financial institutions, [Congress] altered the showing the FDIC must make to obtain a preliminary injunction."); *Elio*, 39 F.3d at 1245 (In requesting appointment of a trustee, "there is no need for plaintiff to show that the injury, loss or damage will be irreparable or immediate.").  "Congress . . . grant[ed] . . . relief from the more rigorous requirements of Rule 65 because the [federal financial regulators] are [ultimately] in the position of protecting . . . the taxpayers' money."  *Faulkner*, 991 F.2d at 265 (citing 136 Cong. Rec. E3686 (daily ed. Nov. 2, 1990)).  Under the modified Rule 65 standard, the NCUAB submits that there is a compelling need for injunctive relief, as explained below.

## LEGAL ISSUES PRESENTED

(1)     Whether a preliminary injunction enjoining Tina Funez from transferring or dissipating assets, a prejudgment attachment of Funez's accounts and assets, and placing certain assets under the control of the Court with the NCUAB serving as trustee, are all supported under

9

the traditional four-factor test for injunctive relief, recognizing that the NCUAB need not show irreparable harm; and

(2)    If entitled to injunctive relief, whether the NCUAB, as a United States agency, must post a bond in connection with such relief.

## ARGUMENT

### I.    The NCUAB is Likely to Succeed on the Merits of Its Claims Against Tina Funez.

Analysis of the likelihood of success on the merits is conducted by reference to the "standards provided by the substantive law" applicable to the causes of action identified in the complaint. *TitleMax*, 142 F.4th at 329. "To show a likelihood of success, plaintiffs must present a prima facie case[.]" *Id.* Even "some likelihood of success on the merits will justify temporary injunctive relief[]" if the movant has made a strong showing on the other factors. *Productos Carnic, S.A. v. Cent. Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

The NCUAB's amended complaint sets forth twelve causes of action exclusive of its count for relief under 12 U.S.C. § 1787(b)(2)(G). *See* ECF No. 17. Funez is named in three of those counts, specifically two counts of fraudulent transfer and one count of constructive trust. The NCUAB will likely prevail on those counts given that Funez has admitted to providing no consideration for at least $1 million in gifts from Leigh Bridges and that Leigh Bridges has admitted to substantial misappropriation and its concealment. *See True Yang Vangh*, 2015 WL 13767043, at *2 (finding likelihood of success on the merits was met for the TRO requested when NCUAB "submitted evidence that defendants fabricated $1.8 million in loans and converted the proceeds to their own use"); *see also Harris v. Upwintrade.com*, No. 1:24-CV-00313, 2024 WL 4920599, at *4 (E.D. Tex. Sept. 5, 2024) (finding that a TRO was justified in light of obvious fraud).

10

### A. Leigh Bridges misappropriated significant funds from JAFCU and concealed that activity from JAFCU and the NCUA.

Leigh Bridges became the president and CEO of JAFCU in 2021 after having previously served as JAFCU's CFO. *See* Meyer decl. ¶ 5. Leigh Bridges abused her position in that she improperly used JAFCU funds to make expenditures for the personal benefit of her, her husband, and others, including Tina Funez. Specifically, on April 17, 2026, in a meeting with JAFCU board members and two NCUA examiners, Leigh Bridges admitted to misappropriating JAFCU funds for her own personal benefit. *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶ 10; O'Quinn ¶¶ 8-10. Leigh Bridges admitted to using JAFCU funds to make extensive personal purchases, including expensive jewelry and handbags, and to transferring JAFCU funds into personal accounts, including accounts with American Express, Acorns Investing, and JP Morgan Chase Bank. *See* Baylor decl. ¶ 8; O'Quinn decl. ¶¶ 8, 10. Aggregating the transactions for the share accounts of Leigh and Chad Bridges shows over **$51 million dollars in false entries** from the year 2015 until the present. *See* Stanislao decl. ¶ 6. As of April 17, 2026, the total difference between the stated financials of JAFCU and the actual financials was a deficit of at least $95 million. *See* Meyer decl. ¶ 8.

Although the NCUAB has not yet been able to account for the totality of the missing funds, or how all of the misappropriated funds were utilized, Corporate America, JAFCU's corporate credit union, brought to the NCUA's attention millions of dollars of transactions running through JAFCU for the benefit of the Defendants. According to Corporate America's records, ACH transactions from January 1, 2025 through March 31, 2026, wire transfers from January 2021 through March 31, 2026, and check transactions from March 2019 through March 31, 2026, all show outgoing transfers from JAFCU of at least $22,453,999.67 for the benefit of Defendants. *See* Corp. decl. ¶¶ 7-10. As set forth fully in the declaration of Corporate America, Leigh Bridges

11

made or caused to be made the transfer of $15,052,890.45 of JAFCU funds to pay her personal credit card bills with Apple Card, Chase Bank, and American Express. *See id.* ¶ 8; *see also id.* ¶¶ 7, 9 (identifying expensive personal purchases of the Bridges). Indeed, JAFCU records show that since 2015, over $40 million in payments were made from Leigh and Chad Bridges' JAFCU share accounts to American Express. *See* Stanislao decl. ¶ 9.

