UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION
---------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION BOARD, in its capacity as conservator of Jackson Area Federal Credit Union,

Plaintiff,

v.

LEIGH BRIDGES, CHAD BRIDGES, and TINA FUNEZ,

Defendants.

---------------------------------------------------------------------X

Case No.: 3:26-cv-343-DPJ-RPM
Hon. Daniel P. Jordan
Hon. Robert P. Myers, Jr.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS URGENT AND NECESSITOUS MOTION FOR IMPOSITION OF A TRUSTEESHIP ON REAL PROPERTY OF DEFENDANTS LEIGH AND CHAD BRIDGES**

Plaintiff, the National Credit Union Administration Board ("NCUAB"), acting in its capacity as conservator of Jackson Area Federal Credit Union ("JAFCU"), submits the following memorandum of law in support of its urgent and necessitous motion for imposition of a trusteeship of real property of defendants Leigh and Chad Bridges.

## BACKGROUND

Leigh and Chad Bridges own real property located at (1) 3826 Sleepy Hollow, Jackson, Mississippi ("Sleepy Hollow residence"), (2) 2085 Great Southern Road, Hazelhurst, Mississippi, (3) 29500 Perdido Beach Boulevard, Apartment 702, Orange Beach, Alabama ("Alabama condo"), and (4) 257 Eastbrooke Street, Jackson, Mississippi ("Eastbrooke condo").[1]

[1] Even though one property is in Alabama, this Court has authority to order the Bridges to convey title to the property because the Court has jurisdiction over them. *See SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 294 (5th Cir. 2024) (holding that court can enjoin persons over whom it has personal jurisdiction).

*See* Newbold decl. ¶ 3. The Sleepy Hollow residence is currently vacant; Chad Bridges lives in an apartment and Leigh Bridges has lived in the Eastbrooke condo with the NCUAB's permission since early July. *See id.* ¶ 3. All of the real and personal property owned by the Bridges is subject to a prejudgment attachment. *See* ECF No. 20, Preliminary Inj. ¶¶ 6, 7.

To protect its prejudgment attachment, the NCUAB took out an insurance policy on the value of the items found at the Sleepy Hollow residence. *See* Newbold decl. ¶ 7. Although the luxury items insured by the policy have since been removed to a secure location, *id.*, the insurance also covers the Sleepy Hollow residence, *see id.* ¶ 8. Maintaining 24/7 security on the premises is needed to avoid non-compliance with the insurance. *See id.* It is also needed because the property is vacant, *see id.* ¶ 4, and because the NCUAB is currently unable to exclude persons from the Sleepy Hollow residence or obtain insurance on the property without title to the property, *see id.* ¶¶ 9, 10. The NCUAB's security cost for the Sleepy Hollow residence is **$3,600 per day**. *See id.* ¶ 6. As of August 20, JAFCU has incurred $225,652.50 in total security costs. *Id.* The need to eliminate that significant expense, which will continue to reduce the monies returned to JAFCU, *see id.*, as well as concerns about management of property expenses, *see id.* ¶¶ 11-13, have led to the filing of this motion to place the real property owned by the Bridges into trusteeship.

The NCUAB has taken significant efforts to resolve this matter without the filing of this motion. The NUCAB's counsel provided a proposed modification to preliminary injunction to counsel for all Defendants on July 17. *See* Ex. A. When negotiations on the proposed agreed order petered out, she sent draft quitclaim deeds to counsel for Leigh Bridges and counsel for Chad Bridges on August 4, and again on August 14. *See* Exs. B and C. Except for a vague reference that he may have some equity in the properties, *see id.*, Chad Bridges has not given a

reason that the real property should not be trusteed. Rather, Chad Bridges has refused to sign the deeds unless the NCUAB releases the lien on his retirement account to pay for living expenses and his attorneys' fees.[2] *See* Ex. C. That refusal to agree on wholly unrelated grounds has necessitated the instant motion for trusteeship under the Federal Credit Union Act (FCUA).

**APPLICABLE LEGAL STANDARDS**

The FCUA permits the NCUAB, when acting as conservator or liquidating agent, to request "an order placing the assets of any person . . . under the control of the court and appointing a trustee to hold such assets." 12 U.S.C. § 1787(b)(2)(G). The relevant section, 12 U.S.C. § 1787(b)(2)(G), which is entitled "Attachment of assets and other injunctive relief,"[3] permits a court to attach assets to ensure the agency's ability to collect a potential judgment. *See Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1517 (D.C. Cir. 1993) ("Section 1821(d)(18) allows the RTC to attach the assets of any person."); *In re Colonial Realty Co.*, 980 F.2d 125, 128 n.2 (2d Cir. 1992) ("Section 1821(d)(18) empowers the FDIC-receiver to obtain attachment of assets and other injunctive relief pursuant to the relaxed standards set forth in § 1821(d)(19)."); *NCUAB v. Zovko*, No. 1:13-cv-1430, 2014 WL 12889793, at *5 (N.D. Ohio Mar. 31, 2014) (entering order under 12 U.S.C. § 1787(b)(2)(G) attaching defendants' real property). To manage assets subject to the attachment, the statute also permits a court to appoint a trustee, which "is analogous to a receiver." *FDIC v. Elio*, 39 F.3d 1239, 1244 (1st Cir. 1994).

