UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION
---------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION BOARD, in its capacity as conservator of Jackson Area Federal Credit Union,

Plaintiff,

v.

LEIGH BRIDGES, CHAD BRIDGES, and TINA FUNEZ,

Defendants.

Case No.: 3:26-cv-343-DPJ-RPM
Hon. Daniel P. Jordan
Hon. Robert P. Myers, Jr.

---------------------------------------------------------------------X

**PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF ITS URGENT AND NECESSITOUS MOTION FOR IMPOSITION OF A TRUSTEESHIP ON REAL PROPERTY OF DEFENDANTS LEIGH AND CHAD BRIDGES**

Plaintiff, the National Credit Union Administration Board ("NCUAB"), acting in its capacity as conservator of Jackson Area Federal Credit Union ("JAFCU"), submits the following reply brief in further support of its urgent and necessitous motion for imposition of a trusteeship on real property of defendants Leigh and Chad Bridges.

## INTRODUCTION

The NCUAB has offered to let Leigh Bridges reside at the Eastbrooke condo throughout this litigation. *See* ECF No. 33-5, Proposed Or. ¶ 4. It is also offering to manage the paying of the bills, upkeep, and the insurance of the Bridges' properties, ECF No. 34, P.'s mem. 8, addressing the concern in point four in Chad Bridges' "alternative proposal," Chad's Opp. 10. This would all aid in preparing the Sleepy Hollow residence for sale, which was Leigh Bridges

intention a short while ago. *See* Ex. D, 6/26/26 letter. Despite the benefits of trusteeship to the Bridges, both now oppose the NCUAB's motion, albeit on dubious grounds.

Chad Bridges has filed an opposition containing a scattershot of objections, none of which provide a basis for denying the motion. Leigh Bridges' opposition only second guesses the business judgment of the NCUAB. In the end, their dispute appears to be about attorneys getting paid. Indeed, Chad Bridges spends a portion of his brief arguing about whether he can unfreeze his retirement accounts to pay his attorneys, Chad's Opp. 9-10, an issue irrelevant to this motion,[1] and Leigh Bridges notes a similar concern, Leigh's Opp. ¶ 3. Nevertheless, the NCUAB addresses the pertinent arguments within the oppositions in the paragraphs below.

## ARGUMENT

### I. Chad Bridges' Procedural Objections.

Chad Bridges suggests the NCUAB has not complied with language in the preliminary injunction specifying terms under which the NCUAB can take control over the Bridges' real property. Chad's Opp. 5-6. That language reads that "[i]f the Defendants fail to abide by this Order, pay property-related bills, and/or properly maintain any real property or the structures thereon, or the NCUAB believes that the value of specific property may decline significantly without it taking control of the property, the NCUAB may file a motion [for trusteeship] . . . ." ECF No. 20, Preliminary Inj. ¶ 20. Assuming that language is limiting all motions to those bases rather than providing additional bases for the filing of a motion, Leigh Bridges admits in her opposition that the condominium fees for the Alabama condo have not been paid, Leigh Opp. ¶ 3, thereby justifying a motion under the terms of the preliminary injunction.

[1] The NCUAB will respond to that argument when responding to Chad Bridge's motion in separate filing.

Notwithstanding the preceding paragraph, the motion for trusteeship requires a modification of the preliminary injunction to permit trusteeship, and thus the Court may modify any restrictions imposed by the quoted language. A court "may appropriately modify an injunction 'when the legal or factual circumstances justifying the injunction have changed.'" *Yue v. Reaction Labs, LLC*, 816 F. Supp. 3d 732, 737 (W.D. Tex. 2026) (quoting *Bear Ranch, LLC. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 803 (5th Cir. 2018)). In early June, when the NCUAB moved for a preliminary injunction against the Bridges, ECF No. 12, the Sleepy Hollow residence was not vacant. In late June, Leigh Bridges suggested moving from the Sleepy Hollow residence to the Eastbrooke condo in order to prepare Sleepy Hollow for sale. *See* Ex. D, 6/26/26 letter. The NCUAB consented to her moving to the Eastbrooke condo in early July. *See* Newbold decl. ¶ 4.

