UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION
---------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION BOARD, in its capacity as conservator of Jackson Area Federal Credit Union,

Plaintiff,

v.

LEIGH BRIDGES, CHAD BRIDGES, and TINA FUNEZ,

Defendants.

Case No.: 3:26-cv-343-DPJ-RPM
Hon. Daniel P. Jordan
Hon. Robert P. Myers, Jr.

---------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CHAD BRIDGES' URGENT AND NECESSITOUS MOTION TO DISSOLVE AND/OR MODIFY PRELIMINARY INJUNCTION**

Plaintiff, the National Credit Union Administration Board ("NCUAB"), acting in its capacity as conservator of Jackson Area Federal Credit Union ("JAFCU"), submits the following memorandum of law in opposition to Defendant Chad Bridges' Urgent and Necessitous Motion to Dissolve and/or Modify Preliminary Injunction.

**APPLICABLE LEGAL STANDARDS**

"District courts may appropriately modify an injunction 'when the legal or factual circumstances justifying the injunction have changed.'" *Yue v. Reaction Labs, LLC*, 816 F. Supp. 3d 732, 737 (W.D. Tex. 2026) (quoting *Bear Ranch, LLC. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 803 (5th Cir. 2018)). The "party seeking to modify the injunction" has the "burden to show 'that changed circumstances warrant relief." *Id.* at 738. If the movant can show

that circumstances have in fact changed, then the court applies the traditional four-factor test for injunctive relief. *See id.* at 737.

Under the four-factor test, the party seeking the injunction must "establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Mississippi Ass'n of Educators v. State Institutions of Higher Learning*, No. 3:25-CV-00417-HTW-LGI, 2025 WL 2142676, at *1 (S.D. Miss. July 20, 2025) (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)). Under the Fifth Circuit's "sliding scale" approach, a greater showing on a particular factor allows for a lesser showing on the other three factors. *See TitleMax of Texas, Inc v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025).

## ARGUMENT

### I. Chad Bridges has not Demonstrated that the NCUAB is Unlikely to Succeed on the Merits of its Claims Against him.

Analysis of the likelihood of success on the merits is conducted by reference to the "standards provided by the substantive law" applicable to the causes of action in the complaint. *TitleMax*, 142 F.4th at 329. "To show a likelihood of success, plaintiffs must present a prima facie case[.]" *Id.* A plaintiff "can satisfy this requirement by 'raising questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation . . . .'" *CoreClarity, Inc. v. Gallup, Inc.*, No. 4:20-CV-601, 2020 WL 5095130, at *2 (E.D. Tex. Aug. 28, 2020) (quoting *Tampa Phosphate R.R. Co. v. Seaboard Coast Line R.R. Co.*, 418 F.2d 387, 392 (5th Cir. 1969)). Even "some likelihood of success on the merits will justify temporary injunctive relief[]" if the plaintiff made a strong showing on the other factors. *Productos Carnic, S.A. v. Cent. Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

The amended complaint sets forth causes of action pertaining to Chad Bridges based on constructive trust, fraudulent transfer (under federal and Mississippi law), and § 1787(b)(2)(G). The last two types of causes of action are relevant here and are discussed below.

### *A. Chad Bridges received valuable property and significant benefits as a result of fraudulent transfers from Leigh Bridges.*

The NCUAB is permitted to recover fraudulently-transferred property from the "initial transferee of such transfer." 12 U.S.C. § 1787(b)(16)(B)(i). The NCUAB is also permitted to obtain "if a court so orders, the value of such property (at the time of such transfer) from . . . the initial transferee of such transfer." *Id.*; *see* Miss. Code § 15-3-113(2) (using similar language). Consistent with this language, "a personal judgment could arise against [a fraudulent transferee] as a result of her receipt of fraudulent transferred properties." *RTC v. Cruce*, 972 F.2d 1195, 1203 (10th Cir. 1992). The NCUAB is therefore permitted by law to obtain a money judgment against Chad Bridges as the fraudulent transferee of Leigh Bridges if the fraudulently transferred property or benefit is **(a)** not recoverable or **(b)** the recoveries from the sale of the transferred property do not equal the value of the property at the time of its acquisition.

