UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

-----------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION BOARD, in its capacity as conservator of Jackson Area Federal Credit Union,

Plaintiff,

v.

LEIGH BRIDGES, CHAD BRIDGES, and TINA FUNEZ,

Defendants.

-----------------------------------------------------------------------X

Case No.: 3:26-cv-343-DPJ-RPM
Hon. Daniel P. Jordan
Hon. Robert P. Myers, Jr.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO MODIFY, CLARIFY, AND ENFORCE PRELIMINARY INJUNCTIONS**

Plaintiff, the National Credit Union Administration Board ("NCUAB"), acting in its capacity as conservator of Jackson Area Federal Credit Union ("JAFCU"), submits the following memorandum of law in support of its motion to modify, clarify, and enforce the preliminary injunctions, ECF Nos. 20, 21.

## APPLICABLE LEGAL STANDARDS

A district court may "issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued . . . ." *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977). If an injunction is ambiguous in any way, "a court may clarify the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'" *Stoneeagle Servs., Inc. v. Gillman*, No. 3:11-CV-02408-P, 2013 WL 12124595, at *1 (N.D. Tex. Aug. 23, 2013). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from

performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995).

If an injunction is clear, but not fully effective, "an injunction may be modified . . . when the original purposes of the injunction are not being fulfilled in any material respect." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 503 (5th Cir. 1980). "District courts may [also] appropriately modify an injunction 'when the legal or factual circumstances justifying the injunction have changed.'" *Yue v. Reaction Labs, LLC*, 816 F. Supp. 3d 732, 737 (W.D. Tex. 2026) (quoting *Bear Ranch, LLC. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 803 (5th Cir. 2018)). If circumstances have in fact changed, the court applies the traditional four-factor test for injunctive relief. *See id.*

Under the four-factor test, the party seeking the injunction must "establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Mississippi Ass'n of Educators v. State Institutions of Higher Learning*, No. 3:25-CV-00417-HTW-LGI, 2025 WL 2142676, at *1 (S.D. Miss. July 20, 2025) (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)). Under the Fifth Circuit's "sliding scale" approach, a greater showing on a particular factor allows for a lesser showing on the other three factors. *See TitleMax of Texas, Inc v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025).

## ARGUMENT

To the extent that the preliminary injunctions need to be modified in accordance with the Rule 65 standard, the analysis for the first factor, likelihood of success on the merits, and the fourth factor, the public interest, is the same as the analysis contained within the memoranda in

support of the NCUAB's motion for a preliminary injunction against the Bridges and Tina Funez, and in the NCUAB's opposition to Chad Bridges' motion to modify the preliminary injunction. *See* ECF No. 13, P.'s mem. 10-22, 31-32 (Bridges); ECF No. 19, P.'s mem. 16-20, 28-29 (Funez); ECF No. 48, P.'s opp. 2-6. The NCUAB therefore incorporates the analysis from those memoranda here. The analysis for the second factor, harm to the NCUAB, and third factor, potential harm to the Defendants, is different though, and thus both are discussed below.

## I. The Defendants' Use of Frozen Funds must be Restricted to Preserve the Limited Funds and Assets Subject to Prejudgment Attachment or Held in Constructive Trust for JAFCU.

### *A. Defendants have not adequately disclosed how they are paying for living expenses and they appear to be utilizing frozen funds to do so.*

The temporary restraining order (TRO) provided the Bridges with $2,500 per month to preserve property subject to that Order and $750 per week for other necessary living expenses. *See* ECF No. 7, TRO ¶¶ 10, 11. The preliminary injunction against the Bridges modified those paragraphs to permit them to "use income derived from the salary of Chad Bridges during the pendency of this lawsuit . . . . for basic living expenses[.]" ECF No. 20, Prelim. Inj. ¶ 25. Chad Bridges has since lost his employment with the state of Mississippi and is not currently employed. *See* ECF No. 37, D.'s mem. 3. In addition, Chad Bridges now lives in an apartment and Leigh Bridges now lives in the Eastbrooke condo. *See* ECF No. 33-4, Newbold decl. ¶ 4. Consequently, the preliminary injunction does not address the Bridges' current circumstances.

