UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION
--------------------------------------------------------------------X

NATIONAL CREDIT UNION ADMINISTRATION BOARD, in its capacity as conservator of Jackson Area Federal Credit Union,

Plaintiff,

v.

LEIGH BRIDGES, CHAD BRIDGES, and TINA FUNEZ,

Defendants.

--------------------------------------------------------------------X

Case No.: 3:26-cv-343-DPJ-RPM
Hon. Daniel P. Jordan
Hon. Robert P. Myers, Jr.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT LEIGH BRIDGES' MOTION TO AMEND OR MODIFY THE PRELIMINARY INJUNCTION**

Plaintiff, the National Credit Union Administration Board ("NCUAB"), acting in its capacity as conservator of Jackson Area Federal Credit Union ("JAFCU"), submits the following memorandum of law in opposition to Defendant Leigh Bridges' Motion to Amend or Modify the Preliminary Injunction.

## INTRODUCTION

In a brief that parrots, often word-for-word, the brief filed by Chad Bridges, Leigh Bridges asks for various amounts of money from her JAFCU retirement plan to pay for her living expenses and $250,000 in yet-to-be substantiated attorneys' fees, *see* ECF No. 35-1, Ex. A. But her argument to access retirement funds at this early stage of the litigation is weaker than her husband's argument, which fails for the reasons set forth in Plaintiff's opposition to his motion, *see* ECF No. 48. Her argument fails not only because 12 U.S.C. § 1787(b)(2)(G) preempts

contrary law, but also because **she is asking for compensation that she "earned" while misappropriating at least $73 million from the credit union**.

A fiduciary who breaches her duties may be required to forfeit all compensation "earned" during the period of disloyalty under Mississippi law. If her salary is forfeitable, any "work" she performed for JAFCU could not serve as consideration for JAFCU's retirement contributions. JAFCU contributed an amount equal to 23.5% of her six-figure JAFCU salary to Leigh Bridges' retirement account since at least 2020. This appears to be orchestrated by her in order to shelter funds for her "future self" when her misappropriation was eventually caught. If retirement contributions are made based on fraudulent pretenses, courts have held that the contributions can be recovered from retirement plans even when the plans are otherwise protected under ERISA. Regardless, her motion must be denied because the NCUAB can show a likelihood of success in attaching Leigh Bridges' retirement account to secure a judgment against her based on her misappropriation of JAFCU funds and because the harm to the NCUAB from the utilization of the frozen funds greatly outweighs any harm to Leigh Bridges.

## APPLICABLE LEGAL STANDARDS

"District courts may appropriately modify an injunction 'when the legal or factual circumstances justifying the injunction have changed.'" *Yue v. Reaction Labs, LLC*, 816 F. Supp. 3d 732, 737 (W.D. Tex. 2026) (quoting *Bear Ranch, LLC. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 803 (5th Cir. 2018)). The "party seeking to modify the injunction" has the "burden to show 'that changed circumstances warrant relief.'" *Id.* at 738. If the movant can show that circumstances have in fact changed, then the court applies the traditional four-factor test for injunctive relief. *See id.* at 737.

Under the four-factor test, the party seeking the injunction must "establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Mississippi Ass'n of Educators v. State Institutions of Higher Learning*, No. 3:25-CV-00417-HTW-LGI, 2025 WL 2142676, at *1 (S.D. Miss. July 20, 2025) (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)). Under the Fifth Circuit's "sliding scale" approach, a greater showing on a particular factor allows for a lesser showing on the other three factors. *See TitleMax of Texas, Inc v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025).

**ARGUMENT**

**I. Leigh Bridges has not Demonstrated that the NCUAB is Unlikely to Succeed on the Merits of its Claims Against her.**

Analysis of the likelihood of success on the merits is conducted by reference to the "standards provided by the substantive law" applicable to the causes of action in the complaint. *TitleMax*, 142 F.4th at 329. "To show a likelihood of success, plaintiffs must present a prima facie case[.]" *Id.* A plaintiff "can satisfy this requirement by 'raising questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation . . . .'" *CoreClarity, Inc. v. Gallup, Inc.*, No. 4:20-CV-601, 2020 WL 5095130, at *2 (E.D. Tex. Aug. 28, 2020) (quoting *Tampa Phosphate R.R. Co. v. Seaboard Coast Line R.R. Co.*, 418 F.2d 387, 392 (5th Cir. 1969)). Even "some likelihood of success on the merits will justify temporary injunctive relief[]" if the plaintiff made a strong showing on the other factors. *Productos Carnic, S.A. v. Cent. Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

The amended complaint sets forth causes of action pertaining to Leigh Bridges based on fraudulent misrepresentation (two counts), conversion, breach of fiduciary duty, personal

liability under § 1787(h), fraudulent transfer (under federal and Mississippi law), constructive trust, and § 1787(b)(2)(G). The causes of action for conversion, breach of fiduciary duty, and § 1787(b)(2)(G) are the most relevant here and are discussed below.