Between May 1, 2019 and May 4, 2026, funds coming into Chad Bridges' share accounts at JAFCU from his salary after payroll deductions totaled $397,035.13 (approximately $56,719.30 per year). *See* Stanislao decl. ¶ 7. During that same period, funds coming into Chad Bridges' share accounts at JAFCU from Leigh Bridges' salary after payroll deductions totaled $705,637.40 (approximately $100,805.35 per year). *See id.* Leigh Bridges' taxable yearly salary from JAFCU for 2025 was $193,758 and Chad Bridges' taxable yearly salary from his employer for 2025 was $86,633. *See id.* The purchases described above were therefore grossly inconsistent with Defendants' financial means to afford such purchases.

In light of Leigh Bridges' admission to misappropriating an indefinite amount of funds from JAFCU, the NCUAB's analysis showing at least $51 million in deposits to the Bridges' accounts from the JAFCU general ledger, and the intermingling of substantial amounts of misappropriated funds with a modest amount of potentially legitimate funds, the expenditures must be presumed to have been made using funds rightfully belonging to JAFCU. Consequently, the NCUAB will likely prevail on several causes of action against Leigh Bridges, including claims of conversion, breach of fiduciary duty, fraudulent misrepresentation, and the federal credit union director and officer liability statute, as explained in Part B. Because the NCUAB will likely prevail on those claims against Leigh Bridges, it will likely also prevail against Funez under fraudulent transfer and constructive trust theories, as explained in Part C.

12

**B. Leigh Bridges' misappropriation establishes that the NCUAB will likely prevail on its claims against her under Mississippi tort law and under federal law.**

The NCUAB will likely prevail on its claims under Mississippi tort law, including its conversion claim. To establish the intentional tort of conversion, a plaintiff must show "a wrongful possession with intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 426 (S.D. Miss. 2015), *aff'd*, 886 F.3d 507 (5th Cir. 2018) (quoting *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So.2d 767, 773-74 (Miss. 2004)).

Leigh Bridges admitted to misappropriating JAFCU funds to fund her personal accounts and to make extensive personal purchases. *See* Baylor decl. ¶ 8; Hill decl. ¶¶ 9-10; O'Quinn decl. ¶ 10. The use of such funds was made clear at the April 17, 2026 meeting and was not for any known legitimate purpose. Although the amount of conversion is not yet known, NCUAB's analysis shows at least $51 million in deposits to the Bridges' accounts from the JAFCU general ledger. *See* Stanislao decl. ¶ 6. In addition, Corporate America found millions of dollars flowing through the accounts of her and her husband to fund what appear to be personal expenses. *See* Corp. decl. ¶¶ 7-10. The Defendants' combined payroll deposits for the past seven years do not even equal the amount currently available in Chad Bridges' share accounts with JAFCU and are insufficient to support such extravagant purchases. The obvious wrongful use and possession of JAFCU funds establishes that the NCUAB will likely prevail on its claim of conversion.

For similar reasons, the NCUAB will also likely prevail on its claim for breach of fiduciary duty. In Mississippi, "[t]he elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship, and (2) its breach." *Cascade Cap. Grp., LLC v. Livingston Holdings, LLC*, No. 3:17CV952-LG-MTP, 2019 WL 438488, at *12 (S.D. Miss. Feb. 4, 2019). Like an officer of a bank, as an officer of a credit union, the CEO has a fiduciary duty to the credit union.

13

*See Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 84 (Miss. 1992) (holding that bank branch manager had fiduciary duties).  Leigh Bridges was the CEO and previously the CFO of JAFCU, *see* Meyer decl. ¶ 5, a credit union with three branches.

Fiduciaries owe their principal "a duty of loyalty and fair dealing."  *Omnibank of Mantee*, 607 So. 2d at 84.  "A part of an officer's duty of loyalty requires that he protect the corporation's property. That he may not appropriate corporate assets to his own use seems apparent." *Omnibank of Mantee*, 607 So. 2d at 91.  Of course, if a bank or credit union officer "steal[s] and embezzle[s] [or] defraud[s] the corporations they serve," they are in breach of the duty of loyalty.  *Id.* at 90.  In misappropriating millions of dollars of funds for her personal use, Leigh Bridges is clearly in breach of her fiduciary duty to JAFCU.

She is also in breach of her duty to disclose the true financial position of JAFCU to the board of directors.  Fiduciaries are obligated "to make 'a full disclosure of any and all material facts within his knowledge, and of which he knows or should know that the other person is ignorant.'"  *Strong v. First Fam. Fin. Servs., Inc.*, 202 F. Supp. 2d 536, 541 (S.D. Miss. 2002) (quoting *American Nat. Ins. Co. of Galveston, Tex. v. Murray*, 383 F.2d 81, 86 (5th Cir. 1967)). If one is a fiduciary, "his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act[.]"  *Id.* at 540-41 (quoting *Van Zandt v. Van Zandt*, 86 So.2d 466, 470 (Miss. 1956)).