---

[2] The proposed modification to preliminary injunction provided each defendant with $3,000 per month of living expenses, *see* Ex. A, but that proposal was not agreed to by Chad Bridges.

[3] The relevant sections of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1821(d)(18, (19), are materially the same as 12 U.S.C. §§ 1787(b)(2)(G), (H). *See FDIC v. RBS Sec. Inc.*, 798 F.3d 244, 250 n.8 (5th Cir. 2015) (relying on FCUA precedent in FDIC litigation because the extender statutes in both the FDIA and the FCUA were "for all intents and purposes identical").

"[T]he appointment of a trustee under 12 U.S.C. § 1821(d)(18) [and § 1787(b)(2)(G)] is governed by the standards and precedents applicable to the issuance of injunctive relief under Rule 65" rather than under Rule 66, which typically provides the standard for the appointment of a receiver. *Elio*, 39 F.3d at 1245. To establish the basis for relief under Rule 65, a movant must generally "establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Mississippi Ass'n of Educatorsv. Bd. of Trs. of State Institutions of Higher Learning*, No. 3:25-cv-00417-HTW-LGI, 2025 WL 2142676, at *1 (S.D. Miss. July 20, 2025) (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)). The Fifth Circuit espouses a "sliding scale" approach such that a greater showing on a particular factor allows for a lesser showing on the other three factors. *See TitleMax of Texas, Inc v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025).

Importantly, the "FCUA loosens some of the requirements of Rule 65 where the NCUAB seeks to attach assets [or requests other relief permitted] under § 1787(b)(2)(G)." *Zovko*, 2014 WL 12889793, at *3. Specifically, Congress relieved the NCUAB of the need to show irreparable injury. *See* 12 U.S.C. § 1787(b)(2)(H)(i) ("Rule 65 of the Federal Rules of Civil Procedure shall apply . . . without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate."); *see Elio*, 39 F.3d at 1245 (In requesting appointment of a trustee, "there is no need for plaintiff to show that the injury, loss or damage will be irreparable or immediate."). "Congress . . . grant[ed] . . . relief from the more rigorous requirements of Rule 65 because the [federal financial regulators] are [ultimately] in the

position of protecting . . . the taxpayers' money." *FDIC. v. Faulkner*, 991 F.2d 262, 265 (5th Cir. 1993) (citing 136 Cong. Rec. E3686 (daily ed. Nov. 2, 1990)).

## ARGUMENT

Under the modified Rule 65 standard, there is a compelling need to place the Bridges' real property into trusteeship. The analysis for the first factor, likelihood of success on the merits, and the fourth factor, the public interest, is the same as the analysis contained within the memorandum in support of the NCUAB's motion for a preliminary injunction against the Bridges. *See* ECF No. 13, P.'s mem. 10-22, 31-32. The NCUAB therefore incorporates the analysis from that memorandum here. The analysis for the second factor, harm to the NCUAB, and third factor, potential harm to the Bridges, is different though, and therefore both are discussed below.

### I. The NCUAB will Continue to Suffer Harm if the Real Property Owned by the Bridges is not Placed under Trusteeship Forthwith.

In interpreting the language of 12 U.S.C. § 1787(b)(2)(H)(i), which relieves the NCUAB of proving irreparable harm when seeking injunctive relief, "[s]ome courts have interpreted this [statutory language] strictly as essentially negating the showing of harm required by Rule 65." *Zovko*, 2014 WL 12889793, at *4; *see NCUAB v. True Yang Vangh*, No. 15-SM-0082, 2015 WL 13767043, at *2 (D. Minn. Oct. 16, 2015); *FDIC. v. Cafritz*, 762 F. Supp. 1503, 1506 (D.D.C. 1991); *see also Faulkner*, 991 F.2d at 267, n.6 (referring to "clear language" of analogous FDIC statutes). At most, the NCUAB must establish "'some potential injury' prior to obtaining an asset freeze . . . ." *Faulkner*, 991 F.2d at 267, n.6 (in dictum). Because the NCUAB can readily establish a likelihood of harm, although the NCUAB need not show any harm, the Court does not need to decide that issue in connection with this motion.