NCUAB counsel then circulated a proposed agreed order amending the preliminary injunction in mid-July, *see* Ex. A, roughly two weeks after the preliminary injunction was entered, *see* ECF No. 20. The Bridges have been unwilling to negotiate based on concerns about living allowances and attorneys' fees. *See* Exs. B-C; Leigh's Opp. ¶ 3. Leigh Bridges' desire to sell, followed by the Bridges' subsequent change in tune, could not have been anticipated in early June when the NCUAB filed the motion for preliminary injunction and the proposed injunction order. Absent the cooperation of the Bridges, the motion to trustee the real property became necessary to properly address the changed circumstances and the associated costs.

Chad Bridges also contends that the NCUAB cannot trustee the property because it has failed to consider alternatives to trusteeship. Chad's Opp. 6. Although "a less drastic equitable remedy" must be shown for receiverships under Fed. R. Civ. P. 66, *see Ettorre v. Russo's Westheimer, Inc.*, 677 F. Supp. 3d 644, 648 (S.D. Tex. 2023), "the appointment of a trustee under

[§ 1787(b)(2)(G) analogue] is governed by the standards and precedents applicable to the issuance of injunctive relief under Rule 65." *FDIC v. Elio*, 39 F.3d 1239, 1245 (1st Cir. 1994). Accordingly, even if there were any evidence supporting Chad Bridges' suggested alternative, they are legally irrelevant to the questions this Court must decide.

**II. Harm to the NCUAB.**

This Court must decide the balance of harms between the NCUAB and the Bridges. Chad Bridges suggests that the NCUAB's harm is self-inflicted. Chad's Opp. 5. He states that "[NCUAB] omits the critical fact that the property is vacant solely because it asked Leigh to move out and agreed she should temporarily stay at the Eastbrook property." Chad's Opp. 4. As described above, it was Leigh Bridges who suggested moving out of Sleepy Hollow residence in order to facilitate its sale. Ex. D, 6/26/26 letter. The NCUAB's permitting her to move out was hardly unreasonable under those circumstances.

Chad Bridges also argues, without supporting evidence, that the security at the Sleepy Hollow residence is unnecessary. Chad's Opp. 5. Leigh Bridges also questions the NCUAB's security expenditures. Leigh's Opp. ¶ 2. Security was necessary due to the value of the items on the property and lack of sufficient insurance on those items. *See* Newbold decl. ¶¶ 5, 7. Leigh Bridges estimated the items' value at $15 million, but the value could be higher. *See* Ex. D, 6/26/26 letter. When Leigh Bridges gave the NCUAB permission to take custody of the items, *see* ECF No. 35-2, security became necessary to protect against catastrophic loss, particularly considering the media coverage of the Sleepy Hollow residence.[2] *See* Newbold decl. ¶ 9.

[2] At least one local news story was videoed at the residence. *See* https://www.wapt.com/article/leigh-bridges-jackson-federal-credit-union-fraud-case/71593673.

During that time, the Bridges were also making trips to the residence. Due to concerns about property loss and the safety of NCUAB employees and contractors, security was necessary.

Although the NCUAB's goal was to discontinue the security as soon as possible, the conditions of the insurance contract and the Bridges' decision to cease cooperation have not allowed that. Leigh Bridges offers as an alternative that, because the Sleepy Hollow residence is vacant, "NCUAB could occupy the premises and remove anything it believes to be of value." Leigh's Opp. ¶ 1. The NCUAB does not know what it would mean to "occupy the premises" and removing additional items from the property would just lead to more storage costs. Leigh Bridges also suggests that the security in place at Sleepy Hollow is adequate, providing many details about the security system to NCUAB for the first time.[3] Leigh's Opp. ¶ 2. But the NCUAB does not have security codes, despite having asked for them, *see* Newbold decl. ¶ 9, or the ability to access the Ring cameras, and thus it cannot currently monitor the premises.