Indicia of fraudulent transfer includes transfers to family members, a lack of consideration, and insolvency of the debtor. *See FDIC v. Elio*, 39 F.3d 1239, 1246 (1st Cir. 1994); *Cruce*, 972 F.2d at 1202 (applying these same indicia); *accord* Miss. Code § 15-3-107(2) (listing badges of fraud). The NCUAB has shown over $51 million dollars in false entries hiding Leigh Bridges' misappropriation in two JAFCU accounts between 2015 and 2026.[1] *See* ECF No. 12-8, Stanislao decl. ¶ 13. The misappropriation created a debt to JAFCU and rendered

[1] To date, the NCUAB's forensic auditor has been able to determine that $73,325,882.54 in JAFCU losses were due to Leigh Bridge's misappropriation. Although not necessary for this motion, the NCUAB can provide documentation detailing that amount if necessary.

Leigh Bridges insolvent. Chad Bridges is married to Leigh Bridges, *see id.* ¶ 3, and is thus an insider. Moreover, even at this early stage of the litigation, the NCUAB is aware of significant transfers from Leigh Bridges to Chad Bridges for no apparent consideration.

Approximately $26.8 million of funds transferred from the general ledger of JAFCU into Chad and Leigh Bridges' JAFCU account. *See* ECF No. 12-8, Stanislao decl. ¶ 13; *see also* ECF No. 12-7, Meyer decl. ¶ 11. Payments from that account were to businesses such as Craig-Wilkinson Inc., and Courtney Peters Interior Design, LLC. *See* ECF No. 12-3, Corp. decl. ¶¶ 7, 9; ECF No. 12-8, Stanislao decl. ¶ 11. Those businesses made improvements to the Sleepy Hollow residence where Chad Bridges lived.[2] As explained in the NCUAB's reply brief in support of its motion to trustee real property, Chad Bridges authorized a wire from a Raymond James account, which held misappropriated JAFCU funds, that was apparently used to purchase the Sleepy Hollow residence. *See* ECF No. 46, P.'s reply 6-7. The Sleepy Hollow residence is jointly owned by Leigh and Chad Bridges. *See* ECF No. 46-2, Deed. If Chad Bridges has a one-half interest in the residence, based on those expenditures alone, he benefited in the amount of $1,082,590.18 at JAFCU's expense. *See* ECF No. 46-3, Wire; ECF No. 12-3, Corp. decl. ¶ 9.

In addition to benefiting from the JAFCU funds likely used to purchase, and certainly used to renovate, his residence, Chad Bridges made luxurious personal property purchases. This includes spending $24,817.88 to purchase a necklace, Ex. A, $5,202.00 to purchase three pairs of sneakers and what appears to be a wallet, Ex. B, and making a roughly $34,389.80 deposit for an item from Christian Dior, Ex. C. Chad Bridges also has a collection of expensive luxury watches, including watches from **Rolex, Patek Phillipe, Cartier, and Vacheron Constantin**. Ex. D, Funez dep. 108:2 – 109:5; *see also* Ex. E (purchase of $88,275.00 Cartier men's watch).

---

[2] *See* https://mismag.com/calm-cool-and-collected/

Chad Bridges also spent lavishly on travel. He booked a private jet that cost $13,335.00. Ex. F. That jet was booked with the American Express card that Leigh Bridges paid for using JAFCU funds. *See* ECF No. 12-8, Stanislao decl. ¶¶ 11, 13. Chad Bridges flew on private jets with Leigh Bridges on multiple occasions. Ex. D, Funez dep. 84:9-12. He traveled extensively with Leigh Bridges, travel which included trips to Nice, France and the island of Utila in Honduras. *Id.* 81:8 - 82:19. Chad Bridges also benefited from Leigh Bridges' exorbitant spending in other ways. He received flight upgrades for his business trips. Ex. G. Chad and Leigh Bridges both received over $7,600 in benefits for the money spent with Graziela Gems, a jewelry company, which included a three-night stay at a luxury hotel in New York City. Ex. H.

There is no apparent evidence that indicates Chad Bridges provided any value for the property or benefits he received. The amount of salary deposited into Chad Bridges' JAFCU share account over the last seven years averaged $56,719.30 per year after payroll deductions. *See* ECF No. 12-8, Stanislao decl. ¶ 14. The Cartier watch alone exceeded his take-home salary of $86,633 in 2025. *See* ECF No. 12-8, Stanislao decl. ¶ 14. Given the substantial amount of money that Leigh Bridges misappropriated from JAFCU, Chad Bridges' modest salary as a state employee, and the significant property and benefits he received from Leigh Bridges, he almost certainly received many fraudulent transfers for no consideration, making him potentially liable to the NCUAB as a fraudulent transferee.