The change in circumstances has led to a lack of complete clarity in the Court's Orders, which has been to the detriment of the NCUAB. The preliminary injunction states that Leigh and Chad Bridges will "arrange for Chad Bridges' salary to be deposited into a specific account and will forward a copy of statements for such accounts to the NCUAB soon after each statement is received by the Defendants." ECF No. 20, Prelim. Inj. ¶ 25. The TRO also required the

Bridges to keep an accounting of expenditures. *See* ECF No. 7, TRO ¶¶ 10, 11. Even though the loss of Chad Bridges' employment made one part of the preliminary injunction obsolete, the clear intention of the Court's Orders was that the Bridges would keep the NCUAB apprised of their expenditures. However, the NCUAB has not received financial account statements from Chad or Leigh Bridges evidencing either's expenditures.

Tina Funez has done a better job of keeping the NCUAB apprised of her expenses, although the NCUAB does not have a complete picture of her spending. The preliminary injunction against Tina Funez requires her to "keep a precise accounting of any such expenditures and produce a copy of such to the NCUAB at the first hearing set by the Court in this case to continue monthly until such time that she is reemployed." ECF No. 21, Prelim. Inj. ¶ 25. The NCUAB received some statements from Ms. Funez, but others, such as her American Express, and statements before July of this year are missing. The NCUAB also notes that Ms. Funez appears to be earning only minimal income from employment and is thus utilizing frozen funds to provide for her living expenses.

The NCUAB has reason to believe that frozen funds are being utilized to fund the Bridges' living expenses as well. Chad Bridges' rent and utilities is $2,900 per month,[1] ECF No. 48-10, Ex. J, and his only income from unemployment is $235 per week, ECF No. 37, D.'s mem. 3. He must therefore be paying most of his living expenses with funds from some other source. Because all of Chad Bridges' accounts are frozen, the NCUAB must presume that he is using some unknown amount of frozen funds to live, which is concerning to the NCUAB.

[1] Although Chad Bridges moved out of the Sleepy Hollow residence after the entry of the TRO, that decision was never discussed with NCUAB counsel.

Also concerning to the NCUAB is Chad Bridges' attempt to cashout his accrued leave from his former employer, the Mississippi Department of Insurance. A representative of that state agency sent an email to NCUAB counsel on September 2, stating that "Mr. Bridges has requested a cash payout of a portion of his accrued retirement/leave balance (240 hours)[.]" Ex. A. The monetary value of the benefit is $14,865.60. *Id.* That email was the first time NCUAB received notice of Chad Bridges' cashout request; he did not notify the NCUAB. This is concerning because vested employment benefits are an interest in property, and thus subject to the preliminary injunction. *See* ECF No. 20, Prelim. Inj. ¶ 5.

Leigh Bridges' use of frozen funds is also of concern to the NCUAB. The NCUAB has received what appears to be a budget listing of some of her monthly expenditures , *see* Ex. B, p.7, but has not received proof of her actual expenditures. The lack of invoices or receipts has led to concerns about the payment of expenses associated with real property. *See* ECF No. 33-4, Newbold decl. ¶¶ 11-13. Much more concerning, however, is her redemption of credit card points and utilization of gift cards after she was served with the TRO.

Leigh Bridges was served with the TRO on May 29, 2026. *See* ECF No. 11, Lindsay decl. ¶ 4. Between June 1 and June 18, 2026, Ms. Bridges attempted to redeem a portion of her points for these cash-equivalent gift cards in an amount up to $200,000.00. Meyer decl. ¶ 4. That effort was frustrated by a fraud alert on her account. *Id.* Eventually, she was able to redeem the credit card points for at least $32,750 in gift cards since May 30, 2026. *See* Ex. C. Ms. Bridges redeemed $12,000 of points on her American Express account for gift cards on May

30, the day after she was served with the TRO. *See id.* She also redeemed points for gift cards on June 3, June 10, July 3, July 11, July 20, and July 26.[2] *Id.*; *see also* Meyer decl. ¶ 5.