### *A. The NCUAB is likely to establish the liability of Leigh Bridges.*

#### **1. Leigh Bridges misappropriated significant funds from JAFCU and concealed that activity from JAFCU and the NCUA.**

Leigh Bridges became the president and CEO of JAFCU in 2021 after having previously served as JAFCU's CFO. *See* ECF No. 12-7, Meyer decl. ¶ 5. In her position as president and CEO, she was responsible for preparing and signing JAFCU's financial statements. *See* ECF No. 12-4, Hill decl. ¶ 5. On April 17, 2026, in a meeting with JAFCU board members and two NCUA examiners, Leigh Bridges admitted to misappropriating JAFCU funds for her own personal benefit. *See* ECF No. 12-5, Baylor decl. ¶¶ 8-9; ECF No. 12-4, Hill decl. ¶ 10; ECF No. 12-6, O'Quinn ¶¶ 8-10. She admitted to using JAFCU funds to make extensive personal purchases, including expensive jewelry and handbags, and to transferring JAFCU funds into her personal accounts. *See* ECF No. 12-5, Baylor decl. ¶ 8; ECF No. 12-6, O'Quinn decl. ¶¶ 8, 10.

Leigh Bridges also admitted to concealing the fact that funds were missing from JAFCU by overstating the amount on JAFCU's general ledger on deposit with a corporate credit union. *See* ECF No. 12-4, Hill decl. ¶¶ 6-9; ECF No. 12-6, O'Quinn decl. ¶ 8. To further the concealment, Leigh Bridges told the JAFCU board that JAFCU was well capitalized and doing well. *See* ECF No. 12-4, Hill decl. ¶ 5. False deposit entries were also made in the share accounts of Leigh and Chad Bridges. *See* ECF No. 12-7, Meyer decl. ¶ 11. Those false deposits were manually entered under the transaction code "SDIT," which signifies a share deposit, and contained descriptions with the preface "EFT," which stands for electronic funds transfer. *See id.* Those entries were false in that no funds were being transferred from an external source, but

rather the funds were being transferred from the general ledger of JAFCU to the share accounts of Leigh and Chad Bridges. *See id.* The false transactions listed financial institutions such as Acorns Investing, JP Morgan Chase Bank, and Raymond James Financial as their sources. *See* ECF No. 12-8, Stanislao decl. ¶ 13; *see also* ECF No. 12-6, O'Quinn decl. ¶ 10. Aggregating those transactions from the information for a share account of Leigh Bridges and a share account for Leigh and Chad Bridges, shows over $51 million dollars in entries from the year 2015 until the present. *See* ECF No. 12-8, Stanislao decl. ¶ 13. As of the date of this filing, the NCUAB's forensic auditor has been able to determine that $73,325,882.54 in JAFCU losses were a direct result of Leigh Bridges' misappropriation.

Leigh Bridges and her husband used misappropriated JAFCU funds to provide a lavish lifestyle for themselves and Tina Funez, as detailed elsewhere. *See, e.g.*, ECF No. 17, Am. Compl. ¶¶ 23-43, 63-70; ECF No. 48, P.'s opp. 2-6. That spending was grossly out of line with the Bridges' actual income. Between May 1, 2019 and May 4, 2026, funds coming into the Bridges' joint share account at JAFCU from Chad Bridges' salary after payroll deductions totaled $397,035.13 (approximately $56,719.30 per year). *See* ECF No. 12-8, Stanislao decl. ¶ 14. During that same period, funds coming into the Bridges' joint share account at JAFCU from Leigh Bridges' salary after payroll deductions totaled $705,637.40 (approximately $100,805.35 per year). *See id.* Given the spending incommensurate with their actual salaries, evidence of falsified statements, and Leigh Bridges' admissions of concealment and misappropriation, the NCUAB will likely prevail on several causes of action against her.

### 2. Leigh Bridges' misappropriation establishes that the NCUAB will likely prevail on its claims against her under Mississippi tort law.

The NCUAB will likely prevail on its claims under Mississippi tort law, including its conversion claim. To establish the intentional tort of conversion, a plaintiff must show "a

wrongful possession with intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 426 (S.D. Miss. 2015), *aff'd*, 886 F.3d 507 (5th Cir. 2018) (quoting *Cmty. Bank, Ellisville, Miss. v. Courtney*, 884 So.2d 767, 773-74 (Miss. 2004)).

Leigh Bridges admitted to misappropriating JAFCU funds to bankroll her personal accounts and to make extensive personal purchases. *See* ECF No. 12-5, Baylor decl. ¶ 8; ECF No. 12-4, Hill decl. ¶¶ 9-10; ECF No. 12-6, O'Quinn decl. ¶ 10. The use of such funds was made clear at the April 17, 2026 meeting. The evidence in the record shows at least $51 million in deposits from the JAFCU general ledger into two of Leigh Bridges' accounts, *see* ECF No. 12-8, Stanislao decl. ¶ 13, although the NCUAB's forensic auditors currently believe that at least $73,325,882.54 has been converted. Millions of dollars flowed through the accounts of her and her husband to fund personal expenses. *See* ECF No. 12-3, Corp. decl. ¶¶ 7-10; *see also* ECF No. 12-8, Stanislao decl. ¶ 11. The Bridges' combined payroll deposits for the past several years do not even equal the amount currently available in the Bridges' joint share accounts with JAFCU. The wrongful use and possession of JAFCU funds establish that the NCUAB will likely prevail on its claim of conversion.

For similar reasons, the NCUAB will also likely prevail on its claim for breach of fiduciary duty. In Mississippi, "[t]he elements of a claim for breach of fiduciary duty are (1) a fiduciary relationship, and (2) its breach." *Cascade Cap. Grp., LLC v. Livingston Holdings, LLC*, No. 3:17CV952-LG-MTP, 2019 WL 438488, at *12 (S.D. Miss. Feb. 4, 2019). Like an officer of a bank, the CEO of a credit union has a fiduciary duty to the credit union. *See Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 84 (Miss. 1992) (holding that bank

branch manager had fiduciary duties). Leigh Bridges was the CEO and previously the CFO of JAFCU, *see* ECF No. 12-7, Meyer decl. ¶ 5, a credit union with three branches.