Leigh Bridges admitted to concealing the fact that funds were missing from JAFCU by overstating the amount on JAFCU's general ledger on deposit with or pending from Corporate America, and through altering ACH entries on JAFCU's ledger to conceal the true purpose of those entries.  *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶¶ 7-10; Meyer ¶ 8; O'Quinn decl. ¶¶ 8-10.

14

Leigh Bridges also told the JAFCU board that JAFCU was well capitalized and doing well. *See* Hill decl. ¶ 5. Such concealment is undoubtedly a breach of her fiduciary duty to JAFCU.

The concealment also constitutes the tort of fraudulent misrepresentation under Mississippi law. "The elements of fraud . . . include: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Levens v. Campbell*, 733 So. 2d 753, 761-62 (Miss. 1999).

The false statements concerning the amount held at Corporate America are material in both the amount of loss she concealed, estimated to be at least $95 million, *see* Meyer decl. ¶ 8, and that doing so was clearly to perpetuate her scheme to misappropriate funds from JAFCU. The board of directors had a right to rely on such statements, as Leigh Bridges was a fiduciary of JAFCU, as explained above. By the time of the April 17, 2026 meeting, Leigh Bridges' concealment of her misappropriation had caused significant financial harm to JAFCU. Because the elements are met, the NCUAB has a likelihood of success as to fraudulent misrepresentation.

The NCUAB is also likely to succeed in establishing fraudulent misrepresentation based on Leigh Bridges' false statements made with respect to wire transfer forms and ACH transactions. Leigh Bridges admitted to altering ACH entries on JAFCU's ledger to conceal the true purpose of those entries. *See* Meyer ¶ 8; O'Quinn decl. ¶ 8. The concealment of wire transfers is evident from a wire transfer sheet to Tiffany & Co. On that sheet, she altered the wire transfer sheet to instead identify Raymond James as the beneficiary. *See* Ex. B, Wire sheet; Corp. decl. ¶ 6. The board of directors had a right to rely on such statements, as Leigh Bridges

15

was a fiduciary of JAFCU, as explained above. By the time of the April 17, 2026 meeting, Leigh Bridges' concealment of the transactions that she made utilizing JAFCU funds had caused significant financial harm to JAFCU. The NCUAB therefore has a likelihood of success on its second count of fraudulent misrepresentation.

In establishing a likelihood of success on these four torts under Mississippi law, the NCUAB also establishes a likelihood of success on a claim against her under federal law. "A director or officer of an insured credit union may be held personally liable for monetary damages in any civil action by, on behalf of . . . of the [NCUA] Board . . . acting as conservator or liquidating agent of such insured credit union . . . for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct." 12 U.S.C. §§ 1787(h)(1), (3). In committing the intentional torts of conversion and fraudulent misrepresentation, and in willfully breaching her fiduciary duty to JAFCU, Leigh Bridges is liable to the NCUAB consistent with 12 U.S.C. § 1787(h).

### C. Because the misappropriated funds were used to provide funds and gifts to Tina Funez, the NCUAB will likely prevail on its claims against Funez for constructive trust and fraudulent transfer.

Based on Leigh Bridges' misappropriation of JAFCU funds, the NCUAB will likely prevail against Tina Funez under a claim for constructive trust. "A constructive trust 'is a means . . . whereunder one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.'" *Barriffe v. Est. of Nelson*, 153 So. 3d 613, 618 (Miss. 2014). There are "several examples of wrongful conduct that may justify imposition of a constructive trust" which include, among other wrongs, "fraud, actual or constructive" and "abuse of confidence." *Joel v. Joel*, 43 So. 3d 424, 431 (Miss. 2010). "An abuse of confidence

16

within the rule may be an abuse of . . . a technical fiduciary relationship . . . ." *Allred v. Fairchild*, 785 So. 2d 1064, 1068 (Miss. 2001).

As explained in Part B, above, Leigh Bridges likely breached her fiduciary duties, made fraudulent representations, and engaged in conversion, all conduct indicating a constructive trust. Accordingly, all the property acquired using JAFCU funds is held in constructive trust for the benefit of the NCUAB and an equitable lien in favor of the NCUAB is imposed on such property. *See Lindsey v. Lindsey*, 612 So. 2d 376, 379 (Miss. 1992); *Neyland v. Neyland*, 482 So. 2d 228, 230 (Miss. 1986). Importantly, because the funds were misappropriated, the funds and any assets purchased therewith are still JAFCU property. *See Eisenberg v. Grand Bank for Sav., FSB*, 207 F. Supp. 2d 553, 560 (S.D. Miss. 2002), *aff'd*, 70 F. App'x 765 (5th Cir. 2003) (quoting *Newman v. Stuart*, 597 So.2d 609, 613, 614 (Miss. 1992)) ("In this state, as in most states, the law is that neither the thief of stolen property nor his transferees can convey any title or property right to such property."); *see also SEC v. Hallam*, 42 F.4th 316, 332 (5th Cir. 2022) ("Equity considers th[e] asset [subject to a constructive trust] to be held on behalf of the wronged party.").