The NCUAB is suffering significant harm in that it is currently required to pay $3,600 per day to secure the Sleepy Hollow residence. *See* Newbold decl. ¶ 6. As of August 20, JAFCU has incurred $225,652.50 in total security costs. *Id.* That expense will continue until the property is titled to and possessed by the NCUAB, which will allow it to exclude persons from the property and for the alarm system for the property to be set. *See id.* ¶¶ 8, 9. Continuing security costs will reduce the recoveries that may be returned to JAFCU in connection with this litigation. *See id.* ¶ 6.

An insurance policy was taken out due to the significant value of the items found at the Sleepy Hollow residence. *See* Newbold decl. ¶ 7. Although many of the luxury items insured by the policy have since been removed to a secure location, *id.*, the insurance also covers the items remaining at the Sleepy Hollow residence, which include a Steinway piano, *see id.* ¶ 8. Maintaining security on the premises is believed to be necessary to avoid non-compliance with the insurance. *See id.* ¶ 8. It is also necessary because the property is vacant, *see id.* ¶ 4, and because the NCUAB is currently unable to exclude persons from the Sleepy Hollow residence without title to the property, *see id.* ¶ 9. For these reasons, security expenses will almost certainly continue to accrue until the Sleepy Hollow residence is in the possession of the NCUAB. A trusteeship will thus allow the NCUAB to discontinue security.

Even setting aside the costs of security, the NCUAB will be harmed without a trusteeship because it cannot fully protect its interest in the property. The purpose of a receivership or trusteeship is to protect a party's interest in property pending the outcome of litigation. *See SEC v. Barton*, 135 F.4th 206, 217-18 (5th Cir. 2025). The NCUAB has an interest in the Bridges' real property by virtue of its prejudgment attachment. *See* ECF No. 20, Preliminary Inj. ¶¶ 6, 7.

JAFCU is in a deficit of at least $95 million. *See* ECF No. 12-7, Meyer decl. ¶ 8. At least $26.8 million of JAFCU funds were run through Chad and Leigh's account with JAFCU between 2019 and 2026 and misappropriated from JAFCU. *See* ECF No. 12-8, Stanislao decl. ¶ 13; *see also* ECF No. 12-7, Meyer decl. ¶¶ 10-11. Rough estimates show that the values of the real estate and vehicles combined would not even satisfy a $26.8 million judgment. *See* ECF No. 12-8, Stanislao decl. ¶¶ 5, 8. Accordingly, the NCUAB's prejudgment attachment interest in the Bridges' property is almost certainly undersecured.[4]

The NCUAB also has an interest because the residence is likely held in a constructive trust, as explained in its memorandum supporting a preliminary injunction. Trusteeships or receiverships are often implemented when "necessary to protect a party's interest in property[,]" *Barton*, 135 F.4th at 217, which the NCUAB would have by virtue of the constructive trust and/or its equitable lien. *See Zovko*, 2014 WL 12889793, at *5 (finding NCUAB established harm by "stat[ing] that the property sought to be attached was purchased with funds received from [the liquidated credit union]"). The harm is particularly salient here as the funds were misappropriated, and thus property purchased with those funds is considered JAFCU property. *See Eisenberg v. Grand Bank for Sav., FSB*, 207 F. Supp. 2d 553, 560 (S.D. Miss. 2002), *aff'd*, 70 F. App'x 765 (5th Cir. 2003) (quoting *Newman v. Stuart*, 597 So.2d 609, 613, 614 (Miss. 1992)) ("In this state, as in most states, the law is that neither the thief of stolen property nor his transferees can convey any title or property right to such property."). The fact that the property obtained utilizing JAFCU funds is held for the NCUAB's benefit justifies a trusteeship on the real property of the Bridges.

---

[4] To date, the NCUAB's forensic auditor has been able to determine that $73,325,882.54 in JAFCU losses were due to Leigh Bridge's misappropriation. Although not necessary for this motion, the NCUAB can provide documentation detailing that amount if necessary.

Moreover, a trusteeship is appropriate if "the value of the assets will decline if they are not well managed." *Barton*, 135 F.4th at 218. Given the strong likelihood of success on the merits, *see* ECF No. 13, P.'s mem. 10-22, the NCUAB will likely eventually be able to sell the real property and apply the proceeds against a judgment far exceeding the value of the properties. The Bridges therefore have a drastically-reduced incentive to carefully manage the properties. Given that the NCUAB has primary interest in the real property at this point in time, the NCUAB should be permitted to manage the property to protect its interest.