Leigh Bridges further states that there is $2.1 million in insurance on the Sleepy Hollow residence. Leigh's Opp. ¶ 2. The NCUAB has not seen the policy, *see* Newbold decl. ¶ 10, and thus cannot evaluate that assertion. Whether the insurance is adequate would depend on the coverage limits for the personal property on the premises and whether vacancy voids the policy, among other factors. Regardless, the NCUAB now has its own insurance, which covers the items at Sleepy Hollow, and intends to take out insurance covering the residence. *See* Newbold decl. ¶¶ 8, 10. Leigh Bridges states that she has fully cooperated in the preservation of property except for payment of the fees for the Alabama condo. Leigh's Opp. ¶ 3. But the NCUAB has not seen payment records or receipts for the real properties, from either her or Chad Bridges, and

[3] Leigh Bridges indicates that a gate provides security, but one viewing a video segment of the gate in the local news identified in footnote 2 can see that it is easy to walk around the gate.

thus cannot verify those statements, which further explains why the lack of trusteeship harms the NCUAB.

**III. Harm to the Bridges.**

Chad Bridges alleges several "harms," none of which are in fact harms. He raises several state-law defenses to a forced sale of the property and asserts that a trusteeship would deprive him of those defenses. Chad's Opp. 8. First, the NCUAB is not seeking permission to sell the properties at this time, as should be clear from the proposed order the NCUAB filed. *See* ECF No. 33-5. Second, an order of trusteeship, like an order of receivership, is an interlocutory order. *See* 28 U.S.C. § 1292(b) (permitting appeals from "[i]nterlocutory orders appointing receivers"). An interlocutory order by its nature is not final. Because Chad Bridges can raise any state-law defenses at a later stage of the litigation, including in response to any motion to sell the properties, he is not forfeiting anything if ordered to deed the properties to the NCUAB. This position appears consistent with Chad Bridges' request in point two of his alternative proposal. Chad's Opp. 10. Whether homestead and tenancy-by-the-entirety defenses could prevent a forced sale under a federal statute is questionable, however. *See, e.g.*, *Drye v. United States*, 528 U.S. 49, 59 (1999) ("[E]xempt status under state law does not bind the federal collector[.]").

In any event, those defenses are of little use when a property is purchased with stolen funds. *See, e.g., Matter of Moody*, 862 F.2d 1194, 1200 (5th Cir. 1989) (observing that under Texas law, constructive trusts may be applied against homestead property if purchased with stolen funds). The Sleepy Hollow residence was likely purchased with misappropriated JAFCU funds. The residence was purchased via a deed dated September 28, 2018. *See* Ex. E, Deed. Four days earlier, $1.227 million was wired from Raymond James to a real estate closing firm.

*See* Ex. F, Wire.[4] JAFCU records show that many transfers were made from Chad and Leigh's JAFCU account to Raymond James. *See* ECF No. 12-3, Corp. decl. ¶ 11; ECF No. 12-8, Stanislao decl. ¶ 11. And there were over $51 million in false entries concealing transfers from the JAFCU general ledger to the JAFCU accounts of Leigh Bridges going back to 2015. *See* ECF No. 12-8, Stanislao decl. ¶ 13. The evidence strongly suggests that the Sleepy Hollow residence was purchased with misappropriated funds and is therefore held in constructive trust for the benefit of JAFCU. The NCUAB seeks to protect that interest through the trustee motion.