Chad denies "that the funds in [his] retirement accounts are traceable to any funds allegedly misappropriated from [JAFCU] by Leigh." D.'s mem. 6.[3] Assuming that none of the

[3] Chad Bridges states that his "IRA was funded entirely from contributions to a 401(k) plan and pension plan offered by his former employer, Blue Cross and Blue Shield of Mississippi ("BCBS")." D.'s mem. 6. A record that his counsel provided to NCUAB counsel shows a significant amount was in the IRA prior to the BCBS funding. The NCUAB does not know the source of those funds, and thus cannot rule out that they came from JAFCU.

funds are in fact from JAFCU, all that means is that those accounts are not held in a constructive trust. If "a personal judgment . . . arise[s] against [a defendant] as a result of her receipt of fraudulent transferred properties . . . . the [financial regulator] . . . [is] able to reach her separate assets." *Cruce*, 972 F.2d at 1203. Upon a showing of a likelihood of success on a fraudulent transferee theory, the financial regulator can thus freeze assets under § 1787(b)(2)(G) even though they are not held in constructive trust. *See id.*

This same principle holds true in other types of enforcement actions. The SEC and FTC use asset freezes "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005). Disgorgement is a different remedy than constructive trust and, unlike constructive trust, does not require tracing. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372-73 (2d Cir. 2011). However, "[n]othing . . . supports concluding that an asset freeze can encompass only those assets traceable to the alleged wrongdoing." *FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1315 (S.D. Fla. Sept. 18, 2013). Otherwise, "a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement." *Id.* at 11316 (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000)). Similarly, Chad Bridges profited from fraudulently-transferred property and benefits from Leigh Bridges while utilizing his salary to fund his retirement accounts; this conduct should not allow him to shield his retirement accounts from the asset freeze under § 1787(b)(2)(G).

### ***B. Section 1787(b)(2)(G) permits the NCUAB to attach "the assets of any person" in order to secure a potential judgment, including retirement accounts otherwise exempt under state law.***

The NCUAB, when acting as conservator or liquidating agent, may request "an order placing the assets of any person . . . under the control of the court and appointing a trustee to

hold such assets." 12 U.S.C. § 1787(b)(2)(G). The section at issue, 12 U.S.C. § 1787(b)(2)(G), which is entitled "Attachment of assets and other injunctive relief," permits a court to attach assets to ensure the agency's ability to collect a potential judgment. *See Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1517 (D.C. Cir. 1993) ("Section 1821(d)(18) allows the RTC to attach the assets of any person."); *In re Colonial Realty Co.*, 980 F.2d 125, 128 n.2 (2d Cir. 1992) ("Section 1821(d)(18) empowers the FDIC-receiver to obtain attachment of assets and other injunctive relief pursuant to the relaxed standards set forth in § 1821(d)(19)."); *NCUAB v. Zovko*, No. 1:13CV-1430, 2014 WL 12889793, at *5 (N.D. Ohio Mar. 31, 2014) (entering order under 12 U.S.C. § 1787(b)(2)(G) attaching defendants' real property). Section 1787(b)(2)(G) can be used to attach the assets of "any person designated by the Board," even if he did not commit fraud against the credit union. *See NCUAB v. Jurcevic*, 867 F.3d 616, 623 (6th Cir. 2017); *FDIC v. Garner*, 125 F.3d 1272, 1278 (9th Cir. 1997).

The NCUAB can attach Chad Bridges' retirement accounts because they are "assets of any person" within the plain meaning of § 1787(b)(2)(G). "When the plain language of a statute is unambiguous and does not lead to an absurd result, [a court's] inquiry begins and ends with the plain meaning of that language." *Texas Brine Co., LLC. v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 486 (5th Cir. 2020). Even if the term "asset" were ambiguous, a dictionary definition could provide clarification. *See Adams v. All Coast, LLC*, 15 F.4th 365, 371 (5th Cir. 2021) ("This court often looks to dictionary definitions to determine the ordinary meaning of key statutory terms."). According to Black's Law Dictionary, an asset is "[a]n item that is owned and has value." *Asset*, Black's Law Dictionary (12th ed. 2024). Chad Bridges' retirement accounts are owned by him and have value; thus, they are "assets." Consequently, his retirement accounts may be subject to prejudgment attachment under § 1787(b)(2)(G).