The NCUAB became aware of the gift-card redemptions around the end of July, after reviewing information provided in American Express' response to an administrative subpoena. That response was received by the NCUAB on July 23, 2026. Leigh Bridges did not make her credit card point redemptions known to NCUAB counsel until she did so through her attorney on August 12, well after many of the points were redeemed. Ex. D. Leigh Bridges redeemed $41,200 in gift cards in all of 2026. Ex. C. A document she provided to the NCUAB indicates that she has only $15,035.05 in gift card balances as of August 19. Ex. B. Subtracting that amount from the $32,750 in gift cards she redeemed since May 30, 2026 shows that **she used at least $17,714.95 of the gift cards she redeemed**, and quite possibly more, as of August 19, a span of less than twelve weeks. *See* Exs. B, C. Frozen property is being utilized extensively to fund living expenses outside of the knowledge of the NCUAB and the Court, therefore necessitating modification to the preliminary injunctions.

***B. Modifications to the preliminary injunctions are necessary to limit past and future harm to JAFCU and to ensure compliance with this Court's orders.***

To ensure compliance with this Court's orders and to limit past and future harm to JAFCU, the NCUAB requests the relief set forth in the proposed order. The relief includes restricting the conditions under which the Defendants may use frozen funds for monthly living expenses, requiring the Defendants to identify ongoing and previous expenditures and receipt of funds, and preserving the status quo by requiring the Defendants to reimburse the NCUAB for living expenses in the event that they are able to unfreeze funds or property. The NCUAB

[2] American Express acknowledged receipt of the TRO on June 3. The reason American Express let Leigh Bridges redeem credit card points after that date is not known to the NCUAB.

submits that this relief is appropriate because the harm to the NCUAB—the loss of funds that either belong to JAFCU by virtue of a constructive trust or that could be applied against forthcoming judgments that will not be satisfied—outweighs the harm to the Defendants in being required to live frugally using their own resources rather than frozen funds.

A party seeking to utilize frozen funds has the burden to show that the use of such funds is necessary. *See FSLIC v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) ("[T]he burden . . . [is] on the defendant to satisfy the court that he can secure the services of an attorney only if assets subject to the freeze order are released."). To meet that burden, a party must show that she or he lacks "other sources of income" or assets and that she or he is not "requesting funds for luxuries[.]" *SEC v. Heartland Grp. Ventures, LLC*, No. 4:21-CV-01310-O, 2022 WL 1527542, at *5 (N.D. Tex. Mar. 18, 2022), *report and recommendation adopted*, No. 4:21-CV-01310-O, 2022 WL 1523471 (N.D. Tex. May 13, 2022); *see FTC v. Am. Tax Serv. LLC*, No. 2:25-CV-01894-GMN-EJY, 2025 WL 3564724, at *2 (D. Nev. Dec. 11, 2025) (identifying five factors relevant to whether funds should be unfrozen). Although the NCUAB has limited insight into the Bridges' spending, it does know that Chad Bridges pays $2,900 per month in rent and utilities, ECF No. 48-10, Ex. J, and that Leigh Bridges spent a minimum of $17,714.95 in gift cards in less than twelve weeks, *see* Exs. B, C. Therefore, the Bridges appear to be utilizing frozen funds and/or property for luxuries, and the burden is on them to show otherwise.

Even if the Defendants are not found to be living luxuriously, the general presumption is that defendants can provide for their living expenses through employment. *See Am. Tax Serv.*, 2025 WL 3564724, at *3 ("Absent persuasive evidence to the contrary, the Court can conclude only that Defendants are capable of working to support their basic necessities."). As argued previously, ECF No. 48, P.'s opp. 13, Chad Bridges has not sufficiently detailed his efforts to

obtain employment. The NCUAB is also unaware of any reason that Tina Funez cannot support herself through employment. The NCUAB does understand that Leigh Bridges is under criminal investigation, *see* ECF No. 25, D.'s mtn. for stay, and thus her circumstances may be different. However, no Defendant has explained what other resources he or she might have to pay her or his living expenses aside from their frozen retirement accounts. None has explained why they cannot borrow from relatives, stay with relatives, or use lines of credit (such as credit cards) to pay or reduce their living expenses.