Fiduciaries owe their principal "a duty of loyalty and fair dealing." *Omnibank of Mantee*, 607 So. 2d at 84. "A part of an officer's duty of loyalty requires that he protect the corporation's property. That he may not appropriate corporate assets to his own use seems apparent." *Id.* at 91. Of course, if bank or credit union officers "steal and embezzle [or] defraud the corporations they serve," they are in breach of the duty of loyalty. *Id.* at 90. In misappropriating millions of dollars for her personal use, Leigh Bridges is clearly in breach of her fiduciary duty to JAFCU.

She is also in breach of her duty to disclose the true financial position of JAFCU to the board of directors. A fiduciary is obligated "to make 'a full disclosure of any and all material facts within his knowledge, and of which he knows or should know that the other person is ignorant.'" *Strong v. First Fam. Fin. Servs., Inc.*, 202 F. Supp. 2d 536, 541 (S.D. Miss. 2002) (quoting *American Nat. Ins. Co. of Galveston, Tex. v. Murray*, 383 F.2d 81, 86 (5th Cir. 1967)). If one is a fiduciary, "his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act[.]" *Id.* at 540-41 (quoting *Van Zandt v. Van Zandt*, 86 So.2d 466, 470 (Miss. 1956)).

Leigh Bridges admitted to concealing the fact that funds were missing from JAFCU by overstating the amount on JAFCU's general ledger on deposit with or pending from its corporate credit union and to altering entries on JAFCU's ledger. *See* ECF No. 12-5, Baylor decl. ¶¶ 8-9; ECF No. 12-4, Hill decl. ¶¶ 7-10; ECF No. 12-7, Meyer ¶ 8; ECF No. 12-6, O'Quinn decl. ¶¶ 8-10. Leigh Bridges also told the JAFCU board that JAFCU was well capitalized and doing well. *See* ECF No. 12-4, Hill decl. ¶ 5. Such concealment is undoubtedly a breach of her fiduciary duty to JAFCU, particularly considering the multimillion-dollar misappropriation.

Despite her extensive misappropriation of JAFCU funds, Leigh Bridges contends that the "funds in [her] retirement accounts . . . are not traceable to any funds allegedly misappropriated [from JAFCU] . . . ." D.'s mem. 5. Assuming that none of the funds are in fact from JAFCU, all that means is that those accounts are not held in a constructive trust. If "a personal judgment . . . arise[s] against [a defendant] . . . . the [financial regulator] . . . [is] able to reach her separate assets." *RTC. v. Cruce*, 972 F.2d 1195, 1203 (10th Cir. 1992). Indeed, the Fifth Circuit found "no error in the district court's application of the preliminary injunction provisions of the [Federal Deposit Insurance Act (FDIA)] for the purpose of securing a potential damage award." *FDIC v. Faulkner*, 991 F.2d 262, 265 (5th Cir. 1993); *see Cruce*, 972 F.2d at 1203. The absence of a constructive trust claim is not dispositive of whether the NCUAB can collect from Leigh Bridges' retirement account.

This same principle holds true in other types of enforcement actions. The SEC and FTC use asset freezes "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005). Disgorgement is a different remedy than constructive trust and, unlike constructive trust, does not require tracing. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372-73 (2d Cir. 2011). However, "[n]othing . . . supports concluding that an asset freeze can encompass only those assets traceable to the alleged wrongdoing." *FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1315 (S.D. Fla. Sept. 18, 2013). Otherwise, "a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement." *Id.* at 1316 (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000)). Similarly, Leigh Bridges profited from misappropriated JAFCU funds while

funneling her JAFCU compensation into her retirement accounts; this misconduct should not allow her to shield her retirement account from the asset freeze under § 1787(b)(2)(G).

***B. The NCUAB will be able to collect from Leigh Bridges' retirement account.***

**1. Section 1787(b)(2)(G) permits the NCUAB to attach "the assets of any person" to secure a potential judgment, including retirement accounts otherwise exempt under state or federal law.**

The NCUAB, when acting as conservator or liquidating agent, may request "an order placing the assets of any person . . . under the control of the court and appointing a trustee to hold such assets." 12 U.S.C. § 1787(b)(2)(G). The section at issue, 12 U.S.C. § 1787(b)(2)(G), which is entitled "Attachment of assets and other injunctive relief," permits a court to attach assets to ensure the agency's ability to collect a potential judgment. *See Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC*, 5 F.3d 1508, 1517 (D.C. Cir. 1993) ("Section 1821(d)(18) allows the RTC to attach the assets of any person."); *In re Colonial Realty Co.*, 980 F.2d 125, 128 n.2 (2d Cir. 1992) ("Section 1821(d)(18) empowers the FDIC-receiver to obtain attachment of assets and other injunctive relief pursuant to the relaxed standards set forth in § 1821(d)(19)."); *NCUAB v. Zovko*, No. 1:13 CV 1430, 2014 WL 12889793, at *5 (N.D. Ohio Mar. 31, 2014) (entering order under § 1787(b)(2)(G) attaching defendants' real property).