Funez received many gifts and transfers of money from Leigh Bridges. *See* Hegyi dec. ¶¶ 12-21; Stanislao decl. ¶ 8. Given that the Bridges' salaries alone could not support the vast majority of their expenditures, most, if not all, of that property is likely subject to a constructive trust. Under a constructive trust theory, "the wronged party may recover that party's interest by identifying that precise asset or tracing anything that has been 'substituted for it.'" *Hallam*, 42 F.4th at 332. Notably, Funez made purchases totaling $456,150.32 between 2022 and 2025 as an authorized user on an American Express card account of Leigh Bridges. *See id.* ¶ 7. Forty million dollars in American Express payments were made from the share accounts of Leigh and

17

Chad Bridges containing the funds misappropriated from JAFCU's general ledger. *See* Corp. decl. ¶ 8; Meyer decl. ¶ 11; Stanislao decl. ¶ 9. In addition, $487,666 in funds were transferred from the Bridges' JAFCU accounts with misappropriated funds to Funez. *See* Stanislao decl. ¶ 6, 8. Therefore, at a minimum, the NCUAB will likely be able to trace those transactions to misappropriated JAFCU funds. Although the totality of property subject to the constructive trust will not be known until the NCUAB can fully trace the misappropriated funds with the benefit of discovery, the likelihood of a constructive trust has clearly been established, and it applies to all property acquired with misappropriated JAFCU funds.

Even if the NCUAB is ultimately unable to establish that all property received by Tina Funez is traceable to JAFCU funds, the NCUAB will likely establish that Funez was the recipient of fraudulent transfers. The NCUAB may "avoid a transfer of any interest of an institution-affiliated party . . . in property . . . that was made within 5 years of the date on which the Board becomes conservator . . . if such party or person voluntarily or involuntarily made such transfer . . . with the intent to hinder, delay, or defraud the insured credit union . . . ." 12 U.S.C. § 1787(b)(16)(A); *accord* Miss. Code § 15-3-107(1) ("A transfer . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor or debtor."). As CEO and president of JAFCU since the year 2021, *see* Meyer decl. ¶ 5, Leigh Bridges was an institution-affiliated party because she was an "officer, or employee of, or agent for, an insured credit union[.]" 12 U.S.C. § 1786(r)(1).

In proving the intent to hinder, delay, or defraud JAFCU, "fraudulent transfer can be proven in two ways: directly or circumstantially." *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 385 (5th Cir. 2017). "When direct evidence of fraudulent intent exists, as when a debtor admits the fraud, then intent can be decided as a matter of law." *Id.* (cleaned up). Leigh

18

Bridges admitted to misappropriating funds from the credit union. *See* Baylor decl. ¶¶ 8-9; Hill decl. ¶ 10; O'Quinn decl. ¶¶ 8-10. She is a debtor of the NCUAB because she is liable to the NCUAB for the misappropriation of JAFCU's funds. Those funds were used to fund personal accounts and to make millions of dollars of purchases. *See* Baylor decl. ¶ 8; O'Quinn decl. ¶¶ 8, 10. That evidence is sufficient to show a likelihood that the NCUAB will prevail in proving that fraudulent transfers were made by Leigh Bridges.

Even if Leigh Bridges' misappropriation of JAFCU funds were not direct evidence of actual fraud, there are significant indicia of actual fraud. Indicia of actual fraud includes transfers to family members or friends, a lack of consideration, insolvency of the debtor, and attempts at concealing the transactions. *See Elio*, 39 F.3d at 1246; *accord* Miss. Code § 15-3-107(2) (listing badges of fraud). Tina Funez was a close friend of Leigh Bridges, rents a townhouse from Leigh Bridges, and many of Leigh Bridges' transfers to Funez are known to be without consideration. *See* Hegyi decl. ¶¶ 10-21. Leigh Bridges apparently concealed the source of the misappropriated funds from Funez in that Funez claims she did not know how Leigh Bridges obtained her wealth. *See id.* ¶ 22. Based on this, Leigh Bridges' insolvency based on the debt created by her misappropriation, and Leigh Bridges' concealment, the NCUAB will likely prevail on its fraudulent transfer claim against Leigh Bridges.

For similar reasons, the NCUAB will also likely prevail on its fraudulent-transfer claim against Tina Funez, as the transferee of fraudulently-transferred funds and property. The NCUAB is permitted to recover fraudulently-transferred property from the "initial transferee of such transfer." 12 U.S.C. § 1787(b)(16)(B)(i). The NCUAB may not collect fraudulently-transferred property from a "transferee that takes for value," 12 U.S.C. § 1787(b)(16)(C)(i), but there is no evidence that NCUAB is aware of showing that Funez provided any value for the

19

transfers. Indeed, she admitted that the items and benefits she received from Leigh Bridges were gifts and that the dwelling in Honduras was fully paid for by Leigh Bridges. *See* Hegyi decl. ¶¶ 12-21. Consequently, the NCUAB will likely prevail on its fraudulent-transfer claim against Funez, and a failure to freeze and otherwise protect assets obtained through potentially voidable transactions or subject to a constructive trust will very likely cause the NCUAB significant harm.