Management of the property would allow the NCUAB to ensure that all expenses are paid. The real properties require various upkeep expenses. *See* Newbold decl. ¶ 13. For instance, the Sleepy Hollow residence requires lawncare and pool maintenance. *See id.* The NCUAB, however, does not have an accurate accounting of what utilities or property-related bills are being paid or not. *See id.* Multiple communications from the condominium association managing the Alabama condo have indicated that invoices for the Bridges' condominium have gone unpaid. *See id.* ¶¶ 11, 12. There is a real concern that interest, fees, and/or attorney fees may be added to any unpaid condominium assessments. *See id.* ¶ 12. Due to these concerns, and the fact the NCUAB is the party with the most to lose, the NCUAB is in the best position to manage the real property. *See id.* ¶¶ 13. This cannot be accomplished until the NCUAB has title to the properties, however. Having title to the property will also permit the NCUAB to obtain insurance on the properties, ensuring that the NCUAB is protected against loss. *See id.* ¶ 10. The property titles thus need to be transferred to NCUAB to avoid continuing harm to JAFCU.

## II. The Bridges will not Suffer any Likely Harm if Their Real Property is placed under Trusteeship.

Neither of the Bridges currently resides at the Sleepy Hollow residence. *See* Newbold decl. ¶ 4. Chad Bridges is renting an apartment and Leigh Bridges is residing at the Eastebrooke

residence with the NCUAB's permission. *See id.* Accordingly, transferring titles to the real property does not require them to move or to incur additional expenses.

Rather than harm, the trusteeship will benefit the Bridges because they will no longer have the responsibility of managing the properties. The risk that NCUAB could mismanage the properties is minimal given that the NCUAB has the predominant interest in the properties. Chad Bridges suggests that he may have some equity in the property. *See* Ex. B. Merely transferring title to the NCUAB does not affect that equity, however. Even if this Court were to determine that the Bridges were entitled to have the real property returned to them, the properties could easily be deeded back to them. Accordingly, there is no valid argument against trusteeship based upon any harm to the Bridges.

At this early stage of the litigation, whether the NCUAB can trace all JAFCU funds to the real property is immaterial. *See Janvey v. Proskauer Rose LLP*, No. 3:13-cv-477-N-BG, 2017 WL 11499756, at *5 (N.D. Tex. June 19, 2017) (requiring a plaintiff to identify all property potentially subject to a constructive trust in its complaint "is illogical and would require a creditor to do the impossible—identify (or more accurately guess) in its complaint, prior to discovery, where a party may have transferred proceeds or assets in an attempt to defraud creditors"). Indeed, "the burden is upon the party opposing an injunction to prove that certain assets are unrelated to the underlying litigation and should therefore be excluded from a constructive trust." *Tisino v. R & R Consulting & Coordinating Grp., L.L.C.*, 478 F. App'x 183, 186 (5th Cir. 2012) (referring to Texas's law of constructive trusts); *see also Barton*, 135 F.4th at 227 ("[F]reezing the assets . . . is appropriate to prevent . . . irreparable harm, given that [defendant's] commingling of funds . . . hindered tracing efforts."). Chad Bridges has submitted no evidence meeting that burden.

And even if he could show that any of the jointly-owned properties were not acquired with JAFCU funds, the real properties are still subject to an attachment securing any judgment obtained against Chad Bridges as a fraudulent transferee. *See* 12 U.S.C. § 1787(b)(16)(B) ("[T]he Board may recover, for the benefit of the insured credit union, the property [fraudulently] transferred, or, if a court so orders, the value of such property (at the time of such transfer) from . . . the initial transferee of such transfer."). To the extent that a judgment against Chad Bridges exceeds the value of his property interests, because that judgment is secured by a prejudgment attachment, a finding of constructive trust is unnecessary.

Rather than any valid assertion of harm, Chad Bridges' objections this motion appear to be based on his position that he is entitled to access to access his retirement expenses to pay for his living costs and attorney fees. *See* Ex. C. If Chad Bridges believes that his retirement account should not be subject to the preliminary injunction, the proper course of action is to file a motion addressing that issue—not to object without basis to an unrelated issue thereby needlessly increasing the cost of litigation. Because Chad Bridges will not be harmed, but will in fact be benefited, by placement of his real property into trusteeship, the NCUAB's motion for trusteeship should be granted.

**CONCLUSION**

For the reasons explained above, the Court should impose a trusteeship on all real property owned by Leigh and Chad Bridges.

Respectfully submitted,

August 21, 2026

*/s/ Alysson Mills*

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of
JACKSON AREA FEDERAL CREDIT UNION

CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

*/s/ Alysson Mills*

Alysson Mills