Setting aside the constructive trust issue, Chad Bridges' concern that transferring title would be "[f]orcing [him] to permanently divest himself of legal title to his home" is unfounded. Chad's Opp. 8. In fact, he appears to misunderstand the effects of the Court naming the NCUAB as trustee under § 1787(b)(2)(G). "In a trust relationship . . . the trustee holds legal title while the beneficiary possesses an equitable title or property interest." *Matter of Southmark Corp.*, 49 F.3d 1111, 1117-18 (5th Cir. 1995). Appointment of the NCUAB as trustee under § 1787(b)(2)(G) and giving it legal title would not deprive the Bridges of their property interest under principals of trust law, and, regardless, the statute is clear that the trusteed property is "under the control of the court." Accordingly, the NCUAB would be a mere title holder. If this Court were to determine that the Bridges were entitled to have the real property returned to them (because the NCUAB failed to prove liability or the Bridges prevailed on an affirmative defense), this Court has full authority to order the NCUAB to deed the real property back to them. Transfer of legal title does not have the risks that Chad Bridges suggests it does.

---

[4] While not relevant to the instant motion, the NCUAB does not "admit[] that Chad committed no active fraud or wrongdoing." Chad's Opp. 7.

Without title to the real property, however, the NCUAB cannot exclude persons from the real property, and thus cannot leave the Sleepy Hollow residence unattended. *See* Newbold decl. ¶¶ 8, 9. For that reason, Chad Bridges' first alternative proposal, that the Bridges retain title to the property, Chad's Opp. 10, and his fifth proposal, that he have access to the properties, *id.*, are unacceptable to the NCUAB. Chad Bridges will not need to access the properties because the NCUAB will manage the property under court supervision. And given that most personal property over $100 is subject to NCUAB trusteeship, ECF No. 20, Preliminary Inj. ¶ 9, it is difficult to understand why he would have a reason to go to the residence, or any of the properties. If Chad Bridges has reason to enter the properties after they are trusteed, his counsel can put that request to NCUAB counsel on an as-needed basis.

Chad Bridges raises procedural due process concerns as a potential harm, Chad's Opp. 8, but he could not have any property interest in a property purchased with JAFCU funds. Relevant to this motion, the four-factor test that a court must apply under Rule 65 protects Chad Bridges' procedural due process rights. *See United States v. Thier*, 801 F.2d 1463, 1468 (5th Cir. 1986) *overruled on other grounds by United States v. Holy Land Found. for Relief & Dev.*, 493 F.3d 469 (5th Cir. 2007) ("With the procedures and protections accorded by Rule 65 included, the statute comports with procedural due process."). Analysis under that four-factor test here favors the position of the NCUAB.

Chad Bridges states that the NCUAB "does not cite a single case where a federal court has ordered a defendant to convey ownership or sign over the legal title of their real property as part of a pre-judgment attachment." Chad's Opp. 8. Chad Bridges' argument is unclear as the NCUAB already has a prejudgment attachment against the property. *See* ECF No. 20, Preliminary Inj. ¶¶ 5-7. The motion here seeks to place the property under trusteeship, which is

the equivalent of a receivership, and is governed by analysis under Rule 65. *See Elio*, 39 F.3d at 1244. A trusteeship is appropriately placed on property believed to be connected to a fraudulent transfer. *See id.* at 1245-48. Moreover, receiverships and trusteeships are commonly used to manage real property. *See, e.g.*, *SEC v. Barton*, 135 F.4th 206, 218 (5th Cir. 2025) (describing the receivership as a "real-property receivership[]"). There is nothing untoward about the NCUAB's trusteeship request, particularly given its benefits to all parties. Accordingly, Chad Bridges has shown no harm if a trusteeship is imposed on the real properties owned by the Bridges.

**CONCLUSION**

For the reasons explained above and in the NCUAB's memorandum of law, the Court should impose a trusteeship on all real property owned by Leigh and Chad Bridges.

Respectfully submitted,

August 28, 2026

*/s/ Alysson Mills*

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of
JACKSON AREA FEDERAL CREDIT UNION

CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

*/s/ Alysson Mills*

Alysson Mills