Although clearly "assets," Chad Bridges contends that "federal courts must be mindful of Fed.R.Civ.P. 64 which permits pre-judgement seizure of a defendant's property only to the extent allowed by the laws of the state where the court is located." D.'s mem. 5 (citation omitted). That contention is beside the point, however, as "Federal Rule of Civil Procedure 64, which is the standard avenue for parties seeking attachment of property, does not apply when the NCUAB invokes its powers under § 1787(b)(2)(G)." *Zovko*, 2014 WL 12889793, at *2; *see also* Fed. R. Civ. P. 64(a) ("But a federal statute governs to the extent it applies."). Chad Bridges also contends that because Mississippi law, Miss. Code. § 85-3-1(e), exempts § 457(b) plans and IRAs, the NCUAB cannot attach those assets. D.'s mem. 6-7. He notes that those state-law exemptions can apply in bankruptcy, *id.* at 6, n.1, but the bankruptcy code, 11 U.S.C. § 522(b), specifically incorporates state-law exemptions. *See In re Garrett*, 435 B.R. 434, 451 (Bankr. S.D. Tex. 2010) ("[T]hrough the application of § 522(b)(3)(A), Congress incorporated state law into the federal bankruptcy framework."). Section 1787(b)(2)(G) does no such thing.

Section 1787(b)(2)(G), as federal law, preempts Miss. Code. § 85-3-1(e) and any other state law to the extent that such laws are inconsistent with the federal statute. *See Crystal Clear Special Util. Dist. v. Jackson*, 142 F.4th 351, 363 (5th Cir. 2025) ("[A]ny state law . . . , which interferes with or is contrary to federal law, must yield."). "Conflict preemption applies (1) where complying with both federal law and state law is impossible; or (2) where the state law creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 364. There is a conflict between a law that permits "an order placing the assets of any person . . . under the control of the court . . . ," 12 U.S.C. § 1787(b)(2)(G), and a law that makes retirement accounts "exempt from seizure under execution or attachment," Miss. Code. § 85-3-1(e). State-law exemptions to certain classes of

assets are also antithetical to Congressional intent. In enacting § 1787(b)(2)(G), "Congress has evidenced its desire to take an aggressive position in minimizing losses sustained by taxpayers due to bank failures . . . [by] giv[ing] [federal regulators] a green light to use aggressive tactics in protecting taxpayers' interests." *Elio*, 39 F.3d at 1244-45.

Consistent with the supremacy of federal law, the Tenth Circuit found that the RTC could freeze a wife's one-half interest in real property under the Federal Deposit Insurance Act (FDIA) analogue to § 1787(b)(2)(G) even though that interest was arguably protected under Kansas joint tenancy law. *See Cruce*, 972 F.2d at 1202-03. That result is consistent with other contexts where a government agency is collecting on behalf of the public. *See, e.g., Drye v. United States*, 528 U.S. 49, 59 (1999) ("[E]xempt status under state law does not bind the federal collector[.]"). The collection tools of the financial regulators still have supremacy even if other federal law is involved. Indeed, a district court in the Fifth Circuit found that the FDIC could collect from a debtor's ERISA-protected retirement account because the offset provision of the FDIA preempted ERISA. *See Calhoun v. FDIC*, 653 F. Supp. 1288, 1294 (N.D. Tex. 1987).

Outside of the context of collection, courts have also found that state law does not limit a financial regulator's statutory authority. *See, e.g.*, *FDIC v. Bank of Boulder*, 911 F.2d 1466, 1472-73 (10th Cir. 1990) ("[S]ection 1823(c)(2)(A) creates a power in FDIC/Corporation to purchase any assets, including assets nontransferable under state law, from FDIC/Receiver in order to facilitate a P & A transaction."); *S. Miami Holdings LLC v. FDIC*, No. 10-CV-22032, 2012 WL 4644716, at *5 (S.D. Fla. July 26, 2012), *aff'd*, 533 F. App'x 898 (11th Cir. 2013) ("The authority conferred on the FDIC . . . to effectuate asset transfers in a purchase and assumption agreements trumps any state law that would otherwise invalidate or call into question

such transfers."). Accordingly, consistent with principals of federal preemption and the relevant case law, § 1787(b)(2)(G) preempts Mississippi law to the contrary.