To the extent Defendants claim that those alternatives create a hardship, *see* ECF No. 52, Chad's reply 7, the hardship is no different than the one faced by many residents in this state who struggle with underemployment or unemployment. The Defendants lived luxuriously utilizing JAFCU funds for a long time. *See, e.g.*, ECF No. 17, Am. Compl. ¶¶ 23-43, 63-70. Defendants' prior opulence obtained through misappropriated JAFCU funds should not insulate them from the "hardship" of having to earn a living. *See Jostens, Inc. v. Hammons*, No. 4:20-CV-00225, 2022 WL 2392311, at *3 (E.D. Tex. July 1, 2022) ("The Court will not shield [defendants] from the consequences of [their luxurious lifestyle] at the expense of [the plaintiff.]"). For these reasons, and because the Defendants have the burden of proof, the NCUAB requests that the Defendants be prohibited from using frozen funds until they provide evidence that the use of frozen funds is absolutely necessary for non-luxurious living expenses.

To the extent that Defendants have been using, or are later permitted to use, frozen funds for living expenses, the NCUAB requests that the Court restore the status quo by requiring the Defendants to reimburse the NCUAB. "A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000); *see Vaughn v. Harrison Cnty., Mississippi*, No. 1:25-CV-347-TBM-RPM,

2025 WL 3252301, at *1 (S.D. Miss. Nov. 21, 2025) ("The primary purpose of a [preliminary injunctive relief] is to maintain the status quo."). "[T]he status quo is defined as the 'last peaceable uncontested status' existing between the parties before the dispute developed." *Vaughn*, 2025 WL 3252301, at *3. A "district court has the equitable power to return the parties to their last uncontested status" if the status quo is disturbed. *United States v. FDIC*, 881 F.2d 207, 210 (5th Cir. 1989); *see Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may . . . restore the status quo.").

Although the true status quo—JAFCU's financials before Leigh Bridges' extensive misappropriation—can never be restored, the relative status quo—JAFCU's position as of the date of the TRO—can only possibly be restored by requiring the Defendants to reimburse the NCUA from any funds or property determined to be free and clear of any interest of the NCUAB. This requirement is consistent with the rule that a defendant seeking to unfreeze funds for living expenses must first use unencumbered funds. *See Heartland Grp. Ventures*, 2022 WL 1527542, at *5 ("The Court . . . will deny . . . requests [for living expenses] where parties are found to have other sources of income . . . ."); *Am. Tax Serv.*, 2025 WL 3564724, at *2 (examining "a defendant's access to alternative assets"); *see also Dixon*, 835 F.2d at 565 (holding that a party seeking to unfreeze funds must "show that he cannot pay [his attorneys] from new or exempt assets"). It is also consistent with the preliminary injunctions' imposition of liability for "facilitat[ing] the transfer of and/or devaluation of" frozen funds and property. *See* ECF No. 20, Prelim. Inj. ¶¶ 3, 6; ECF No. 21, Prelim. Inj. ¶¶ 3, 6.

Although all of Defendants' accounts and assets are currently frozen, if the Defendants are eventually permitted to access property they claim should be unfrozen—such as their

retirement accounts—restoration of the status quo requires that the Defendants reimburse the NCUAB for their use of frozen funds from the exempt property. If a Defendant is unable to unfreeze any funds or assets, then the Defendant will have a debt to the NCUAB for the frozen funds utilized that will be in addition to the debt resulting from any money judgment obtained in this litigation—neither of which is likely to be collected in full. Nevertheless, the possibility of repayment should incentivize the Defendants to be discerning about their use of frozen funds, thereby furthering the principle that frozen funds should be used for "necessities" and not to "support luxuries or a lavish lifestyle." *Am. Tax Serv.*, 2025 WL 3564724, at *4. As to previously spent frozen funds and property, the creation of a debt to the NCUAB will provide for the possibility of restoring the status quo in the event property is unfrozen.

Any debt to the NCUAB for the Defendants' use of frozen funds cannot be accounted for unless the Defendants are required to provide past and future monthly account statements to the NCUAB. A requirement that defendants account for expenditures is typical when a preliminary injunction is in effect. *See, e.g., Dixon*, 835 F.2d at 557 ("The defendants were ordered to maintain itemized monthly accountings of their expenditures."); *FDIC v. Faulkner*, No. CA 3-85-2360-T, 1992 WL 486799, at *3-4 (N.D. Tex. Apr. 10, 1992) (setting limit on personal expenditures from frozen funds). Without full knowledge of the Defendants' income and expenditures, the NCUAB cannot protect the frozen funds in any meaningful sense.