The NCUAB can attach Leigh Bridges' retirement account because they are "assets of any person" within the plain meaning of § 1787(b)(2)(G). "When the plain language of a statute is unambiguous and does not lead to an absurd result, [a court's] inquiry begins and ends with the plain meaning of that language." *Texas Brine Co., LLC. v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 486 (5th Cir. 2020). Even if the term "asset" were ambiguous, a dictionary definition could provide clarification. *See Adams v. All Coast, LLC*, 15 F.4th 365, 371 (5th Cir. 2021) ("This court often looks to dictionary definitions to determine the ordinary meaning of key statutory

terms."). According to Black's Law Dictionary, an asset is "[a]n item that is owned and has value." *Asset*, Black's Law Dictionary (12th ed. 2024). Leigh Bridges' retirement account is owned by her and has value; thus, it is an "asset." Consequently, her retirement accounts may be subjected to prejudgment attachment under § 1787(b)(2)(G).

Although clearly an "asset," Leigh Bridges contends that "federal courts must be mindful of Fed.R.Civ.P. 64 which permits pre-judgment seizure of a defendant's property only to the extent allowed by the laws of the state where the court is located." D.'s mem. 4 (citation omitted). That contention is beside the point, however, as "Federal Rule of Civil Procedure 64, which is the standard avenue for parties seeking attachment of property, does not apply when the NCUAB invokes its powers under § 1787(b)(2)(G)." *Zovko*, 2014 WL 12889793, at *2; *see also* Fed. R. Civ. P. 64(a) ("But a federal statute governs to the extent it applies."). Leigh Bridges also contends that because Mississippi law, Miss. Code. § 85-3-1(e), exempts retirement plans, the NCUAB cannot attach those assets. D.'s mem. 4. That contention fails as well.

Section 1787(b)(2)(G), as federal law, preempts Miss. Code. § 85-3-1(e) and any other state law to the extent that such laws are inconsistent with the federal statute. *See Crystal Clear Special Util. Dist. v. Jackson*, 142 F.4th 351, 363 (5th Cir. 2025) ("[A]ny state law . . . , which interferes with or is contrary to federal law, must yield."). The lack of express language in § 1787(b)(2)(G) stating that state law is preempted does not foreclose the possibility of preemption; it simply makes the analysis one of "conflict" preemption. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000) ("[T]his Court traditionally distinguishes between 'express' and 'implied' pre-emptive intent, and treats 'conflict' pre-emption as an instance of the latter."). "Conflict preemption applies (1) where complying with both federal law and state law is impossible; or (2) where the state law creates an unacceptable obstacle to the accomplishment

and execution of the full purposes and objectives of Congress." *Crystal Clear Special Util. Dist.*, 142 F.4th at 364.

There is a conflict between a law that permits "an order placing the assets of any person . . . under the control of the court . . . ," 12 U.S.C. § 1787(b)(2)(G), and Miss. Code. § 85-3-1(e), a law that makes retirement accounts "exempt from seizure under execution or attachment." State-law exemptions to certain classes of assets are also antithetical to Congressional intent. In enacting § 1787(b)(2)(G), "Congress has evidenced its desire to take an aggressive position in minimizing losses sustained by taxpayers due to bank failures . . . [by] giv[ing] [federal regulators] a green light to use aggressive tactics in protecting taxpayers' interests." *FDIC v. Elio*, 39 F.3d 1239, 1244-45 (1st Cir. 1994). Because of the irreconcilable conflict between the federal law and state laws, conflict preemption applies and federal law is supreme.

Consistent with the supremacy of federal law, the Tenth Circuit found that the RTC could freeze a wife's one-half interest in real property under the FDIA analogue to § 1787(b)(2)(G) even though that interest was arguably protected under Kansas joint tenancy law. *See Cruce*, 972 F.2d at 1202-03. That result is consistent with other contexts where a government agency is collecting on behalf of the public. *See, e.g., Drye v. United States*, 528 U.S. 49, 59 (1999) ("[E]xempt status under state law does not bind the federal collector[.]"). Outside of the context of collection, courts have also found that state law does not limit a financial regulator's statutory authority. *See, e.g.*, *FDIC v. Bank of Boulder*, 911 F.2d 1466, 1472-73 (10th Cir. 1990) ("[S]ection 1823(c)(2)(A) creates a power in FDIC/Corporation to purchase any assets, including assets nontransferable under state law, from FDIC/Receiver in order to facilitate a P & A transaction."); *S. Miami Holdings LLC v. FDIC*, No. 10-22032-CV, 2012 WL 4644716, at *5 (S.D. Fla. July 26, 2012), *aff'd*, 533 F. App'x 898 (11th Cir. 2013) ("The authority conferred on

the FDIC . . . to effectuate asset transfers in a purchase and assumption agreements trumps any state law that would otherwise invalidate or call into question such transfers.”). Accordingly, consistent with principles of federal preemption and the relevant case law, § 1787(b)(2)(G) preempts Mississippi law to the contrary.

The collection tools of the financial regulators still have supremacy even if other federal law is involved. Indeed, a district court in the Fifth Circuit found that the FDIC could collect from a debtor’s ERISA-protected retirement account because the offset provision of the FDIA preempted ERISA. *See Calhoun v. FDIC*, 653 F. Supp. 1288, 1294 (N.D. Tex. 1987). In finding ERISA preempted, the court observed that “the Congressional policies underlying the . . . [FDIA] would be frustrated were ERISA’s non-alienability provision found to limit the FDIC’s right to withhold payment of the insured deposits of persons indebted to a failed bank.” *Id.* at 1293. Accordingly, to the extent ERISA applies to Leigh Bridges’ retirement account, that does not protect her account from prejudgment attachment here either.