**II.    The NCUAB Can Show Significant Harm if it is not Granted a Preliminary Injunction, Prejudgment Attachment, and Trusteeship, Even Though a Showing of Harm is Not Required Under 12 U.S.C. § 1787(b)(2)(H)(i).**

In interpreting the language of 12 U.S.C. § 1787(b)(2)(H)(i), which relieves the NCUAB of proving irreparable harm when seeking injunctive relief, "[s]ome courts have interpreted this [statutory language] strictly as essentially negating the showing of harm required by Rule 65." *Zovko*, 2014 WL 12889793, at *4 (citing *Johnson*, 133 F.3d at 1101); *see True Yang Vangh*, 2015 WL 13767043, at *2; *Cafritz*, 762 F. Supp. at 1506; *see also Faulkner*, 991 F.2d at 267, n.6 (referring to "clear language" of analogous FDIC statutes). At most, the NCUAB must establish "'some potential injury' prior to obtaining an asset freeze . . . ." *Faulkner*, 991 F.2d at 267, n.6 (in dictum). Because the NCUAB can readily establish a likelihood of harm, although the NCUAB need not show any harm, the Court does not need to decide that issue in connection with this motion.

> **A.   The NCUAB will be harmed without the preliminary injunction, prejudgment attachment, and trusteeship because its ability to satisfy a potential judgment will otherwise be impaired.**

Even though a private party seeking equitable relief is often limited to "the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds[,]" *Alguire*, 647 F.3d at 600, because federal financial regulators acting as conservator or receiver are permitted to seek attachments of property under a statute that lessens the standard for harm, the

insufficiency of assets to satisfy a potential judgment alone establishes harm for purposes of relief under § 1787(b)(2)(G) and analogous statutes. *See Elio*, 39 F.3d at 1247 ("The record supports . . . that the F.D.I.C. would be harmed . . . specifically, that the F.D.I.C.'s ability to fulfill its statutory objective of collecting on the assets of the failed banks would be impaired."); *RTC v. Cruce*, 972 F.2d 1195, 1200 (10th Cir. 1992) ("[T]he record . . . suggests that [defendant] does not possess assets of sufficient value—even taking into account the assets he allegedly fraudulently conveyed . . . to extinguish this liability. These facts alone support a showing of injury."); *see also Dixon*, 835 F.2d at 563 ("[I]ts general equitable powers give the district court the authority to freeze assets when necessary, as here, to preserve meaningful equitable remedies."). For this reason, the Fifth Circuit found "no error in the district court's application of the preliminary injunction provisions of [12 U.S.C. §§ 1821(d)(18), (19)] for the purpose of securing a potential damage award" for the FDIC as receiver of a failed bank. *Faulkner*, 991 F.2d at 265.

The benefits received by Tina Funez from Leigh Bridges exceed one million dollars. *See* Hegyi decl. ¶¶ 15, 17, 19, 20; Stanislao decl. ¶ 8. The NCUAB may obtain a money judgment against a transferee of fraudulent transfers. *See* 12 U.S.C. § 1787(b)(16)(B)(i) ("To the extent a transfer is avoided . . . the Board may recover . . . if a court so orders, the value of such property (at the time of such transfer) from . . . the initial transferee of such transfer . . . ."). Given that certain benefits that Funez received are not recoverable, such as luxury vacations, and other property that she received from Leigh Bridges, such as her automobile, have likely depreciated in value, any potential judgment almost certainly exceeds the property owned by Funez. Attachment of all of Funez's accounts and assets pending the outcome of this lawsuit is therefore justified.

21

The same reasoning justifies a preliminary injunction restraining Funez from transferring or dissipating any accounts or assets subject to the attachment.  "District courts have an inherent authority to enforce their injunctions . . . and to preserve their ability to render judgment[.]" *Parker v. Ryan*, 960 F.2d 543, 546 (5th Cir. 1992) (citations omitted); *see United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) ("This Court has repeatedly recognized the power of a federal court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained[.]").  An attachment of assets is of little utility if Funez is also not prohibited from transferring such assets.  Tina Funez resides within this District, *see* Stanislao decl. ¶ 3, and thus this Court has personal jurisdiction over her.  *See Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 374 (5th Cir. 2003) ("The residency of a defendant in the forum state routinely creates [general jurisdiction].").  Therefore, this Court has the authority to restrain Funez from transferring or dissipating property, even though certain property, such as real property that she owns in Honduras, may be outside the jurisdiction of this Court.  *See SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 294 (5th Cir. 2024) (holding that court can enjoin persons over whom there is personal jurisdiction).

Consistent with this Court's authority to enforce its injunctions, the proposed order requires Tina Funez to identify certain interests in property.  Her assets include jewelry and high-end handbags.  *See* Hegyi decl. ¶¶ 20-21.  At this time, the NCUAB is unaware of the totality of those items possessed by the Funez.  As such, it will not be possible to know whether she is in compliance with any preliminary injunction until an inventory is provided.  Requiring Funez to provide the NCUAB with access to her property is therefore essential to the viability of any prejudgment attachment authorized by this Court.