That the prejudgment attachment remedy in § 1787(b)(2)(G) should preempt contrary law is also clear from the entirety of § 1787. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) ("[T]he structure and purpose of the statute as a whole" is relevant to preemption analysis). Most tellingly, the NCUAB is permitted to serve an administrative subpoena "for purposes of . . . determining and realizing upon **any asset of any person** in the course of collecting money due the credit union . . . ." 12 U.S.C. § 1787(b)(2)(I)(i) (emphasis added). "The adjective 'any' is . . . a broad term[.]" *San Francisco v. EPA*, 604 U.S. 334, 348 (2025). The ability to seek information on "any asset . . . in the course of collecting money due the credit union" would make little sense if Congress did not intend for the NCUAB to actually collect against the asset for which information was subpoenaed. Other enhanced collection tools available to the NCUAB under § 1787 support a broad interpretation of § 1787(b)(2)(G) as well. *See, e.g.*, 12 U.S.C. §§ 1787(b)(2)(H)(i) (relief from irreparable harm requirement for Rule 65 relief), 1787(b)(14) (additional time to file lawsuits), and 1787(n) (ability to offset to collect debts). Section 1787 as a whole is clear that the remedy in § 1787(b)(2)(G) includes attachment of retirement accounts, even if those accounts are exempt from attachment under state law.

The structure of § 1787 as whole, relevant case law, and a straightforward reading of the language of the statute make clear that § 1787(b)(2)(G) allows the attachment of retirement accounts and preempts Mississippi law to the contrary. Accordingly, the NCUAB has met its burden for purposes of Chad Bridges' motion, which requires only that the NCUAB show a likelihood of success on the merits. Whether his retirement accounts may be liquidated to satisfy a judgment against Chad Bridges as a fraudulent transferee will be decided later in this litigation.

## II. The Balance of the Harms Overwhelmingly Favors the NCUAB.

### *A. Chad Bridges has not established cognizable harm if his retirement account remains frozen.*

Chad Bridges asserts harm "because he is [in] need of funds to pay for basic living expenses, attorney's fees and property-related expenses." D.'s mem. 4; *see also id.* at 7-9. He cannot show harm for any of those reasons.

#### 1. Payment of outstanding attorneys' fees.

Chad argues that he is harmed by his inability to pay his outstanding attorneys' fees. D.'s mtn. 7-9. "Because the use of frozen assets to pay attorney fees can be disallowed even in criminal cases, a civil litigant has no greater right to counsel than one who stands accused of a crime." *SEC v. Dobbins*, No. 3:04-CV-0605-H, 2004 WL 957715, at *2 (N.D. Tex. Apr. 14, 2004); *see also Minor v. Transp. Loc. Union 555*, No. 3:23-CV-658-E-BN, 2023 WL 4161750, at *1 (N.D. Tex. May 11, 2023) ("There is no absolute right to an attorney in civil cases[.]"). Accordingly, "a district court may restrain a defendant from using disputed funds to pay for attorney's fees before a final judgment on the merits has been rendered." *SEC. v. Priv. Equity Mgmt. Grp., Inc.*, No. 09-CV-2901-PSG, 2009 WL 2058247, at *2 (C.D. Cal. July 9, 2009) (citing *United States v. Monsanto*, 491 U.S. 600, 615 (1989)).

Although the Fifth Circuit has permitted funds to be unfrozen to pay attorneys' fees, **the unfreezing of funds must be necessary to secure the services of attorneys**. *See FSLIC v. Dixon*, 835 F.2d 554, 5615 (5th Cir. 1987) ("[T]he burden . . . [is] on the defendant to satisfy the court that he can secure the services of an attorney only if assets subject to the freeze order are released."). Consistent with that restriction, courts within the Fifth Circuit require defendants to make that threshold showing of an inability to obtain legal representation before considering the release of frozen funds to pay attorneys' fees. *See, e.g.*, *CFTC v. TMTE, Inc.*, No. 3:20-CV-

2910-L, 2022 WL 1321572, at *2 (N.D. Tex. May 3, 2022); *FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 WL 4182726, at *3 (E.D. Tex. Aug. 8, 2016); *FTC v. Abili-Staff, Ltd.*, No. SA-10-CA-88-OG, 2010 WL 11598071, at *1 (W.D. Tex. May 26, 2010).