Those who benefited the most from the misappropriation of funds from JAFCU should not continue to benefit at the expense of JAFCU by utilizing what remains of those funds. Much of the funds and many of the assets that are frozen in this litigation are held in constructive trust for JAFCU due to the size of Leigh Bridges' misappropriation. *See Eisenberg v. Grand Bank for Sav., FSB*, 207 F. Supp. 2d 553, 560 (S.D. Miss. 2002), *aff'd*, 70 F. App'x 765 (5th Cir. 2003).

Even as to assets and funds not held in constructive trust, the NCUAB's interest in freezing assets to preserve a potential judgment is greater than an ordinary litigant because it seeks the order to further a public rather than a private interest. *See FDIC v. Elio*, 39 F.3d 1239, 1247 (1st Cir. 1994) ("The record supports . . . that the F.D.I.C. would be harmed . . . specifically, that the F.D.I.C.'s ability to fulfill its statutory objective of collecting on the assets of the failed banks would be impaired."); *RTC v. Cruce*, 972 F.2d 1195, 1200 (10th Cir. 1992) ("[T]he record . . . suggests that [defendant] does not possess assets of sufficient value—even taking into account the assets he allegedly fraudulently conveyed . . . to extinguish this liability. These facts alone support a showing of injury."); *see also Dixon*, 835 F.2d at 562 ("The general flexibility of equitable powers is enhanced where, as here, the public interest is at stake."). The interest in preserving recovery is particularly important, given the loss to JAFCU from $51 million dollars misappropriated through two of Leigh Bridges' JAFCU accounts, *see* ECF No. 12-3, Corp. decl. ¶¶ 7-10; ECF No. 12-7, Meyer decl. ¶ 11; ECF No. 12-8, Stanislao decl. ¶ 13, alone exceeds the likely recovery from the frozen assets. In light of the near certainty that JAFCU will never be reimbursed for its losses and considering the minimal harm to the Defendants in requiring them to reel in their spending, the NCUAB requests relief with respect to Defendants' living expenses as set forth in the proposed order.

## II. The Bridges' Attempted and Actual use of Property Subject to the Preliminary Injunctions Require Clarification of the term "Property" and the Enforcement of this Court's Orders Through the Turnover of Property.

### *A. Gift cards, credit card points, and accrued leave are all property subject to this Court's Orders.*

The preliminary injunction against the Bridges provides that "[a]ll financial accounts of any kind of the Defendants remain frozen until the entry of final judgment in this lawsuit." ECF No. 20, Prelim. Inj. ¶ 2. The order also provides that the Bridges "are restrained and enjoined

from transferring or disposing of all other property owned by, titled to, controlled by them in any capacity, otherwise in their custody, or in which they have any beneficial interest[.]" *Id.* ¶ 5. Similar language freezing the Bridges' accounts and property was included in the TRO. *See* ECF No. 7, TRO ¶¶ 2, 5.

The term "property" is quite encompassing. *See Property*, Black's Law Dictionary (12th ed. 2024) ("[T]he rights in a valued resource such as land, chattel, or an intangible."). Although a form of intangible property, credit card points and gift cards are property within the plain meaning of the term. *See In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1210 n.13 (11th Cir. 2013) (referring to "credit card reward points" as property); *Int'l Bhd. of Teamsters Loc. 651 v. Philbeck*, No. CV 5:19-105-DCR, 2019 WL 1320056, at *4 (E.D. Ky. Mar. 22, 2019) ("[The defendant] allegedly took . . . the Union's credit card points and converted them to gift cards for his own personal use. . . . The plaintiff is likely to prevail on a claim of conversion under Kentucky law."). Indeed, points and gift cards are a form of contract rights. *See Gao v. JPMorgan Chase & Co.*, No. 14 CIV. 4281 PAC, 2015 WL 3606308, at *2 (S.D.N.Y. June 9, 2015) (analyzing issue concerning credit card points using contract law); *Benson v. Simon Prop. Grp., Inc.*, 642 S.E.2d 687, 689 (Ga. 2007) ("The contractual obligation created by a gift card or certificate is governed by the generally applicable contract law of this state."). Chad Bridges' accrued leave time is also an interest in property. *See Lampley v. City of Jackson, Mississippi*, No. 3:19-CV-723-KHJ-FKB, 2021 WL 12269762, at *3 (S.D. Miss. Oct. 8, 2021) (citing *Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993)) (observing that state employment benefits create a property interest if created by law or contract). Accordingly, the accrued leave, credit card points, and gift cards are all subject to this Court's Orders.