That the prejudgment attachment remedy in § 1787(b)(2)(G) should preempt contrary law is also clear from the entirety of § 1787. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (“[T]he structure and purpose of the statute as a whole” is relevant to preemption analysis). Most tellingly, the NCUAB is permitted to serve an administrative subpoena “for purposes of . . . determining and realizing upon **any asset of any person** in the course of collecting money due the credit union . . . .” 12 U.S.C. § 1787(b)(2)(I)(i) (emphasis added). “The adjective ‘any’ is . . . a broad term[.]” *San Francisco v. EPA*, 604 U.S. 334, 348 (2025). The ability to seek information on “any asset . . . in the course of collecting money due the credit union” would make little sense if Congress did not intend for the NCUAB to actually collect against the asset for which information was subpoenaed. Other enhanced collection tools

available to the NCUAB under § 1787 support a broad interpretation of § 1787(b)(2)(G) as well. *See, e.g.*, 12 U.S.C. §§ 1787(b)(2)(H)(i) (relief from irreparable harm requirement for Rule 65 relief), 1787(b)(14) (additional time to file lawsuits), and 1787(n) (ability to offset to collect debts). Section 1787, as a whole, is clear that the remedy in § 1787(b)(2)(G) includes attachment of retirement accounts, even if those accounts are exempt from attachment under state law.

The structure of § 1787 as whole, relevant case law, and a straightforward reading of the language of the statute make clear that § 1787(b)(2)(G) allows the attachment of retirement accounts and preempts ERISA and contrary Mississippi law. Accordingly, the NCUAB has met its burden for purposes of Leigh Bridges' motion, which requires only that the NCUAB show a likelihood of success on the merits. Whether her retirement account may be liquidated to satisfy a judgment against Leigh Bridges for her misappropriation will be decided later in this litigation.

**2. Even if not subject to prejudgment attachment, contributions to Leigh Bridges' retirement account may be unwound because they were made based on a fraudulent pretense.**

In addition to being subject to collection under § 1787(b)(2)(G), the funds transferred to Leigh Bridges' retirement account are recoverable based on other grounds. Benefits otherwise protected by ERISA benefit plans have been found to be forfeitable if the payment of benefits could be withheld based on principles of contract law. *See Nash v. Trs. of Boston Univ.*, 946 F.2d 960, 967 (1st Cir. 1991) (benefits under putative ERISA-protected plan were forfeitable under fraudulent-inducement theory). The Mississippi Supreme Court has held that if an employee "was engaged in activities detrimental to his employer and in breach of his contract of employment, then the proper predicate would exist to cause a forfeiture of his salary for this period." *Short v. Columbus Rubber & Gasket Co.*, 535 So. 2d 61, 67 (Miss. 1988). Leigh

Bridges' misappropriation gives grounds to rescind the agreement to provide her retirement benefits, which was predicated on her providing diligent and loyal services to JAFCU.

Her total retirement contributions made within the five years prior to conservatorship may also be recovered as fraudulent transfers under 12 U.S.C. § 1787(b)(16)(A) regardless of ERISA. ERISA's "anti-alienation provision, even if otherwise applicable, does not supersede the [fraudulent transfer] provisions of the Bankruptcy Code." *Wagner*, 500 B.R. at 49; *see In re Vaughan*, 493 B.R. at 607 (same); *In re O'Malley*, 601 B.R. 629, 651 (Bankr. N.D. Ill. 2019), *aff'd*, 633 B.R. 332 (N.D. Ill. 2021) ("ERISA does not preempt a trustee's avoidance and recovery power[.]"). Indeed, the Fifth Circuit has rejected the idea "that pension plans can serve as safe harbors for fraudulent conveyances or voidable transfers." *In re Key Communications, Inc.*, 24 F.3d 236 (5th Cir.1994); *see Shumate v. Patterson*, 943 F.2d 362, 365 (4th Cir. 1991) (recognizing possibility of recovering a fraudulent transfer from an ERISA-protected retirement plan). Like fraudulent transfers in bankruptcy, transfers recoverable under § 1787(b)(16)(A) should not be understood as being restricted by ERISA either.

The transfers that Leigh Bridges received while a trustee of the JAFCU plan, and that she made as a JAFCU employee, are undoubtedly fraudulent transfers recoverable under § 1787(b)(16)(A). The NCUAB may "avoid a transfer of any interest of an institution-affiliated party . . . in property . . . if such party or person voluntarily or involuntarily made such transfer . . . with the intent to hinder, delay, or defraud the insured credit union . . . ." 12 U.S.C. § 1787(b)(16)(A). As CEO and president of JAFCU since the year 2021, *see* ECF No. 12-7, Meyer decl. ¶ 5, Leigh Bridges was an institution-affiliated party, *see* 12 U.S.C. § 1786(r)(1). The question is thus whether the contributions were made with "the intent to hinder, delay, or defraud" JAFCU. Indicia of fraudulent transfer include transfers to family members, a lack of

consideration, insolvency of the debtor, and retention by the debtor of the property involved in the transfer. *See Elio*, 39 F.3d at 1246; *accord* Miss. Code § 15-3-107(2) (listing badges of fraud). Several badges of fraud are present here.

Leigh Bridges was a trustee of the JAFCU retirement plan, Meyer decl. ¶ 3, and the CEO of the credit union. Her receipt of JAFCU funds as a beneficiary of the retirement account therefore appears to be an insider transaction to herself. She was also grossly insolvent at the time of the transfers. Five years prior to conservatorship, in May 2021, Leigh Bridges had significant debt due to her misappropriation from JAFCU. *See* ECF No. 12-3, Corp. decl. ¶¶ 7-10; ECF No. 12-7, Meyer decl. ¶ 11; ECF No. 12-8, Stanislao decl. ¶ 13.