22

Appointment of the NCUAB as trustee of many of those assets is also necessary to protect the prejudgment attachment and preserve the possibility of a meaningful final judgment. Assets, such as jewelry and handbags, are valuable, but are also easily transferable. A trusteeship thus permits the NCUAB to inventory and fully account for some of the more valuable items of property subject to the prejudgment attachment. A trusteeship eliminates concerns that a party will choose to transfer or dissipate valuable assets. *See Barton*, 135 F.4th at 218 ("Barton exerting some degree of control over investor assets . . . increases the risk of asset dissipation[.]"). Moreover, a trusteeship is appropriate if "the value of the assets will decline if they are not well managed." *Id.* A trusteeship that permits the NCUAB to inventory, evaluate, maintain, and safeguard certain property pending the outcome of this lawsuit is critical to preserving the status quo.[2]

### B. The NCUAB will be harmed without the preliminary injunction, prejudgment attachment, and trusteeship because Tina Funez will be able to transfer or dissipate property that is likely subject to a constructive trust.

Even if the inadequacy of assets sufficient to satisfy a potential judgment were insufficient to establish harm, the NCUAB can establish harm because many of the assets seized, and proceeds therefrom, are likely held in a constructive trust, as explained in Section I.C, above. "[The Fifth Circuit] and others have upheld broad preliminary injunctions based upon a party's request for entry of a constructive trust." *Tisino v. R & R Consulting & Coordinating Grp., L.L.C.*, 478 F. App'x 183, 185 (5th Cir. 2012) (citing *Dixon*, 835 F.2d at 561); *see Zovko*, 2014 WL 12889793, at *5 (finding NCUAB established harm by "stat[ing] that the property

---

[2] Rather than a trusteeship, the proposed order provides for what could be considered a "monitorship" for her automobile. *See, e.g., Barton*, 135 F.4th at 218-19. The monitorship permits Tina Funez to use her automobile for limited purposes, but provides a mechanism for the NCUAB to seek to place that asset under this Court's control if she does not properly care for it.

sought to be attached was purchased with funds received from [the liquidated credit union].”). The harm is particularly salient here as the funds were misappropriated and thus are still JAFCU property. *See Eisenberg*, 207 F. Supp. 2d at 560; *see also Harris*, 2024 WL 4920599, at \*4 (“The asset freeze the [plaintiffs] seek . . . is permissible in light of their request for a constructive trust over specific, traceable stolen assets[.]”). The fact that the property traceable to misappropriated funds belongs to JAFCU also justifies a trusteeship. Trusteeships or receiverships are often implemented when “necessary to protect a party’s interest in property[,]” *Barton*, 135 F.4th at 217, which the NCUAB would have by virtue of its constructive trust and/or equitable lien.

The NCUAB cannot trace all the purchases to specific items without the benefit of discovery, but that does not matter for purposes of this motion and at this early stage of the litigation. *See Janvey v. Proskauer Rose LLP*, No. 3:13-CV-477-N-BG, 2017 WL 11499756, at \*5 (N.D. Tex. June 19, 2017) (requiring a plaintiff to identify all property potentially subject to a constructive trust in its complaint “is illogical and would require a creditor to do the impossible—identify (or more accurately guess) in its complaint, prior to discovery, where a party may have transferred proceeds or assets in an attempt to defraud creditors.”). Indeed, “the burden is upon the party opposing an injunction to prove that certain assets are unrelated to the underlying litigation and should therefore be excluded from a constructive trust.” *Tisino*, 478 F. App’x at 186 (referring to Texas’s law of constructive trusts); *see Barton*, 135 F.4th at 227 (“[F]reezing the assets . . . is appropriate to prevent . . . irreparable harm, given that [defendant’s] commingling of funds . . . hindered tracing efforts.”). The amount of Funez’s assets likely subject to a constructive trust establishes more than adequate harm for purposes of a prejudgment attachment of assets, a preliminary injunction, and a trusteeship.

24

At the very least, this Court is undoubtedly permitted to enter an "asset freeze . . . to determine which assets are the subject matter of the litigation." *Barton*, 135 F.4th at 227; *see Faulkner*, 991 F.2d at 268 ("[T]he district court did not err in freezing all of the [defendant's] assets, pending a determination through limited discovery of which assets are traceable to [defendant's] alleged fraudulent activities."); *Dixon*, 835 F.2d at 566 ("[S]ince a vital public interest was at stake, the district court was correct to assume that all the defendants' assets were subject to restitution."). As explained in Section I.C, above, the transfers to Funez from the Bridges' JAFCU accounts, the gifts that Funez received, purchased with funds improperly obtained from the credit union, and the items purchases with the American Express card that was paid for by Leigh Bridges, are all subject to a constructive trust. Consequently, to protect the property rights of JAFCU, this Court should at the very least enjoin Funez from transferring funds and property, and permit certain property to be placed in trust, until there is a determination of which property is subject to the constructive trust.