Chad Bridges cannot meet that threshold requirement because he already has attorneys who are representing him in this litigation. As he is currently represented, he is not harmed by his retirement account remaining frozen. To be sure, his attorneys may suffer harm if they ultimately remain unpaid because they cannot collect their unpaid bills from Mr. Bridges' future earnings or some other source. But that is not the harm with which *Dixon* is concerned.

The NCUAB's argument is not intended to disparage Chad Bridges' attorneys or to criticize the quality of the services that they have provided to him. But the services were provided with his attorneys' knowledge that they were representing a client whose assets were subject to an asset freeze.[4] Like in contingency-fee cases, where attorneys bear a "risk of loss or nonpayment assumed by carrying through with the case[,]" *Jenkins v. Trustmark Nat. Bank*, 300 F.R.D. 291, 309 (S.D. Miss. 2014) (Jordan, J.), attorneys taking on representation of a client whose assets are frozen bear a similar risk. And that risk is not insured by the NCUAB. *See Dobbins*, 2004 WL 957715, at *2 (citing *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir.1988)) ("The Court has a duty to ensure that Defendants' assets are available to make restitution to the alleged victims."). The NCUAB insures credit unions such as JAFCU, and recoveries in this case will go to JAFCU and/or the National Credit Union Share Insurance Fund. Protection of that interest requires keeping Chad Bridges' retirement accounts frozen.

[4] Although Chad Bridges states that "the TRO and the Preliminary Injunction were entered before Chad formally entered his appearance through counsel in this matter[,]" D.'s mem. 5, a June 12 voicemail from his attorneys shows that he was represented before the preliminary injunction was entered. Ex. I.

Chad Bridges would still be unable to show why he should be permitted to access frozen funds even assuming that he was not yet represented in this litigation. A party seeking to unfreeze funds must "show that he cannot pay [his attorneys] from new or exempt assets[.]" *Dixon*, 835 F.2d at 565. In that regard, "the use of income from future employment . . . to pay for counsel appears uncontroversial." *TMTE*, 2022 WL 1321572, at *4. Courts are reluctant to unfreeze funds if "defendants have made little effort to obtain employment." *Abili-Staff*, 2010 WL 11598071, at *1. Chad Bridges' declaration states that "[a]lthough I have been seeking other employment, I have not yet secured another full-time job." Bridges decl. ¶ 5. That vague statement is insufficient to show that he has been using sufficient effort to obtain employment.

The record is also unclear as to what other resources he might have to pay his attorneys' fees. For instance, he has not explained why he cannot borrow money from relatives or use existing lines of credit (such as credit cards) to pay his attorneys' fees. Absent that information, the Court cannot determine whether Chad Bridges actually needs to access frozen funds, assuming that analysis were necessary. *See Dobbins*, 2004 WL 957715, at *2 ("The Court cannot . . . tell what other resources Defendants have for the payment of attorney fees.").

Chad Bridges would also be required to show "the reasonableness of the amount of [his] request." *Dobbins*, 2004 WL 957715, at *2. He has not stated the amount of the attorneys' fees to be paid or whether his attorneys have been paid in part. *See id.* ("The Court . . . does not know if Defendants' current attorney has already been paid[.]"). Reasonableness also depends on the hourly rates charged and the hours billed. *See Abili-Staff*, 2010 WL 11598071, at *2 ("[T]he Court finds that the hourly rates charged and the hours billed are unreasonable and unnecessary (although the Court realizes that this case has already become motion-and-response intensive)."); *see also FTC v. Am. Tax Serv. LLC*, No. 2:25-CV-01894-GMN-EJY, 2025 WL

3564724, at *4 (D. Nev. Dec. 11, 2025) ("The Court cannot ascertain the reasonableness of Defendants' attorneys' fees and costs request without more information such as an itemization of the costs incurred, hours worked, and rates charged."). Chad Bridges has not provided this Court with that information. "Without itemization and supportive evidence, the Court should deny [a] request" for attorneys' fees from frozen funds. *SEC v. Heartland Grp. Ventures, LLC*, No. 4:21-CV-01310-O, 2022 WL 1527542, at *5 (N.D. Tex. Mar. 18, 2022), *report and recommendation adopted*, No. 4:21-CV-01310-O, 2022 WL 1523471 (N.D. Tex. May 13, 2022).