Leigh Bridges had notice of the TRO as of May 29, 2026, ECF No. 11, Lindsay decl. ¶ 4, and Chad Bridges had notice shortly thereafter, *see id*. ¶¶ 5, 6. Upon being served with the TRO, both were "restrained and enjoined from taking any action that would decrease the value of, or the amount of equity in, any of their property[.]" ECF No. 7, TRO ¶ 8; *accord* ECF No. 20, Prelim. Inj. ¶ 8. Chad Bridges' attempt to cash out his accrued leave was therefore inconsistent with the preliminary injunction. As the accrued leave is property with undisputed cash value, the NCUAB is unclear why he did not seek court permission or notify the NCUAB before trying to redeem his accrued leave. Similarly, the NCUAB does not know why Leigh Bridges did not seek the Court's permission prior to redeeming credit card points for $32,750 in cash-equivalent gift cards since the entry of the TRO and spending at least $17,714.95 of the value of those cards for her own benefit during that same period.

Perhaps, despite the clear monetary value of the accrued leave, points, and gift cards, the Bridges did not understand that they were "property" within the meaning of this Court's orders. That being said, it would be odd for the Court to permit the Bridges strict spending allowances, *see* ECF No. 7, TRO ¶¶ 10, 11; ECF No. 20, Prelim. Inj. ¶ 25, only to then permit them to enhance that allowance through the use of other assets, such as accrued leave and credit card points, without saying so. With respect to the credit card points, because $16,213,355.48 in JAFCU funds were used to pay her American Express card and two other credit cards between January 1, 2025 and March 31, 2026 alone, *see* ECF No. 12-3, Corp. decl. ¶ 8, it would seem obvious that any benefit obtained from those payments would belong to JAFCU.

Considering these observations, it is of course possible that the Bridges knowingly or recklessly disregarded the Court's order. Gift cards can be used to conceal a person's spending, Meyer decl. ¶ 6, and Leigh Bridges did not notify the NCUAB until well after they were

redeemed, *see* Ex. D. Chad Bridges' attempt to redeem leave through his former employee also suggests possible concealment because the NCUAB only found out when notified through his former employer. Nevertheless, the NCUAB is not requesting a finding of contempt here, so the Court need not make those findings. Rather, the NCUAB asks for the relief set forth in the proposed order and explained below.

***B. Clarification of this Court's Orders and the turnover of property are both necessary to protect the asset freeze.***

While the Court's Orders clearly freeze the Bridges' accounts at financial institutions, freeze and restrict the transfer of property, and prohibit the Bridges from diminishing the value of assets, the Orders do not explicitly define accrued leave, credit card points, and gift cards as "property." The NCUAB requests modification of the preliminary injunctions to clarify the term "property," per the definition provided in the proposed order, as to avoid any doubt as to what is subject to the preliminary injunction and to put all Defendants on notice of the same.

The NCUAB also requests enforcement of the preliminary injunction through turnover of the points and gift cards. The Fifth Circuit recognizes an "order directing the turnover of funds to a Receiver" in connection with a receivership. *United States v. Beasley*, 558 F.2d 1200, 1201 (5th Cir. 1977); *see* 12 U.S.C. § 1787(b)(2)(G) (permitting the trusteeship of property). Because at least $17,714.95 in gift cards has already been dissipated, *see* Exs. B, C, the remaining gift cards are properly turned over to the NCUAB. Leigh Bridges' attorney has represented that Ms. Bridges will stop using points and will return what is left of the gift cards to the NCUAB, but the NCUAB has not yet received them. According to a document that Leigh Bridges

produced as required by the preliminary injunction, she is currently in possession of $15,035.05 in gift cards and Chad Bridges possesses $10,384.01 in gift cards.[3] *See* Ex. B.

The gift cards and credit card benefits must be turned over because they cannot be tracked with any accuracy otherwise, as the NCUAB suggests is clear from this memorandum. Monetization of these gift cards and the credit card points is also important because they may have expiration dates or other restrictions. The proposed order provides that money obtained from the gift cards and credit card points will be held in trust pending further order of this Court. This procedure protects frozen assets from further dissipation while posing only a minor inconvenience to the Bridges.