The payments to the retirement account were also without consideration because she was a disloyal fiduciary. *See Short*, 535 So. 2d at 67 ("The general rule is that an employer is not obligated to continue to pay the salary of an employee who has been demonstrated to be dishonest or disloyal[.]") (citing *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1314 (Ill. App. 1980)); *see also Sunflower Farms, Inc. v. McLean*, 117 So. 2d 808, 815 (Miss. 1960) ("[A] trustee is entitled to receive compensation . . . . but it may be forfeited or reduced in the discretion of the court for bad faith, conversion, commingling of funds, or other improper conduct."); *Reeves v. Reeves*, 128 So. 330, 331 (Miss. 1930).

Leigh Bridges cannot claim consideration for compensation transferred to her retirement account from her salary and the additional contribution from JAFCU when all of her compensation since at least 2014 is forfeitable due to her disloyalty. The JAFCU-funded transfers to her retirement account are particularly problematic here as they were curiously high. Leigh Bridges received a transfer of 23.5% of her salary into her retirement over and above the contribution from her salary during the five-year period before conservatorship. Meyer decl.

¶¶ 4, 5. "[S]ubstantial or unusual contributions to a . . . pension trust made . . . with intent to defraud creditors, should receive no protection under [the Bankruptcy Code]." *Velis v. Kardanis*, 949 F.2d 78, 82 (3d Cir. 1991). There is no reason for a different result under § 1787(b)(16). If nothing else, the overly generous JAFCU contributions to her retirement account suggest fraudulent intent and present another reason why Leigh Bridges' contributions to her retirement account during the period five years prior to conservatorship should be unwound to mitigate harm to the NCUAB.

## II. The Balance of the Harms Overwhelmingly Favors the NCUAB.

### *A. Leigh Bridges has not established cognizable harm if her retirement account remains frozen.*

Leigh Bridges asserts harm because without relief, she "does not have the means to pay her basic living expenses (including the obligations imposed by the Court) or her attorney's fees to defend herself against this action." D.'s mem. 5. She cannot show harm for any of these three reasons.

#### 1. Payment of outstanding attorneys' fees.

Leigh Bridges argues that she is harmed by her inability to pay her outstanding attorneys' fees. D.'s mem. 5-6. "There is no absolute right to an attorney in civil cases[.]" *Minor v. Transp. Loc. Union 555*, No. 3:23-CV-658-E-BN, 2023 WL 4161750, at *1 (N.D. Tex. May 11, 2023). Although there is a right to an attorney in criminal cases, "the use of frozen assets to pay attorney fees can be disallowed even in criminal cases[.]" *SEC v. Dobbins*, No. CIV.3:04-CV-0605-H, 2004 WL 957715, at *2 (N.D. Tex. Apr. 14, 2004). Accordingly, whether an attorney represents a defendant in a civil case, criminal case, or both, "a district court may restrain a defendant from using disputed funds to pay for attorney's fees before a final judgment on the merits has been rendered." *SEC v. Priv. Equity Mgmt. Grp., Inc.*, No. CV 09-2901 PSG (EX),

2009 WL 2058247, at *2 (C.D. Cal. July 9, 2009) (citing *United States v. Monsanto*, 491 U.S. 600, 615 (1989)); *see United States v. Thier*, 801 F.2d 1463, 1468, 1474 (5th Cir. 1986) *overruled on other grounds by United States v. Holy Land Found. for Relief & Dev.*, 493 F.3d 469 (5th Cir. 2007) (same conclusion as to funds frozen under criminal forfeiture statute).

Although the Fifth Circuit has permitted funds to be unfrozen to pay attorneys' fees, **the unfreezing of funds must be necessary to secure the services of attorneys**. *See FSLIC v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) ("[T]he burden . . . [is] on the defendant to satisfy the court that he can secure the services of an attorney only if assets subject to the freeze order are released."). Consistent with that restriction, courts within the Fifth Circuit require defendants to make that threshold showing of an inability to obtain legal representation before considering the release of frozen funds to pay attorneys' fees. *See, e.g.*, *CFTC v. TMTE, Inc.*, No. 3:20-CV-2910-L, 2022 WL 1321572, at *2 (N.D. Tex. May 3, 2022); *FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 WL 4182726, at *3 (E.D. Tex. Aug. 8, 2016); *FTC v. Abili-Staff, Ltd.*, No. SA-10-CA-88-OG, 2010 WL 11598071, at *1 (W.D. Tex. May 26, 2010). This same requirement from *Dixon* has also been applied in criminal matters. *See United States v. Sharma*, No. H-09-1926, 2010 WL 11454455, at *2 (S.D. Tex. Jan. 7, 2010); *see also United States v. Balotin*, No. 3:19-CR-191-MMH-JBT, 2023 WL 2264181, at *20 (M.D. Fla. Feb. 28, 2023) ("[T]he [criminal] defendant must make the threshold showing that without the release of the assets, he cannot hire counsel of his choice.") (citing *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001)).

Leigh Bridges cannot meet that threshold requirement because she already has an attorney who is representing her in this litigation and with respect to the ongoing criminal investigation. Because she is adequately represented in both matters currently, she is not harmed

if her retirement account remains frozen. To be sure, her attorney may suffer harm if he ultimately remains unpaid because he cannot collect his unpaid bills from Ms. Bridges' future earnings or some other source. But that is not the harm addressed by *Dixon*.