### C. The NCUAB will be harmed without the preliminary injunction, prejudgment attachment, and trusteeship because Tina Funez's conduct suggests the possibility of dissipation.

Even if the NCUAB were required to show the potential dissipation of assets, the Fifth Circuit has recognized a presumption of dissipation of assets where defendants have received or acquired assets through the concealed misappropriation of funds. *See Alguire*, 647 F.3d at 601 ("Receiver provided evidence of a massive Ponzi scheme and proof that each individual received proceeds from the fraudulent scheme. This is sufficient to prove the likelihood of each individual removing or dissipating the frozen assets but for the preliminary injunction."); *see also Dixon*, 835 F.2d at 562 ("[T]he courts' ability to fashion preliminary relief . . . is especially true where the evidence strongly indicates that the assets were ill-gotten gains at the expense of an interest

25

of the public protected by law."). As explained in Section I above, there is substantial evidence that Leigh Bridges misappropriated funds from JAFCU and that the monies were utilized to provide gifts and other benefits to Funez. The presumption of dissipation thus applies here.

Even without the presumption of dissipation, there is specific evidence of the possibility of dissipation. In examining the possibility of dissipation, courts look at how easily assets or funds can be transferred outside of the Court's jurisdiction. *See Alguire*, 647 F.3d at 600 ("If the defendants were to dissipate or transfer these assets out of the jurisdiction, the district court would not be able to grant the effective remedy, either in equity or in law, that the Receiver seeks."); *Harris*, 2024 WL 4920599, at *4 ("[T]he assets allegedly stolen from the [plaintiffs] could be further transferred to unretrievable locations at any time, with the click of a button . . . . Several federal courts have found that this exigency justified issuance of freezing orders.") (citing cases). The descriptions of at least 26 transfers to Funez from the share accounts of Chad Bridges in the total amount of approximately $400,000 refer to Honduran businesses and/or locations in Honduras. *See* Stanislao decl. ¶ 8. Funez wired funds that were received from the Bridges' accounts to contractors in Honduras and had at least one relative in Honduras. *See* Hegyi decl. ¶¶ 16, 17. Therefore, even assuming the NCUAB had to show a threat of dissipation, these indicia establish such a threat here, establishing more than adequate harm for the purposes of the four-factor injunction standard.

### III.   The Remaining Injunction Factors Favor the Entry of a Preliminary Injunction, Prejudgment Attachment, and Trusteeship.

#### A.   *The balance of hardships greatly favors the NCUAB.*

If the NCUAB establishes harm, then "equity favors granting [injunctive relief] because, while the order will likely inconvenience defendants, this inconvenience is outweighed by the potential harm that plaintiff would suffer if defendants dissipated, removed, or encumbered

assets that they stole from the credit union." *True Yang Vangh*, 2015 WL 13767043, at *2; *see also Barton*, 135 F.4th at 227 ("[T]he concern for dissipation of assets and the defrauded investors' irreparable harm outweighs any harm to Barton if he is enjoined from transferring assets."). The NCUAB's interest in attachment of assets, a preliminary injunction, and its appointment as trustee is greater than an ordinary litigant because it seeks the order to further a public rather than a private interest. *See Zovko*, 2014 WL 12889793, at *5 ("A temporary attachment of [defendants'] property, while small in the context of the fraud, is a proper use of the attachment process because it secures assets which could help . . . recover some of the losses from the fraud, which affects the public interest in having a secure banking system."); *cf. Dixon*, 835 F.2d at 562 ("The general flexibility of equitable powers is enhanced where . . . the public interest is at stake."). Given Leigh Bridges' admission to misappropriating JAFCU funds, and Funez's admitted receipt of at least one million dollars in benefits from Leigh Bridges without consideration, the balance of harms clearly favors the NCUAB as the conservator of JAFCU.

Tina Funez will be unable to establish any meaningful harm. To the extent she claims an interest in the JAFCU funds transferred or any of the assets acquired with JAFCU funds, she has no legal right to those funds. *See Eisenberg,* 207 F. Supp. 2d at 560; *see also Faulkner*, 991 F.2d at 268, n.9 ("Because the [defendant's family members] have not demonstrated which assets are traceable to [defendant's] alleged fraud, they cannot prove an independent interest in their assets."). To the extent Funez possesses assets that were acquired without the assistance of misappropriated funds, she "will suffer at worst a temporary inability to move assets if the injunction is later dissolved." *Harris*, 2024 WL 4920599, at *5.