**2. Living expenses and real-property upkeep.**

According to Chad Bridges' motion, he "simply does not have the means to pay his basic living expenses (including the obligations imposed by the Court) . . . ." D's mem. 7. Similar to the analysis for unfreezing attorneys' fees, a court "may consider evidence of the moving party's overall assets or income and will deny such requests where parties are found to have other sources of income or were requesting funds for luxuries, not necessities." *Heartland Grp. Ventures*, 2022 WL 1527542, at *5 (cleaned up). The general presumption is that a defendant can provide for her or his living expenses through employment. *See Am. Tax Serv.*, 2025 WL 3564724, at *3 (quoting *IAB Marketing Associates*, 972 F. Supp. 2d at 1314) ("Absent persuasive evidence to the contrary, the Court can conclude only that Defendants are capable of working to support their basic necessities."). As discussed above, Chad Bridges has not sufficiently explained why he has been unable to obtain employment or obtain funds to pay for living expenses from other sources.

Even if Chad Bridges had made that showing, "a district court must be comfortable that the requested funds involve necessities and would not support luxuries or a lavish lifestyle." *Am. Tax Serv.*, 2025 WL 3564724, at *4; *see Heartland Grp. Ventures*, 2022 WL 1527542, at *5.

The Court cannot know what the requested funds are for because Chad Bridges says nothing about it in his motion. He did previously provide a proposed budget to NCUAB counsel, however. That budget contains $6,171 per month in expenses unrelated to the upkeep of the real property at issue in this litigation, including $2,900 per month for rent and utilities. Ex. J. This requested amount does not even include a car payment; Chad Bridges is permitted to use the Bridges' Mercedes CLA for necessary travel. ECF No. 20, Preliminary Inj. ¶ 23. Given that over the last seven years, the amount of salary deposited into Chad Bridges' JAFCU share account averaged $56,719.30 per year after payroll deductions, *see* ECF No. 12-8, Stanislao decl. ¶ 14, Chad Bridges' request for $74,052 in frozen funds to live on per year is excessive.

Although Chad Bridges has not been forthcoming with the Court about his expenses, he does state that his only income has been unemployment in the amount of $235 per week, D.'s mem. 3, since losing his employment in mid-June.[5] He must therefore be paying most of his living expenses with some other source of funds. Because all of Chad Bridges' accounts are frozen, and because he has not affirmatively stated that he is using lines of credit or money from family for living expenses, the NCUAB must presume that he is using frozen funds to live.

The NCUAB does not know whether Chad Bridges has been utilizing frozen funds because Chad Bridges has not provided any account statements to the NCUAB showing his monthly expenditures. The preliminary injunction states that Leigh and Chad Bridges will "arrange for Chad Bridges' salary to be deposited into a specific account and will forward a copy of statements for such accounts to the NCUAB soon after each statement is received by the Defendants." ECF No. 20, Preliminary Inj. ¶ 25. The TRO also required the Bridges to keep an

---

[5] *See, e.g.,* https://www.wapt.com/article/chad-bridges-no-longer-employed-with-mississippi-insurance-department-after-being-placed-on-leave-amid-95-million-credit-union-lawsuit/71608419

accounting of expenditures. ECF No. 7, TRO ¶¶ 10, 11. Even though the loss of Chad Bridges' employment made a part of one order obsolete, the clear intention was that the Bridges would keep the NCUAB apprised of their expenditures. That has not happened. The NCUAB believes that any use of frozen funds by Chad Bridges should be explained to the Court and the NCUAB.

The NCUAB is also in the dark about what real-property expenses are being paid, as explained in the NCUAB's memorandum in support of its motion to trustee real property. *See* ECF No. 34, P.'s mem. 8. Like with the living expenses, the NCUAB believes those expenses are being paid for using frozen funds. The Bridges were permitted to use frozen funds to maintain their property, ECF No. 7, TRO ¶ 10, but the fact that frozen funds are already being used shows that access to the retirement accounts is not necessary to pay those expenses. *See* *IAB Mktg. Assocs.*, 972 F. Supp. 2d at 1314 (rejecting defendant's "request [for] money for items such as insurance which the Receiver is already required to pay"). Accordingly, Chad Bridges will not be harmed if he cannot access his retirement accounts to pay those expenses.