## III. Lack of Information as to Certain Property Requires that Defendants Identify Property in their Possession and at the Utila Dwelling.

Several circumstances have led to uncertainty as to items of property subject to this Court's Orders. Shortly after being added to this lawsuit, Tina Funez quickly left the Eastbrooke condo where she had been residing. Meyer decl. ¶ 9. Chad Bridges has moved out of the Sleepy Hollow residence and now lives in an apartment. ECF No. 33-4, Newbold decl. ¶ 4. However, he was observed making several trips back to the Sleepy Hollow residence to retrieve various items. Meyer decl. ¶ 10. Leigh Bridges has moved out of the Sleepy Hollow residence and now lives at the Eastbrooke condo. ECF No. 33-4, Newbold decl. ¶ 4. The NCUAB permitted her to take some items with her in order to furnish the condo. The NCUAB does not know precisely what was taken, however.

The lack of knowledge is troubling because the preliminary injunctions permit the NCUAB to take custody of a significant amount of property. The preliminary injunction against

[3] The NCUAB does not know whether Chad Bridges has spent down any of the gift cards.

the Bridges permits the NCUAB to take possession of "all tangible items with estimated resale fair market value of over $100," subject to certain exceptions. ECF No. 20, Prelim. Inj. ¶ 9. The preliminary injunction against Tina Funez permits the NCUAB to take possession of "all jewelry, handbags and/or any other items gifted from the Bridges with estimated resale fair market value of over $100." ECF No. 21, Prelim. Inj. ¶ 9. To ensure compliance with the preliminary injunctions, the NCUAB requests that the Defendants be required to identify all property in their possession with a value of over $100.

For similar reasons, the NCUAB also requests that the Defendants identify all property brought to the Utila dwelling in the last six months with a value of over $100. The Bridges and Tina Funez took at least one trip to Utila after Leigh admitted to misappropriating funds in April of this year. Meyer decl. ¶ 8. Given that jewelry or items of value could have possibly been transferred to the Utila dwelling, and that the NCUAB cannot readily inspect that property, for the Court's Orders to be effective, the Defendants must be required to identify items brought to the Utila dwelling. *Cf. NobelBiz, Inc. v. Glob. Connect, LLC*, No. 6:12-CV-244, 2017 WL 11190016, at *2 (E.D. Tex. Feb. 7, 2017) ("Courts . . . consider the risk that the judgment debtor might transfer or conceal assets located in the foreign judicial district.").

The fact that the property may be located in foreign country does not negate this Court's jurisdiction. This Court has the authority to restrain Defendants from transferring or dissipating property even if the property itself is outside the jurisdiction of this Court. *See SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 294 (5th Cir. 2024) (holding that court can enjoin persons over whom there is personal jurisdiction). Consistent with that authority, courts in the Fifth Circuit have ordered the repatriation of funds and property. *See FTC v. Educare Ctr. Servs., Inc.*, No. EP-19-CV-196-KC, 2019 WL 9516075, at *1 (W.D. Tex. Aug. 30, 2019) (ordering repatriation);

*SEC v. Levy*, No. 304-CV-0351-N, 2004 WL 594474, at *2 (N.D. Tex. Mar. 9, 2004) (same); *see also FTC v. Abili-Staff, Ltd.*, No. SA-10-CA-88-OG, 2010 WL 11598071, at *1 (W.D. Tex. May 26, 2010) (similar). If needed, the Court could do the same here. For the time being, however, the NCUAB is simply requesting that the Defendants identify property brought to the Utila Dwelling within the past six months. Such information is necessary for the NCUAB to know the location of items subject to the preliminary injunctions to ensure full compliance with this Court's Orders.

## CONCLUSION

For the reasons explained above, the Court should modify, clarify, and enforce the preliminary injunctions, ECF Nos. 20, 21, consistent with the language contained within the proposed order.

Respectfully submitted,

September 14, 2026

*/s/ Alysson Mills*

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of JACKSON AREA FEDERAL CREDIT UNION

CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

*/s/ Alysson Mills*

Alysson Mills