The NCUAB's argument is not intended to be an attack on Leigh Bridges' attorney. But the services were and are being provided by an attorney who presumably knew when retained that his client misappropriated funds and who learned that her assets were subject to an asset freeze when she was served with the TRO. Like in contingency-fee cases, where attorneys bear a "risk of loss or nonpayment assumed by carrying through with the case[,]" *Jenkins v. Trustmark Nat. Bank*, 300 F.R.D. 291, 309 (S.D. Miss. 2014) (Jordan, J.), attorneys representing a client whose assets are frozen bear a similar risk. *See FTC v. Am. Tax Serv. LLC*, No. 2:25-CV-01894-GMN-EJY, 2025 WL 3564724, at *2 (D. Nev. Dec. 11, 2025) ("[T]he Court concludes that Defendants' counsel assumed the risk of not getting paid which weighs against modifying the preliminary injunction."); *see also CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 80 (3d Cir. 1993) ("[The defendant's] current attorneys entered their appearance after [defendant's] assets were already frozen and thus should have recognized that there might be some delay in obtaining reimbursement for services rendered.").

The risk of attorneys remaining unpaid is not a risk insured by the NCUAB. *See Dobbins*, 2004 WL 957715, at *2 (citing *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir.1988)) ("The Court has a duty to ensure that Defendants' assets are available to make restitution to the alleged victims."). The NCUAB insures credit unions such as JAFCU, and recoveries in this case will go to JAFCU and/or the National Credit Union Share Insurance Fund. Protection of that interest requires keeping Leigh Bridges' retirement account frozen.

Leigh Bridges would still be unable to show why she should be permitted to access frozen funds even assuming those funds were required to retain new counsel in this litigation. A party seeking to unfreeze funds must "show that he cannot pay [his attorneys] from new or exempt assets[.]" *Dixon*, 835 F.2d at 565. The record is unclear as to what other resources she might have to pay her attorney's fees. For instance, she has not explained why she cannot borrow money from relatives or use existing lines of credit (such as credit cards). Absent that information, the Court cannot determine whether Leigh Bridges actually needs to access frozen funds, assuming that such analysis is necessary. *See Dobbins*, 2004 WL 957715, at *2 ("The Court cannot . . . tell what other resources Defendants have for the payment of attorney fees."); *see also Am. Metals Exch.*, 991 F.2d at 79-80 (denying payment of attorneys' fees from frozen funds because the defendant was "slow to produce his financial records to the court.").

Leigh Bridges would also be required to show "the reasonableness of the amount of [her] request." *Dobbins*, 2004 WL 957715, at *2. Reasonableness depends on the hourly rates charged and the hours billed. *See Abili-Staff*, 2010 WL 11598071, at *2 ("[T]he Court finds that the hourly rates charged and the hours billed are unreasonable and unnecessary (although the Court realizes that this case has already become motion-and-response intensive)."); *see also Am. Tax Serv.*, 2025 WL 3564724, at *4 ("The Court cannot ascertain the reasonableness of Defendants' attorneys' fees and costs request without more information such as an itemization of the costs incurred, hours worked, and rates charged.").

"Without itemization and supportive evidence, the Court should deny [a] request" for attorneys' fees from frozen funds. *SEC v. Heartland Grp. Ventures, LLC*, No. 4:21-CV-01310-O, 2022 WL 1527542, at *5 (N.D. Tex. Mar. 18, 2022), *report and recommendation adopted*, No. 4:21-CV-01310-O, 2022 WL 1523471 (N.D. Tex. May 13, 2022). All that is known

currently is that Leigh Bridges wants to pay her attorney $250,000. *See* ECF No. 35-1, Ex. A. Without more information about how that amount was determined, the request would have to be denied, even assuming that the request were otherwise appropriate.

**2. Living expenses and real-property upkeep.**

According to Leigh Bridges' motion, she "simply does not have the means to pay her basic living expenses (including the obligations imposed by the Court) . . . ." D's mem. 5. Similar to the analysis for unfreezing attorneys' fees, a court "may consider evidence of the moving party's overall assets or income and will deny such requests where parties are found to have other sources of income or were requesting funds for luxuries, not necessities." *Heartland Grp. Ventures*, 2022 WL 1527542, at *5 (cleaned up). Courts are reluctant to unfreeze funds if "defendants have made little effort to obtain employment." *Abili-Staff*, 2010 WL 11598071, at *1. Leigh Bridges' declaration states that "[a]lthough I have been seeking other employment, I have not yet secured another full-time job." Bridges decl. ¶ 4. That vague statement is insufficient to show that she has been using adequate effort to obtain employment.

Moreover, as discussed above, Leigh Bridges has not sufficiently explained why she cannot obtain funds to pay for living expenses from other sources. There is also the appearance that she is spending lavishly given that she used at least $17,714.95 of gift cards obtained from American Express points, and quite possibly more, in a span of less than twelve weeks. ECF No. 54, P.'s mem. 6. However, the Court cannot know what particular living expenses the requested funds are for because Leigh Bridges says nothing at all about that in her motion.

Although Leigh Bridges has not been forthcoming with the Court about her expenses, she does imply that she has no income. D.'s mem. 3-4. She must therefore be paying her living

expenses with frozen funds and property. This is a concern, and is addressed in the NCUAB's motion to clarify, modify, and enforce the preliminary injunctions. *See* ECF No. 54.