Even though appointing the NCUAB as trustee puts certain property under the control of this Court, the potential harm to Defendants is minimal. The personalty subject to the trusteeship

27

requested comprises mostly luxury goods that are unnecessary to basic living needs.  Courts are especially reluctant to view a defendant's lack of access to assets as a hardship if they have been living above their means.  *See Jostens, Inc. v. Hammons*, No. 4:20-CV-00225, 2022 WL 2392311, at *3 (E.D. Tex. July 1, 2022) ("Evidence at trial showed that [defendants] bought with the proceeds of the stolen rings multiple vehicles, a house with land, exotic pets like llamas and peacocks, international travel, etc. The Court will not shield [defendants] from the consequences of these choices at the expense of [the plaintiff.]").  To the extent that Funez believes that certain items are in fact necessary for daily sustenance, the proposed order provides a mechanism for the Defendants to challenge the placement of specific property under control of this Court. The proposed order also permits Funez to use any salary for living expenses and permits restricted automobile ownership subject to the injunction.

As specified in the proposed order, all the property included in the trusteeship will be inventoried and preserved by the NCUAB.  The proposed order also places liability on the NCUAB under certain circumstances if property is mishandled or lost.  The NCUAB's counsel in this litigation is experienced in trusteeship matters, having been appointed as receiver for the Securities & Exchange Commission in connection with "a multi-million dollar Ponzi scheme that defrauded hundreds of investors."  *See SEC v. Adams*, No. 318CV00252CWRFKB, 2018 WL 3097028, at *1-2 (S.D. Miss. June 22, 2018).  For the above reasons, the balance of harm undoubtedly favors the NCUAB as the conservator of JAFCU.

**B. *The public interest strongly favors entry of a preliminary injunction, prejudgment attachment, and trusteeship.***

In assessing whether injunctive relief could disserve the public interest, courts have found that in seeking to freeze assets of those believed to be responsible for the financial institution's failure, federal financial liquidators serve important public interests.  "Granting [an injunction]

28

serves the public interest by allowing plaintiff to protect the . . . members of the credit union." *True Yang Vangh*, 2015 WL 13767043, at *2. More broadly, "even th[e] sparse legislative history" concerning the enactment of the asset-freeze statutes "evidences Congress' seriousness of purpose in protecting taxpayers' interests[,] which is undoubtedly consistent with the public interest. *Cafritz*, 762 F. Supp. at 1509; *see Cruce*, 972 F.2d at 1201 ("[T]he RTC protects the depository insurance fund, which in a very real sense translates to the interest of all taxpayers."). Like other regulators, the NCUA's insurance of members' accounts "is fundamental to the financial stability of the entire [financial institution] industry[.]" *Dixon*, 835 F.2d at 563; *see Cruce*, 972 F.2d at 1201 ("Because the RTC's goal in seeking a preliminary injunction is to preserve assets that potentially may provide restitution to the depository insurance fund for monies fraudulently taken by defendants . . . , we cannot conclude that issuance of the injunction is adverse to the public interest."). In guaranteeing a $110 million line of credit to JAFCU, the NCUSIF is ultimately responsible for any unmitigated losses of JAFCU. *See* Meyer decl. ¶ 9.

Even looking at the public interest more generally, the relief requested is still fully consistent with the interest of the public. Public policy favors the entry of injunctive relief to ameliorate the harm caused by insider fraud. *See Barton*, 135 F.4th at 227 ("[S]eeking to protect the interests of defrauded investors . . . is in the public interest."); *Hammons*, 2022 WL 2392311, at *3 ("[T]he requested injunction furthers the public's interest in protecting against civil theft, conversion, and breach of fiduciary duty[.]"). For this reason and for the protection of JAFCU, the NCUSIF, and taxpayers more generally, a preliminary injunction, prejudgment attachment, and trusteeship are all fully consistent with the interest of the public.

29

**IV.      The NCUAB is Not Required to Post a Bond.**

Fed. R. Civ. P. 65(c) exempts the "United States, its officers, and its agencies" from the requirement to post a bond.  The NCUA is a federal agency.  12 U.S.C. § 1752a(a). Accordingly, the NCUAB, when acting as conservator or "liquidating agent is not required to post a bond, as ordinarily required by Rule 65."  *Zovko*, 2014 WL 12889793, at *3; *see True Yang Vangh*, 2015 WL 13767043, at *2 ("As a United States agency, [NCUAB] falls within [the Rule 65(c)] exception, so it need not provide security.").  Therefore, no bond is required here.

**CONCLUSION**

For the reasons explained above, the Court should enter a preliminary injunction against Tina Funez, order the prejudgment attachment of Defendant's accounts and assets, and place certain property of Defendant under the control of this Court with the NCUAB appointed to serve as trustee of such property.

Respectfully submitted,

June 15, 2026

_Alysson Mills_

_____

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of
JACKSON AREA FEDERAL CREDIT UNION

30

## <u>CERTIFICATE OF SERVICE</u>

I, Alysson Mills, certify that on June 15, 2026, I sent a copy of the forgoing to Leigh Bridges at lucyleighjames@aol.com and John Colette, her confirmed counsel, at colettelawms@gmail.com; Chad Bridges at chad.bridges@msdh.ms.gov and Billy Quinn, his presumed counsel, at wquin@mmqnlaw.com; and Tina Funez at tfunez@gmail.com and Chris Routh, her presumed counsel, at chris@csrdefense.com.

*Alysson Mills*

_____

Alysson Mills

31