***B. The NCUAB, which protects a public interest, will suffer significant harm if Chad Bridges' retirement accounts are unfrozen.***

Even if Chad Bridges could show harm, his "interest in having access to funds needed to pay ordinary and necessary living expenses ... must be balanced against the government's interest in preventing the depletion of potentially [recoverable] assets." *Dobbins*, 2004 WL 957715, at *3; *see Heartland Grp. Ventures*, 2022 WL 1527542, at *6. The NCUAB will be harmed if Chad Bridges' retirement accounts are unfrozen in that the NCUAB's ability to recover on a judgment against him will be greatly compromised.

The NCUAB's interest in freezing assets is greater than an ordinary litigant because it seeks the order to further a public rather than a private interest. *See Zovko*, 2014 WL 12889793, at *5 ("A temporary attachment of [defendants'] property, while small in the context of the

fraud, is a proper use of the attachment process because it secures assets which could help . . . recover some of the losses from the fraud, which affects the public interest in having a secure banking system."); *cf. Dixon*, 835 F.2d at 562 ("The general flexibility of equitable powers is enhanced where . . . the public interest is at stake."). Even though a private party seeking equitable relief is often "limited to the property in dispute or its direct, traceable proceeds[,]" *Alguire*, 647 F.3d at 600, because federal financial regulators acting as conservator or receiver are permitted to seek attachments of property under a statute that lessens the standard for harm, the insufficiency of assets to satisfy a potential judgment alone establishes harm for purposes of relief under § 1787(b)(2)(G) and analogous statutes. *See Elio*, 39 F.3d at 1247 ("The record supports . . . that the F.D.I.C. would be harmed . . . specifically, that the F.D.I.C.'s ability to fulfill its statutory objective of collecting on the assets of the failed banks would be impaired."); *Cruce*, 972 F.2d at 1200 ("[T]he record . . . suggests that [defendant] does not possess assets of sufficient value—even taking into account the assets he allegedly fraudulently conveyed . . . to extinguish this liability. These facts alone support a showing of injury."); *see also Dixon*, 835 F.2d at 563 ("[I]ts general equitable powers give the district court the authority to freeze assets when necessary, as here, to preserve meaningful equitable remedies."). For this reason, the Fifth Circuit found "no error in the district court's application of the preliminary injunction provisions of the FDIA for the purpose of securing a potential damage award" for the FDIC as receiver of a failed bank. *See FDIC. v. Faulkner*, 991 F.2d 262, 265 (5th Cir. 1993).

The NCUAB has been able to show over $51 million dollars in false entries, which were used to hide Leigh Bridges' misappropriation in two JAFCU accounts, between 2015 and 2026. *See* ECF No. 12-3, Corp. decl. ¶¶ 7-10; ECF No. 12-7, Meyer decl. ¶ 11; ECF No. 12-8, Stanislao decl. ¶ 13. The NCUAB has not had the opportunity to formally value the Bridges'

assets of which it currently has knowledge of, but Leigh Bridges' counsel suggests that it is around $25 million. ECF No. 46-1, letter. Because the sale of those assets will be insufficient to compensate the NCUAB for JAFCU's loss, the unfreezing of valuable assets such as retirement accounts would be highly detrimental to the NCUAB's recovery efforts. As the harm to JAFCU is significant, while the harm to Chad Bridges is minimal, the balance of the equities heavily favors the NCUAB.

The public interest favors the NCUAB as well. Like other regulators, the NCUA's insurance of members' accounts "is fundamental to the financial stability of the entire [financial institution] industry[.]" *Dixon*, 835 F.2d at 563; *see Cruce*, 972 F.2d at 1201 ("Because the RTC's goal in seeking a preliminary injunction is to preserve assets that potentially may provide restitution to the depository insurance fund for monies fraudulently taken by defendants . . . , we cannot conclude that issuance of the injunction is adverse to the public interest."). "[C]ourts . . . will go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved[.]" *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 326 (1999). That principal supports retaining the asset freeze as to Chad Bridges' retirement accounts.

## CONCLUSION

For the reasons explained above, the Court should deny Defendant Chad Bridges' urgent and necessitous motion to dissolve and/or modify the preliminary injunction.

Respectfully submitted,

September 4, 2026

*/s/ Alysson Mills*

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of JACKSON AREA FEDERAL CREDIT UNION

CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

*/s/ Alysson Mills*

Alysson Mills