The NCUAB is also in the dark about what real-property expenses are being paid, as explained in the NCUAB's memorandum in support of its motion to trustee real property. *See* ECF No. 34, P.'s mem. 8. Like with the living expenses, the NCUAB believes those expenses are being paid for using frozen funds. The Bridges were permitted to use frozen funds to maintain their property, ECF No. 7, TRO ¶ 10, but the fact that frozen funds are already being used shows that access to the retirement accounts is not necessary to pay those expenses. *See IAB Mktg. Assocs.*, 972 F. Supp. 2d at 1314 (rejecting defendant's "request [for] money for items such as insurance which the Receiver is already required to pay"). Accordingly, Leigh Bridges will not be harmed if she cannot access her retirement account to pay those expenses.

***B. The NCUAB, which protects a public interest, will suffer significant harm if Leigh Bridges' retirement account is unfrozen.***

Even if Leigh Bridges could show harm, her "interest in having access to funds needed to pay ordinary and necessary living expenses . . . must be balanced against the government's interest in preventing the depletion of potentially [recoverable] assets." *Dobbins*, 2004 WL 957715, at *3; *see Am. Tax Serv.*, 2025 WL 3564724, at *2; *Heartland Grp. Ventures*, 2022 WL 1527542, at *6. The NCUAB will be harmed if Leigh Bridges' retirement account is unfrozen in that the NCUAB's ability to recover on a judgment against her based upon her extensive misappropriation will be greatly compromised.

The NCUAB's interest in freezing assets is greater than an ordinary litigant because it seeks the order to further a public rather than a private interest. *See Zovko*, 2014 WL 12889793, at *5 ("A temporary attachment of [defendants'] property, while small in the context of the fraud, is a proper use of the attachment process because it secures assets which could help . . .

recover some of the losses from the fraud, which affects the public interest in having a secure banking system."); *see also Dixon*, 835 F.2d at 562 ("The general flexibility of equitable powers is enhanced where . . . the public interest is at stake."). Even though a private party seeking equitable relief is often limited to "the freezing of … the property in dispute or its direct, traceable proceeds[,]" *Alguire*, 647 F.3d at 600, because federal financial regulators acting as conservator or receiver are permitted to seek attachments of property under a statute that lessens the standard for harm, the insufficiency of assets to satisfy a potential judgment alone establishes harm for purposes of relief under § 1787(b)(2)(G) and analogous statutes. *See Faulkner*, 991 F.2d at 265 (finding "no error in the district court's application of the preliminary injunction provisions of the FDIA for the purpose of securing a potential damage award" for the FDIC as receiver of a failed bank); *Elio*, 39 F.3d at 1247 ("The record supports . . . that the F.D.I.C. would be harmed . . . specifically, that the F.D.I.C.'s ability to fulfill its statutory objective of collecting on the assets of the failed banks would be impaired."); *Cruce*, 972 F.2d at 1200 ("[T]he record . . . suggests that [defendant] does not possess assets of sufficient value—even taking into account the assets he allegedly fraudulently conveyed . . . to extinguish this liability. These facts alone support a showing of injury.").

The NCUAB has been able to show over $51 million dollars in false entries in Leigh Bridges' personal share accounts, which were used to hide her misappropriation of JAFCU funds between 2015 and 2026. *See* ECF No. 12-3, Corp. decl. ¶¶ 7-10; ECF No. 12-7, Meyer decl. ¶ 11; ECF No. 12-8, Stanislao decl. ¶ 13. The NCUAB has not had the opportunity to formally value the Bridges' assets of which it currently has knowledge of, but Leigh Bridges' counsel suggests that it is around $25 million. *See* ECF No. 46-1, Ex. D. Because the sale of those assets will be insufficient to compensate the NCUAB for JAFCU's loss, the unfreezing of a

valuable asset such as a retirement account would be highly detrimental to the NCUAB's recovery efforts. This harm is exacerbated because of the NCUAB's strong likelihood of success on the merits of its claims against Leigh Bridges. *See Am. Tax Serv.*, 2025 WL 3564724, at *2 (observing that a court should be less inclined to modify an asset freeze to permit payment of living expenses or attorneys' fees where the plaintiff has a strong likelihood of success on the merits). As the harm to JAFCU is significant, while the harm to Leigh Bridges is minimal, the balance of the equities heavily favors the NCUAB.

The public interest favors the NCUAB as well. Like other financial regulators, the NCUA's insurance of members' accounts "is fundamental to the financial stability of the entire [financial institution] industry[.]" *Dixon*, 835 F.2d at 563; *see Cruce*, 972 F.2d at 1201 ("Because the RTC's goal in seeking a preliminary injunction is to preserve assets that potentially may provide restitution to the depository insurance fund for monies fraudulently taken by defendants . . . , we cannot conclude that issuance of the injunction is adverse to the public interest."). "[C]ourts . . . will go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved[.]" *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 326 (1999). That principle supports retaining the asset freeze as to Ms. Bridges' retirement account.

## CONCLUSION

For the reasons explained above, the Court should deny Defendant Leigh Bridges' motion to amend or modify the preliminary injunction.

Respectfully submitted,

*/s/ Alysson Mills*

Alysson Mills, Mississippi Bar No. 102861

650 Poydras Street Suite 1525
New Orleans, Louisiana 70130
t/f: 504-586-5253
alysson@alyssonmills.com

*Counsel for Plaintiff*
NATIONAL CREDIT UNION ADMINISTRATION BOARD,
acting in its capacity as conservator of JACKSON AREA FEDERAL CREDIT UNION

CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.

*/s/ Alysson Mills*

Alysson Mills